24-2643

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

———— ◆◆ ————

X Corp., a Nevada corporation,

*Plaintiff-Appellant,*

—v.—

Center for Countering Digital Hate, Inc., a Washington, D.C. non-profit corporation; Center for Countering Digital Hate Ltd., Center for Countering Digital Hate Ltd.; Stichting European Climate Foundation,

*Defendants-Appellees.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

**BRIEF FOR DEFENDANTS-APPELLEES
CENTER FOR COUNTERING DIGITAL HATE, INC.,
A WASHINGTON, D.C. NON-PROFIT CORPORATION AND
CENTER FOR COUNTERING DIGITAL HATE LTD.**

Roberta Kaplan
D. Brandon Trice
Kaplan Martin LLP
156 West 56th Street, Suite 207
New York, New York 10119
(212) 316-9500

*Attorneys for Defendants-Appellees
Center for Countering Digital
Hate, Inc., a Washington, D.C.
Non-Profit Corporation and
Center for Countering Digital
Hate Ltd.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Center for Countering Digital Hate, Inc. ("CCDH US") hereby discloses: (1) CCDH US does not have a parent corporation; and (2) CCDH US does not have stock, and therefore, no publicly held corporation owns 10% or more of CCDH US stock. Defendant-Appellee Center for Countering Digital Hate Ltd. ("CCDH UK") hereby discloses: (1) CCDH UK does not have a parent corporation; and (2) CCDH UK does not have stock, and therefore, no publicly held corporation owns 10% or more of CCDH UK stock.

Dated: New York, New York
　　　 September 20, 2024

Respectfully submitted,

 /s/ Roberta A. Kaplan
Roberta A. Kaplan
D. Brandon Trice
KAPLAN MARTIN LLP
156 West 56th Street, Suite 207
New York, New York 10119
(212) 316-9500

*Attorneys for Defendants-Appellees Center for Countering Digital Hate, Inc., a Washington, D.C. Non-Profit Corporation and Center for Countering Digital Hate Ltd.*

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 6

COUNTERSTATEMENT OF THE ISSUES ...................................................... 6

COUNTERSTATEMENT OF THE CASE ........................................................ 8

    I.      Factual background ..................................................................... 8

    II.     Procedural background ................................................................ 12

STANDARD OF REVIEW ........................................................................ 14

SUMMARY OF ARGUMENT .................................................................... 14

ARGUMENT ...................................................................................... 17

    I.      X Corp.'s state law claims are subject to California's
          Anti-SLAPP Statute .................................................................. 17

    II.     X Corp. cannot recover for lost advertising revenue
          under the First Amendment ......................................................... 21

    III.    X Corp. fails to state the elements of its claims ............................... 27

          A.     Breach of contract .............................................................. 27

                    *i.*    *Damages* ...................................................... 27

                    *ii.*   *Breach* ......................................................... 33

          B.     CFAA ............................................................................. 39

    *i.*  *Damages* ...........................................................39

    *ii.*  *Access "without authorization"* ......................43

  C.  Tort claims ...................................................46

    *i.*  *Causation* ......................................................47

    *ii.*  *Knowledge* ...................................................50

 IV.  The District Court properly exercised its discretion to deny amendment .................................................51

CONCLUSION ...............................................................55

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*A.H.D.C. v. City of Fresno*,
  2000 WL 35810722 (E.D. Cal. Aug. 31, 2000)....................................35

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ...............................................................41

*Am. Atl. Ins. Corp. v. Super. Ct. of L.A. Cnty.*,
  37 Cal. Rptr. 3d 918 (2006) .................................................................33

*Andrews v. Sirius XM Radio Inc.*,
  932 F.3d 1253 (9th Cir. 2019).............................................................39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................50

*Atel Fin. Corp. v. Quaker Coal Co.*,
  321 F.3d 924 (9th Cir. 2003) ...............................................................33

*Barnett v. Sea Land Services*
  875 F.2d 741 (9th Cir. 1989) ...............................................................31

*Blatty v. New York Times Co.*,
  42 Cal. 3d 1033 (1986) .........................................................................35

*Blue v. Office of Inspector General*,
  23 Cal. App. 5th 138 (2018) ................................................................18

*Brown Jordan Int'l, Inc. v. Carmicle*,
  846 F.3d 1167 (11th Cir. 2017) ..........................................................41

*Canatella v. City & Cnty. of San Francisco*,
  74 F.3d 1245 (9th Cir. 1996) ...............................................................54

*Cariveau v. Halferty*,
  83 Cal. App. 4th 126 (2000) .......................................................... 37, 38

*Carrigan v. California State Legislature*,
263 F.2d 560 (9th Cir. 1959)......................................................................30

*Club Members for an Honest Election v. Sierra Club*,
45 Cal. 4th 309 (2008) ..............................................................................17

*Coffee v. Google, LLC*,
2021 WL 493387 (N.D. Cal. Feb. 10, 2021) ...........................................11

*Cohen v. Cowles Media Co.*,
445 N.W.2d 248 (Minn. Ct. App. 1989) ..................................................24

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991)............................................................................ 22, 23

*Compuware Corp. v. Moody's Investors Servs., Inc.*,
499 F.3d 520 (6th Cir. 2007) ................................................. 23, 24, 25, 26

*Cross v. Cooper*,
197 Cal. App. 4th 357 (2011) ..................................................................17

*Erlich v. Menezes*,
21 Cal. 4th 543 (1999) ..............................................................................27

*Family Home and Finance Center, Inc. v. Federal Home Loan Mortg. Corp.*,
525 F.3d 822 (9th Cir. 2008) ....................................................................47

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ............................................................ 41, 43

*In re Finjan Holds., Inc.*,
58 F.4th 1048 (9th Cir. 2023) ....................................................................8

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978)..................................................................................35

*Food Lion. v. Bellotti*,
194 F.3d 505 (4th Cir. 1999) .............................................................. 22, 26

*Frangipani v. Boecker*,
  64 Cal. App. 4th 860 (1998) ...................................................................28

*Herring Networks, Inc. v. Maddow*,
  8 F.4th 1148 (9th Cir. 2021) ..................................................................17

*hiQ Labs, Inc. v. LinkedIn Corp.*
  31 F.4th 1180 (9th Cir. 2022) ..................................................... *passim*

*Hustler Magazine v. Falwell*,
  485 U.S. 46 (1988) ......................................................................... 19, 21

*Iloh v. Regents of Univ. of Cal.*,
  94 Cal. App. 5th 947 (2023) ...................................................................18

*Integrated Healthcare Holdings, Inc. v. Fitzgibbons*,
  140 Cal. App. 4th 515 (Cal. Ct. App. 2006) ..........................................35

*Jordan-Benel v. Universal City Studios, Inc.*,
  859 F.3d 1184 (9th Cir. 2017) ...............................................................20

*King v. Facebook, Inc.*,
  571 F. Supp. 3d 776 (N.D. Cal. 2021) ...................................................28

*Leadsinger, Inc. v. BMG Music Pub.*,
  512 F.3d 522 (9th Cir. 2008) ........................................................ 14, 51

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
  34 Cal. 4th 960 (2004) ................................................................. 27, 29

*Lucky Leather, Inc. v. Mitsui Sumitomo Ins. Grp.*,
  2013 WL 12139116 (C.D. Cal. Feb. 26, 2013) ......................................11

*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009) ...............................................................44

*Makaeff v. Trump University, LLC*,
  715 F.3d 254 (9th Cir. 2013) .................................................................14

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
  605 F. Supp. 3d 1218 (N.D. Cal. 2022) ................................................................36

*Navellier v. Sletten*,
  29 Cal. 4th 82 (2002) ...........................................................20

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ...........................................................20

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ...........................................................37

*Park v. Bd. of Trs. of the Cal. State Univ.*,
  2 Cal. 5th 1057 (2017) ...........................................................19

*Planned Parenthood Federation of Am., Inc. v. Ctr. for Medical Progress*,
  402 F. Supp. 3d 615 (N.D. Cal. 2019) ....................................... 21, 22

*Planned Parenthood Federation of Am., Inc. v. Newman*,
  51 F.4th 1125 (9th Cir. 2022) ....................................... 20, 21, 22, 23

*Quelimane Co. v. Stewart Title Guar. Co.*,
  19 Cal. 4th 26 (1998) ...........................................................47

*Russomanno v. Fox Children's Network*,
  2004 WL 2137405 (Cal. Ct. App. Sept. 24, 2004) ...........................................................47

*Sandquist v. Lebo Automotive, Inc.*,
  1 Cal. 5th 233 (2016) ...........................................................35

*Sandvig v. Sessions*,
  315 F. Supp. 3d 1 (D.D.C. 2018) ...........................................................35

*Shamblin v. Berge*,
  166 Cal. App. 3d 118 (1985) ...........................................................46

*Taus v. Loftus*,
  40 Cal. 4th 683 (2007) ...........................................................18

*Tri-Continent Int'l Corp. v. Paris Sav. & Loan Ass'n*,
 12 Cal. App. 4th 1354 (1993) ...............................................................49

*United States v. Nosal*,
 844 F.3d 1024 (9th Cir. 2016) ............................................................45

*United States v. Janosko*,
 642 F.3d 40 (1st Cir. 2011) ................................................................41

*Van Buren v. United States*,
 593 U.S. 374 (2021) ............................................................... 39, 40, 41

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*,
 774 F.3d 1065 (6th Cir. 2014) ............................................................41

**Statutes and Rules**

18 U.S.C. § 1030 .............................................................................. 38, 39

Cal. Civ. Code § 1667(2) .........................................................................36

Cal. Civ. Proc. Code § 425.16 ........................................................... 13, 17

Fed. R. Civ. P. 9(g) ........................................................................... 30, 31

Fed. R. Civ. P. 15 ....................................................................................12

**Treatises**

Restatement (2d) Torts § 766................................................................ 47, 49

1 Witkin, Summary of Cal. Law—Contracts § 780 (11th ed. 2023).......................35

**Other Authorities**

@X, X (Nov. 30, 2023),
 https://x.com/elonmusk/status/1730340274289697171 ......................................37

Steve Benen, *In New Suit, Musk's X Accuses Advertisers of Boycotting Platform After Twitter Takeover*,
 MSNBC (Aug. 7, 2024), https://www.msnbc.com/rachel-maddow-

show/maddowblog/new-suit-musks-x-accuses-advertisers-boycotting-platform-twitter-takeo-rcna165550 ...................................................................2

Center for Countering Digital Hate, *Musk Misleading Election Claims Viewed 1.2BN Times on X – With No Fact Checks*
(Aug. 8, 2024), https://counterhate.com/research/musk-misleading-election-claims-viewed-1-2bn-times-on-x-with-no-fact-checks/ .......................9

Center for Countering Digital Hate, *Social Media's Role in the UK Riots*
(Aug. 2024), https://counterhate.com/wp-content/uploads/2024/08/240819-Convening-Policy-Paper-FOR-DESIGN-WEBSITE.pdf................................9

Kate Conger & Tiffany Hsu, *Advertising Coalition Shuts Down After X, Owned by Elon Musk, Sues*, N.Y. Times (Aug. 8, 2024),
https://www.nytimes.com/2024/08/08/technology/elon-musk-x-advertisers-boycott.html ............................................................................................54

Hibaq Farah, *What's Happening in Britain is Shocking. But It's Not Surprising*, N.Y. Times (Aug. 12, 2024), https://www.nytimes.com/2024/08/12/opinion/uk-riots-far-right.html.....................................................................................2

David Ingram, *Elon Musk's misleading election claims have accrued 1.2 billion views on X, new analysis says*,
NBC News (Aug. 8, 2024), https://www.nbcnews.com/tech/misinformation/elon-musk-misleading-election-claims-x-views-report-rcna165599....................2

Mike Isaac & Lauren Hirsch, *With Deal for Twitter, Musk Lands a Prize and Pledges Fewer Limits*,
N.Y. Times (Apr. 25, 2022), https://nyti.ms/3W92uiU.......................................30

Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary
(Last visited September 20, 2024) ..................................................................48

Elon Musk, X (July 8, 2023, 8:26 a.m.),
https://twitter.com/elonmusk/status/1681279195253551104..............................10

Elon Musk, X (July 18, 2023, 8:30 a.m.),
https://twitter.com/elonmusk/status/1681280344870342657..............................10

Matt Novak, *The 140 Funniest Tweets of All Time*,
  Gizmodo (Nov. 18, 2022), https://gizmodo.com/the-140-funniest-tweets-of-all-time-elon-musk-twitter-1849800017 ....................................................34

Tom Phillips, *X goes offline in Brazil after Elon Musk's refusal to comply with local laws*,
  The Guardian (Aug. 31, 2024), https://www.theguardian.com/technology/article/2024/aug/31/x-offline-brazil-elon-musk ...............................................2

Jon-Michael Poff, et al., *In Loving Memory of Twitter (2006-2022). Here are the 100 Finniest Tweets Ever Published*, BuzzFeed (Nov. 11, 2022)
  https://buzzfeed.com/jonmichaelpoff/funniest-tweets-all-time ..........................34

## INTRODUCTION

The rise of hate speech and misinformation in public discourse, especially on the Internet, is one of the greatest threats to democracy today. Defendants-Appellees Center for Countering Digital Hate, Inc. ("CCDH US") and Center for Countering Digital Hate Ltd. UK ("CCDH UK," collectively, "CCDH") are non-profit organizations that were formed to combat this threat after their founder's colleague was murdered by a white supremacist who was radicalized online. CCDH advances its mission through the research and publication of reports and articles about whether companies are meeting their responsibility to stop the spread of false and dangerous ideas. CCDH's speech is relied on by consumers, advertisers, and the broader public to help them decide what social media platforms to use, how to advertise, and where to spend their time and money.

Plaintiff-Appellant X Corp. is a multibillion-dollar private corporation that is owned by Elon Musk, the world's richest man. X Corp. runs the popular social media platform "X," previously known as "Twitter." Since its acquisition by Mr. Musk, X Corp. has increasingly failed to regulate hate speech and misinformation, becoming a megaphone for false and dangerous statements that

have real-world consequences, such as the recent anti-Muslim riots in the United Kingdom,[1] and ongoing distrust in American elections.[2]

X Corp.'s actions have been met with widespread reprobation. For example, Brazil recently suspended X after it refused to purge "anti-democratic, far-right voices in the wake of the January 2023 uprising in the capital, Brasília."[3] Media Matters, a non-profit media watchdog, has published reports showing how X allows advertisements to appear next to posts praising Adolf Hitler and neo-Nazis. ER-50 n.11. And a coalition of some of the largest advertisers, the Global Alliance for Responsible Media, published content moderation standards that led some of its members to cease affiliation with X.[4]

---

[1] Hibaq Farah, *What's Happening in Britain is Shocking. But It's Not Surprising*, N.Y. Times (Aug. 12, 2024), https://www.nytimes.com/2024/08/12/opinion/uk-riots-far-right.html.

[2] David Ingram, *Elon Musk's misleading election claims have accrued 1.2 billion views on X, new analysis says*, NBC News (Aug. 8, 2024), https://www.nbcnews.com/tech/misinformation/elon-musk-misleading-election-claims-x-views-report-rcna165599.

[3] Tom Phillips, *X goes offline in Brazil after Elon Musk's refusal to comply with local laws*, The Guardian (Aug. 31, 2024), https://www.theguardian.com/technology/article/2024/aug/31/x-offline-brazil-elon-musk.

[4] Steve Benen, *In New Suit, Musk's X Accuses Advertisers of Boycotting Platform After Twitter Takeover*, MSNBC (Aug. 7, 2024), https://www.msnbc.com/rachel-maddow-show/maddowblog/new-suit-musks-x-accuses-advertisers-boycotting-platform-twitter-takeo-rcna165550.

Although X Corp. has tried to convince the public that it is taking the proliferation of hate speech and misinformation seriously, those efforts have failed. Having lost in the marketplace of ideas, X Corp. has resorted to suing its critics to try to silence them. This case is a prime example of that strategy. CCDH published three reports that highlighted the presence of hate speech and disinformation on X, as well as X's reinstatement of banned accounts that were pushing dangerous conspiracy theories. Those reports, according to X Corp., caused advertisers to pause spending, thereby resulting in the loss of "tens of millions of dollars" in revenue. ER-121.[5] Unable to persuade advertisers that Mr. Musk is right and CCDH is wrong, X Corp. filed this action.

The gravamen of X Corp.'s complaint is that CCDH's speech has undermined the willingness of others to spend money on and associate with X, and that it should be permitted to recover its lost revenue as a result. But under the First Amendment, X Corp. cannot recover for that alleged harm because CCDH's statements were not false, let alone made with actual malice. Recognizing as much, X Corp. attempted to reframe its case as not about the publication of CCDH's reports, but instead about how CCDH obtained the data underlying those reports. First, X Corp. alleges that

---

[5] Citations to "Br." are to Appellant's brief, to "ER-" are to the Excerpts of Record filed by Appellant; and to "CCDH-SER-" are to the Supplemental Excerpts of Record filed by CCDH.

CCDH "scraped" user posts from X, in violation of X's Terms of Use ("TOU").[6] Second, X Corp. claims that CCDH improperly accessed X data on non-party Brandwatch's servers, using login credentials provided by Defendant-Appellee Stichting European Climate Foundation ("ECF"), and in so doing caused Brandwatch to breach its contractual obligations to X Corp.

As Judge Breyer recognized in dismissing X Corp.'s complaint, this sleight of hand doesn't work. Fundamentally, "this case is about punishing the Defendants for their speech." ER-34. That means that X Corp. cannot recover alleged lost revenue resulting from the reactions of third parties because that would violate the First Amendment. It also means that X Corp.'s state law claims are subject to California's anti-SLAPP statute, which allows CCDH to recover its fees to discourage these sorts of assaults on free speech.

Beyond these threshold issues, X Corp.'s claims fail in their entirety because it has not properly alleged the requisite elements. As the district court held, X Corp. has not alleged breach of contract (Count I) because CCDH could not have foreseen when it entered into the TOU in 2019 that it could be on the hook for millions of dollars in lost advertising revenue. In 2019, CCDH had no reason to believe that X

---

[6] While X Corp. pleads its "scraping" allegations and resulting breach of contract claim against CCDH US, and CCDH US and CCDH UK are distinct entities, for the sake of convenience we refer to them collectively as "CCDH" unless it is necessary to distinguish them.

would reverse its policy and go from suspending users who posted dangerous content to welcoming them back into the fold and amplifying their voices, let alone that CCDH would then collect user data to publish reports that would lead advertisers to disassociate from the platform. In any event, CCDH did not breach the TOU, which expressly permit users to search posts using X's interface, as CCDH did here. And if the TOU did cover CCDH's small-scale data collection for non-commercial purposes, they would violate California public policy.

X Corp. also fails to plausibly allege a violation of the Computer Fraud and Abuse Act ("CFAA") (Count II) based on CCDH's access of data on Brandwatch's servers. As the district court held, there was no technological loss in the form of damage to or corruption of X Corp.'s computer systems because they were not affected at all. Moreover, X Corp. cannot show "unauthorized access" because ECF was contractually permitted to provide CCDH with access to Brandwatch's servers. Even if it were not, CCDH's use of ECF's account, with no contrary directive from X Corp., would not rise to the level of "unauthorized access" under what is essentially an anti-hacking statute.

With respect to X Corp.'s claims for intentional interference with contractual relations (Count III) and inducement of breach of contract (Count IV), the district court correctly held that CCDH's access of Brandwatch's servers did not cause or induce Brandwatch to breach its contractual obligations to X Corp. to prevent access

to outsiders and keep X data secure.  Rather, it was Brandwatch's alleged lack of restrictions on the database that *led to* CCDH obtaining access.  X Corp. has also failed to plausibly allege CCDH "knew" anything about Brandwatch's contracts or its proscriptions, or establish that CCDH's access resulted in a breach of Brandwatch's obligations to X Corp.

Finally, the district court correctly refused to allow X Corp. to amend its complaint a second time to add new "investigation" damages on its breach of contract claim.  X Corp.'s proposed amendment (articulated vaguely at oral argument) was futile and made for a dilatory purpose, given that its goal in this litigation is to impose crushing litigation costs on speakers like CCDH through SLAPP litigation, and it could have made these allegations much earlier.

Judge Breyer's careful and considered decision should be affirmed.

## JURISDICTIONAL STATEMENT

X Corp.'s statement is complete and correct.

## COUNTERSTATEMENT OF THE ISSUES

1.  Whether X Corp.'s claims are subject to California's anti-SLAPP statute because they arise from acts in furtherance of CCDH's right of free speech in connection with a public issue.

2.   Whether X Corp.'s claims are subject to dismissal under the First Amendment insofar as those claims involve "publication damages" that arise from the actions of third parties in response to CCDH's speech.

3.   Whether X Corp. failed to plausibly allege breach of contract because its damages were not reasonably foreseeable to CCDH when CCDH entered into the TOU, because CCDH did not breach the TOU, and because the TOU would violate public policy if they proscribed CCDH's actions.

4.   Whether X Corp. failed to plausibly allege a violation of the CFAA because CCDH's access did not cause any technological damage to X Corp., and CCDH did not access any computer "without authorization."

5.   Whether X Corp. failed to plausibly allege intentional interference with contractual relations or inducement of breach of contract because CCDH did not cause or induce Brandwatch to breach its contracts with X Corp., CCDH did not know about any contracts between X Corp. and Brandwatch or their terms, and there was no underlying breach.

6.   Whether the district court properly exercised its broad discretion in denying leave to amend when X Corp. had already amended its complaint once, its proposed amendment would be futile, and additional litigation costs would be particularly burdensome on CCDH and inappropriate given the First Amendment concerns at issue and X Corp.'s awareness of the relevant facts beforehand.

## COUNTERSTATEMENT OF THE CASE[7]

### I.    FACTUAL BACKGROUND

CCDH US and CCDH UK are affiliated non-profit organizations committed to protecting human rights and civil liberties online.  They do so primarily by conducting research and publishing reports about "major social media platforms" on matters of public concern, including "hate speech," "COVID-19 vaccinations, reproductive healthcare, and climate change."  ER-99-102.  CCDH's publications have been covered in the media, ER-109, and have elicited responses from social media companies like X Corp., some of which have critiqued CCDH's methodology and tried to persuade users, advertisers, and the broader public that CCDH's findings should be disregarded, ER-100-01.

In 2019, CCDH created an account on X.  ER-97.  At that time, the TOU provided that users could "access or search or attempt to access or search the Services … through our currently available, published interfaces that are provided by Twitter," but "scraping the Services without the prior consent of Twitter is expressly prohibited."  CCDH-SER-73-74.  Although the TOU did not define

---

[7] CCDH accepts the factual allegations in the Amended Complaint as true for purposes of its motion, but not to the extent that they are contradicted by more specific allegations, documents incorporated by reference, or matters of public record subject to judicial notice. *See, e.g.*, *In re Finjan Holds., Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023).

"scraping," that term is commonly understood to involve "extracting massive amounts of data from a website through automated means." Br. 5 (citing ER-37).

In October 2022, Mr. Musk took control of X Corp. for the ostensible purpose of "ensur[ing] freedom of speech." ER-35. Since then, the presence of hate speech and disinformation on X has grown exponentially. To give two examples, CCDH recently issued reports on X's role in fomenting the anti-Muslim, anti-immigrant riots in the U.K.,[8] and on Mr. Musk's personal role in spreading harmful election disinformation on the platform.[9]

At issue in this case are three publications that CCDH made between 2021 and 2023. The first, entitled "The Disinformation Dozen," and published in March 2021, focused on twelve high-profile social media users who opposed COVID vaccinations and were responsible for most of the anti-vaccination content on X. ER-107. The second, "Fact check: Musk's claim about a fall in hate speech doesn't stand [up] to scrutiny," was published in November 2022, shortly after Mr. Musk took control of X Corp., and disputed his claim that hate speech on X had declined.

---

[8] Center for Countering Digital Hate, *Social Media's Role in the UK Riots* (Aug. 2024), https://counterhate.com/wp-content/uploads/2024/08/240819-Convening-Policy-Paper-FOR-DESIGN-WEBSITE.pdf.

[9] Center for Countering Digital Hate, *Musk Misleading Election Claims Viewed 1.2BN Times on X – With No Fact Checks* (Aug. 8, 2024), https://counterhate.com/research/musk-misleading-election-claims-viewed-1-2bn-times-on-x-with-no-fact-checks/.

ER-107-08.  The third, "Toxic Twitter," was published in February 2023 and found that X was receiving millions of dollars in advertising revenue from ten previously banned accounts that Mr. Musk had reinstated.  ER-108-09.

X Corp. acknowledges that CCDH and its reports have faced criticism.  *E.g.*, ER-101.  Indeed, prior to filing this lawsuit, Mr. Musk posted to his nearly 200 million followers that CCDH is "[t]ruly evil" and its CEO is a "rat."[10]  But X Corp. does not allege that CCDH's statements were false or made with malice, because it cannot.  Instead, X Corp. purports to take issue with how CCDH went about obtaining the data underlying the reports in two ways.

First, as to the "Toxic Twitter" report alone, X Corp. alleges that CCDH violated the TOU's ban on "scraping" by searching for posts from the ten X users referenced in that report using "SNScrape," a tool that automates utilization of the X search function.  X Corp. is able to allege that CCDH used that tool because CCDH openly acknowledged in its report that "researchers used the social media web-scraping tool SNScrape, which utilizes Twitter's search function to enable data collection."  CCDH-SER-105.[11]  That public admission was hardly surprising, given

---

[10] Elon Musk, X (July 8, 2023, 8:26 a.m.), https://twitter.com/elonmusk/status/1681279195253551104; Elon Musk, X (July 18, 2023, 8:30 a.m.), https://twitter.com/elonmusk/status/1681280344870342657.

[11] The report is incorporated by reference in the Amended Complaint.  ER-108.

that X's TOU direct users to utilize the search function if they want to access and search user posts.

Second, as to all three reports, X Corp. claims that CCDH accessed X data hosted on the servers of non-party Brandwatch, a brand monitoring service, using login credentials provided to it by ECF, a Brandwatch subscriber. ER-105-07. According to X Corp., this access was improper because X Corp.'s Master License Agreement ("MLA") with Brandwatch provided that Brandwatch would "not allow others to" access "Licensed Materials," namely, the data it had received from X hosted on its servers, and it would "keep 'Twitter Content' secure." ER-102-03. While ECF was authorized to access the database under its own agreement with Brandwatch, that agreement, according to X Corp., prohibited ECF from making the service "available to anybody other than [ECF's] Users," from providing data "to any non-User for any reason other than Customer's (or User's) business purpose," and from sharing its user ID and password. ER-104-05; see CCDH-SER-111-41.[12] The "Customer" was ECF, and a "User" was "an[y] individual that Customer

---

[12] In its complaint, X Corp. explicitly incorporated the Brandwatch terms dated April 21, 2023. ER-104-05. However, those terms were not in effect during the relevant periods when CCDH published its reports—March 2021, November 2022, and February 2023. The applicable Brandwatch terms, CCDH-SER-111-41, are incorporated by reference and subject to judicial notice, see, e.g., Lucky Leather, Inc. v. Mitsui Sumitomo Ins. Grp., 2013 WL 12139116, at *1 (C.D. Cal. Feb. 26, 2013) (collecting cases); Coffee v. Google, LLC, 2021 WL 493387, at *4 (N.D. Cal. Feb. 10, 2021).

(directly or indirectly) *has authorised* to use the Services." CCDH-SER-112 (emphasis added). X Corp. knows CCDH used Brandwatch data to prepare its reports because, again, CCDH openly acknowledged as much in two of its reports. *See, e.g.*, ER-107-08.[13]

X Corp. does not claim that CCDH was aware of Brandwatch's contract with X Corp. or its terms, which X Corp. alleges CCDH openly and knowingly flouted online. Instead, X Corp. asserts that CCDH must have known, "based on [its] experience," that Brandwatch and X Corp. had contracts, and that the terms of those contracts would prohibit ECF, a Brandwatch subscriber with its own separate contract with Brandwatch, from sharing its credentials with CCDH. ER-116.[14]

## II. PROCEDURAL HISTORY

X Corp. commenced this action against CCDH and various Doe Defendants on July 31, 2023. ER-119. On August 7, it exercised its right under Federal Rule of Civil Procedure 15 to amend the complaint without leave of court, adding ECF. ER-94.

As to CCDH US alone, X Corp. alleges breach of contract. ER-113-14. As to CCDH (and ECF and the Does), it alleges violation of the CFAA, as well as two

---

[13] X Corp. also references an April 27, 2023 agreement between it and Brandwatch that contains similar provisions. ER-103-04, 127-28.

[14] In actuality, contemporaneous emails reflect an understanding that CCDH had received a "Brandwatch account." ER-87.

torts: intentional interference with the X Corp.-Brandwatch contracts, and inducement of Brandwatch's breach. ER-114-18. For damages on its contract and tort claims, X Corp. alleges that CCDH's publications have caused "companies who advertised on X on an ongoing basis" to "pause[] spending" and others who "plann[ed] on running future campaigns" to do the same, resulting in "at least tens of millions of dollars in lost revenue" from advertisers. ER-111-12. For damages for its CFAA and tort claims, X Corp. alleges that CCDH's acquisition of the Brandwatch data underlying its reports caused X Corp. to incur more than $5,000 in costs for internal investigations and attorneys' fees. ER-112.

CCDH moved to dismiss pursuant to Rule 12(b)(6) and to strike pursuant to California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16. The district court heard one-and-a-half hours of oral argument on February 29, 2024. CCDH-SER-2-67. During argument, X Corp. proposed for the first time that it should be allowed to amend its complaint for a second time in connection with the alleged "scraping" of ten user accounts in violation of the TOU so it could add costs from implementing "anti-scraping measures," and "understand[ing] what was done, how it was done, what data was taken, and whether there was any damage." CCDH-SER-10. All of

this was supposedly necessary to ensure the "security of data" and of X's systems. ER-70, 72.[15]

On March 25, 2024, Judge Breyer issued a decision dismissing X Corp.'s complaint under Rule 12(b)(6) denying leave to amend, and striking the complaint under the anti-SLAPP statute. ER-34.

## STANDARD OF REVIEW

This Court reviews the district court's decision to dismiss and to strike *de novo*. *Makaeff v. Trump University, LLC*, 715 F.3d 254, 260 (9th Cir. 2013). The denial of X Corp.'s request for leave to amend is reviewed for abuse of discretion. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

## SUMMARY OF ARGUMENT

1. The decision below correctly held that X Corp.'s state law claims are subject to California's anti-SLAPP statute because they arise from CCDH's protected acts, given that X Corp. predicates its damages on the publication of the CCDH reports, and even if X Corp.'s claims arose solely from CCDH's data collection, that conduct is also protected.

---

[15] X Corp. also claimed that it had spent "over a hundred personnel hours across disciplines … trying to figure out … what data was gained via access to the Brandwatch systems," which as the district court recognized, was "not relevant to the breach of contract claim," ER-69-70, based on alleged "scraping."

2. X Corp.'s claims also must be dismissed to the extent they seek to recover damages for harm to its reputation, including lost advertising revenue. Those damages are "publication damages" which exist because of the publication of CCDH's reports, and X Corp. cannot evade the First Amendment's protections through artful pleading.

3. X Corp.'s contract claim fails because it has not plausibly alleged that CCDH could foresee in 2019, before X Corp. did an about-face on its content moderation policies, that a breach of the TOU's anti-"scraping" provision would result in tens of millions of dollars in lost advertising revenue. X Corp. also fails to plausibly allege a breach of the anti-"scraping" provision, because the TOU in the same sentence permit users to utilize X's interface (as CCDH did here), and they must be strictly construed against X Corp. because they seek to impose a waiver of constitutional rights in a contract of adhesion drafted by X Corp. And even if the TOU do proscribe the small-scale, non-commercial "scraping" in furtherance of free speech at issue here, they violate California public policy.

4. X Corp.'s CFAA claim fails because it has not alleged "technological harm" to its systems or data as a result of CCDH's access of Brandwatch data hosted on Brandwatch servers. Contrary to X Corp.'s contention, that is what is required to plead a CFAA claim under governing precedent. X Corp. also has not shown that CCDH accessed the Brandwatch data "without authorization," because ECF's

15

contract with Brandwatch allowed it to share access with "Users," defined as those it authorized like CCDH. Again, even if it did not, the CFAA does not proscribe access in these circumstances unless it has been revoked "unequivocally."

5. X Corp.'s tort claims fail because it has not alleged that CCDH's access to the Brandwatch data caused or induced Brandwatch to breach its contracts with X Corp. X Corp.'s backwards proposition ignores the contract terms. X Corp. also has not plausibly alleged that CCDH knew about those contracts or their terms— indeed, its allegations as to ECF facilitating Brandwatch account access and CCDH disclosing its use of Brandwatch in its reports suggest the opposite. X Corp. cannot show a breach of the Brandwatch agreements in any event because when ECF authorized CCDH, it became a "User."

6. The district court did not abuse its discretion in rejecting X Corp.'s request to amend its complaint a second time to add damages concerning its "investigation" into CCDH's alleged "scraping." Any such amendment would have been futile because those damages would not have been foreseeable to CCDH in 2019. Moreover, X Corp.'s delay reflected a "dilatory motive," given its objective to punish and chill speech with the threat of overwhelming damages and its obvious ability to have alleged these damages earlier. Further delay and cost would not be appropriate given the risk to the protected speech rights of a not-for-profit.

16

## **ARGUMENT**

## I.     X CORP.'S STATE LAW CLAIMS ARE SUBJECT TO CALIFORNIA'S ANTI-SLAPP STATUTE

The district court correctly held that X Corp.'s state law claims are subject to California's anti-SLAPP statute, which permits a special motion to strike "for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." *Club Members for an Honest Election v. Sierra Club*, 45 Cal. 4th 309, 315 (2008). That statute covers causes of action against a person that (1) "arise[] from" (2) acts "in furtherance of" their right of "free speech" (3) "in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1). If the movant makes a "prima facie showing" that the claim falls within Section 425.16, then the non-movant must show a "reasonable probability" that they will prevail on the merits—here, by plausibly stating a claim under the Rule 12(b)(6) standard for dismissal. *Id.*; *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021); Br. 15. Otherwise, the claim must be dismissed, and the movant awarded their fees and costs. Cal. Civ. Proc. Code § 425.16(c)(1).

X Corp. does not dispute that CCDH satisfies the second and third elements. X Corp. concedes that CCDH was acting in furtherance of its right to free speech when it published the reports, ER-45-46; *see* Cal. Civ. Proc. Code § 425.16(e)(3)-(4), and that CCDH's reporting was about the spread of hate speech and

disinformation on X, which is clearly a matter of "public interest," ER-53-54; *see, e.g.*, *Cross v. Cooper*, 197 Cal. App. 4th 357, 372 (2011).

The only element X Corp. contests is the first: whether its claims "arise from" a protected activity. Br. 12-15. X Corp. concedes that the anti-SLAPP law would apply if its claims arose from CCDH's reporting. It argues, however, that its claims are actually "based on CCDH's unlawful access to and scraping of X's data, not CCDH's *later* decision to publish a report," which it asserts is not protected. Br. 13.

As the district court held, X Corp.'s proposed dichotomy between CCDH's reports and its collection of data for the reports finds no support in the law. ER-45-46. CCDH's data collection is itself protected because it was "part and parcel" of its protected reporting. *Iloh v. Regents of Univ. of Cal.*, 94 Cal. App. 5th 947, 956-57 (2023) (organization's efforts to obtain information for reports on transparency in academic publishing were protected acts as "newsgathering") (collecting cases); *see also Taus v. Loftus*, 40 Cal. 4th 683, 713 (2007) (academics' "investigation" for article "unquestionably" was "conduct in furtherance of their right of free speech").

X Corp. does not address this precedent. *See* Br. 14. Instead, it points to its allegations that CCDH "did not scrape X *to report the news*," but rather with the "goal of damaging X's commercial interests" because CCDH is "an activist organization." Br. 14 (emphasis added). But that conclusory (and absurd) allegation makes no difference. "Newsgathering" is not limited to gathering information for

the "news," whatever that means in our digital society today. And CCDH's motive in gathering information for its reports is irrelevant. *See, e.g. Blue v. Office of Inspector General*, 23 Cal. App. 5th 138, 154 (2018) ("The gathering of information preparatory to publishing a … *scholarly article* qualifies as 'other conduct in furtherance of the exercise of the constitutional right of free speech,'" "*regardless of alleged illegality* in the manner that information was gathered") (emphases added). Indeed, Section 425.16, by its terms, is focused on "act[s]" (not "motives") about "speech" (not just "the news"). The anti-SLAPP statute would provide little more than lip service if its protections could be evaded with allegations of ill will or that the speaker is somehow not a part of "the media." *Cf. Hustler Magazine v. Falwell*, 485 U.S. 46, 73 (1988) ("even when a speaker … is motivated by hatred or ill will his expression [is] protected by the First Amendment").

Regardless, Section 425.16 would still apply even if CCDH's collection of data were not protected, because X Corp.'s claims "arise from" CCDH's publication of the reports, which is indisputably protected. To argue otherwise, X Corp. invokes the principle that an act must "itself [be] the *wrong* complained of, and not just *evidence of liability*." Br. 13 (quoting *Park v. Bd. of Trs. of the Cal. State Univ.*, 2 Cal. 5th 1057, 1060 (2017)). In its view, the "wrong" here was CCDH's gathering of data, and the reports are just "evidence of liability." But in *Park*, the California Supreme Court explained that the "wrong" depends on the "elements of the

challenged claim" and "what actions by the defendant supply those elements and consequently form the basis for liability." 2 Cal. 5th at 1063.

Here, all of X Corp.'s claims require it to show damages, and the complaint is overflowing with allegations about how CCDH harmed X Corp. *by causing it to lose advertiser revenue*. As the district court observed, "[i]n its first breath, the complaint alleges that CCDH cherry-picks data in order to produce reports and articles as part of a 'scare campaign' … to drive advertisers from the X platform." ER-48-49. And it never lets up from there. While X Corp. chides the court for "rewrit[ing] the complaint actually before it," Br. 2, even a cursory review shows that it is seeking to establish the element of damages based upon the reports themselves. Indeed, X Corp. acknowledges (as it must) later in its brief that "X's specific losses flow from CCDH's publication of reports." Br. 18.

It would also be a "logical flaw" and "false dichotomy" to suggest that a cause of action must either arise entirely from protected activity or non-protected activity: "A given action, or cause of action, may indeed target both." *Navellier v. Sletten*, 29 Cal. 4th 82, 92 (2002); *see also Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1192-93 (9th Cir. 2017) (focusing on whether "target" of claim is protected activity). Here, the complaint clearly targets protected conduct.

## II.  X CORP. CANNOT RECOVER FOR LOST ADVERTISING REVENUE UNDER THE FIRST AMENDMENT

Turning to the merits, Judge Breyer correctly held that X Corp. cannot recover for its alleged lost advertising revenue because it failed to allege CCDH's statements were false and made with knowledge of their falsity or with reckless disregard of the truth, as required by the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). That result is based on this Court's decision in *Planned Parenthood Federation of Am., Inc. v. Newman*, 51 F.4th 1125 (9th Cir. 2022), *aff'g Planned Parenthood Federation of Am., Inc. v. Ctr. for Medical Progress*, 402 F. Supp. 3d 615 (N.D. Cal. 2019); ER-63-66.

In *Newman*, Planned Parenthood sued anti-abortion activists who infiltrated and secretly recorded its meetings and then posted the recordings online. Planned Parenthood asserted a variety of claims, including violations of RICO and wiretapping laws, breach of contract, trespass, and fraud. *Newman*, 51 F.4th at 1132. It sought as damages (1) the costs "to investigate the intrusions and to implement access-security measures," and (2) lost revenue resulting from a third party hacking its website, as well as the costs to increase physical security and monitor outside threats, address vandalism to its offices and clinics, and repair the website. *Ctr. for Medical Progress*, 402 F. Supp. 3d at 646.

In the proceedings below, Judge Orrick held that only the first category of damages was recoverable because they were "directly tethered to defendants'

conduct," in contrast to "impermissible defamation-like publication damages that were caused by the actions and reactions of third parties" to the publication of the recordings. *Id.* at 643-45. He reasoned that under *Hustler*, 485 U.S. 46, a party cannot "avoid the higher 'actual malice' standard for proving defamation as to a public figure" by alleging a non-defamation claim—there, by seeking "emotional distress damages under a tort theory." 402 F. Supp. 3d at 642 & n.12. And he found persuasive the Fourth Circuit's decision in *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, which held that under *Hustler*, a grocery chain asserting non-defamation claims in connection with the publication of an undercover recording had to satisfy the requirements of the First Amendment to recover "for items relating to its reputation, such as loss of good will and lost sales," because those were "publication damages" caused by "loss of customer confidence." *Id.* at 641-42 (quoting 194 F.3d 505, 522 (4th Cir. 1999)).

This Court affirmed. According to *Newman*, the dispositive question in determining whether a party can recover damages without showing falsity and actual malice is whether those damages are "caused by the publication"—*i.e.*, whether they are "publication damages." 51 F.4th at 1134. Planned Parenthood's damages for investigating physical intrusions and implementing access-security measures were permissible because it "would have been able to recover the infiltration and security damages even if Appellants had never published videos of their surreptitious

22

recordings." *Id.* But the remaining damages that Judge Orrick excluded required additional steps in the causal chain beyond the alleged tortious or breaching conduct of wrongfully obtaining the recording, namely, the publication of the recordings, and the reactions to that speech by third parties. *Id.* at 1134-35.

In its brief here, X Corp. glides over *Newman*—paying the case less than a few sentences—and argues that *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), permits it to recover lost advertising revenue regardless of the First Amendment. Br. 17-20. But *Cohen* compels the same conclusion as *Newman*. In *Cohen*, the Supreme Court held that a confidential informant did not have to show falsity or malice to recover compensatory damages for the loss of his job after a newspaper promised to keep his identity secret and then disclosed it. 501 U.S. at 666. As Judge Breyer reasoned, however, the Supreme Court expressly qualified the scope of its holding, observing that the plaintiff was not "attempting to use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or defamation claim," as he "*could not sue for defamation* because the information disclosed [his name] was true. *Id.* at 671 (emphasis added); ER-62 ("the speech at issue was undeniably true"). In *Newman*, this Court actually relied on *Cohen* to reject the proposition that "all damages related to *truthful* publications are necessarily barred by the First Amendment." 51 F.4th at 1134-35 (emphasis added).

That distinction between statements that everyone agrees are true—like the recording in *Newman* and the informant's statements in *Cohen*—and statements whose truth is contested makes good sense. If a party brings a non-defamation claim arising out of speech the veracity of which it disputes, and seeks damages to its reputation as a result, there is a much greater risk that the choice of a non-defamation claim is meant to be an end-run around "the strict requirements" for proving defamation and "seeking damages for injury to [its] reputation." *Cohen*, 501 U.S. at 671; *see also Compuware Corp. v. Moody's Investors Services, Inc.*, 499 F.3d 520, 530-34 (6th Cir. 2007). X Corp.'s claims are of the end-run type. X Corp. repeatedly (and wrongly) alleges that CCDH's methodologies are "flawed" and that it is spreading an "incorrect narrative," and it seeks to recover reputational damages as a result. *E.g.*, ER-97-100.

*Cohen* further compels the conclusion that X Corp. seeks "publication damages" because, as Judge Breyer recognized, the "conduct that gave rise to the damages in *Cohen was* the publishers' speech"—they were one and the same. ER-66. The newspaper had specifically agreed in the contract to limit its speech by omitting Cohen's name, and it was the newspaper's breach of that *contractual limitation on its speech* "that breached the publishers' contract with Cohen." *Id.* There was no additional speech by defendant, separate from the breach itself, and so

there was no additional *step* in the causal chain from breach (speech) to damages.[16]  Here, by contrast, X Corp. does not allege that CCDH's publication of the reports breached the TOU.  Rather, it says the breach is the obtainment of data, and it seeks "publication damages" that flow from alleged reputational harm based on CCDH's subsequent publication of its reports—speech that CCDH never agreed to limit by contract or otherwise.

The Sixth Circuit's decision in *Compuware* crystallizes the distinction between contractual and reputational harm in this context.  There, "the whole of th[e] agreement" at issue involved speech:  a rating agency's agreement to rate a company.  499 F.3d at 531.  Displeased with its rating, the company sued the rating agency for, among other things, breach of an implied contractual duty to perform its obligations competently.  *Id.* at 531-32.  Unlike in *Cohen*, however, the rating agency had not contractually limited the content of its speech, and so the speech itself did not breach "an express contractual provision."  *Id.* at 534.  Rather, the alleged injury was "a classic example of reputational or defamation-type harm" flowing from the content of the speech, and *Cohen* "compel[led]" application of the actual-malice standard.  *Id.* at 533.  So, too, here: Because CCDH's publication of its reports did not violate

---

[16] Indeed, this tight causal chain enabled the intermediate state appellate court to conclude that the contract damages were "reasonably foreseeable as a probable consequence" of defendant's breach. *Cohen v. Cowles Media Co.*, 445 N.W.2d 248, 260-61 (Minn. Ct. App. 1989).

any obligation to X Corp., and because X Corp. seeks damages based on reactions to that speech, *Cohen* requires X Corp. to satisfy the First Amendment.

As a last gasp, X Corp. argues that none of this makes a difference because it is the "master of its complaint," and it did "not plead reputational harm or broader loss of goodwill," but rather "*economic* damage" from "losing advertisers." Br. 17 (emphasis added). X Corp.'s theory seems to be that if it can quantify its damages by reference to some calculation—such as how much advertising revenue it stood to collect—then it is not seeking damages resulting from harm to its reputation. But that is foreclosed by *Newman*, where Planned Parenthood obviously could have quantified its lost revenue and other costs but was barred from recovering those damages. *See* ER-68; *see also Food Lion*, 194 F.3d at 511 ("lost profits, lost sales, diminished stock value"). The question is not whether something can be characterized as "economic," but whether the damages are "publication damages" in the sense that they exist *because of* the publication. Indeed, the "sort of injury at issue in this case—the 'defendant made statements that harmed the plaintiff' injury—is a classic example of reputational or defamation-type harm." *Compuware*, 499 F.3d at 533. Unlike the damages permitted in *Newman* that would have arisen whether defendant disclosed the recordings or not, X Corp. cannot claim that it would have lost advertising revenue if CCDH had never published its reports.

## III.   X CORP. FAILS TO STATE THE ELEMENTS OF ITS CLAIMS

In addition to these constitutional barriers, X Corp.'s claims fail as a matter of law because X Corp. did not properly plead the requisite elements.

### A.   Breach of contract

To establish a breach of the TOU by CCDH, X Corp. must allege: (1) the existence of a contract, (2) X Corp.'s performance or excuse for non-performance, (3) CCDH's breach, and (4) resulting damages. *Oasis v. W. Realty*, 51 Cal. 4th 811, 821 (2011) (citation omitted).   As the district court held, X Corp. cannot state a contract claim because it has not alleged foreseeable damages.  Moreover, although the district court did not reach the issue, X Corp. has not plausibly stated a breach of the TOU, and its proposed construction of the TOU would violate public policy.

#### i.    Damages

Under black-letter principles of California common law, the aim of the law of contract, in contrast to the law of torts, is "to enforce the intentions of the parties," not to "fully compensate the victim for all injury suffered." *Erlich v. Menezes*, 21 Cal. 4th 543, 550 (1999).  As a result, contract damages are meant to be "equivalent to the benefit of the plaintiff's contractual bargain," and they cannot "exceed what [the party] would have received if the contract had been fully performed on both sides." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968 (2004).  A party in a contract case, therefore, may only recover: (1) general damages, which "flow directly and necessarily from a breach of contract" and so are

fairly "said to be within the contemplation of the parties," or (2) special damages, which "do not arise directly and inevitably from any similar breach of any similar agreement," but were "actually communicated to or known by the breaching party," or "matters of which the breaching party should have been aware at the time of contract." *Lewis Jorge*, 34 Cal. 4th at 968-69. As the district court held, X Corp. fails to plausibly allege damages in the form of lost advertising revenue arising from the reaction of advertisers to CCDH's reports. Those are indisputably not "general" damages, given that they do not directly and necessarily result from an alleged breach of the TOU's anti-"scraping" provision. ER-56; *see* Br. 22-24, 26.

They are not "special" damages either, because X Corp. has not plausibly alleged that, when CCDH entered into the TOU in 2019, it knew or reasonably should have known that a breach of the anti-"scraping" provision would cause advertisers to pause spending on X Corp. and deprive it of "tens of millions of dollars" in revenue. ER-56-57. To the contrary, the rule in California is that "injury to reputation" is "generally not compensable for a breach of contract" at all. *King v. Facebook, Inc.*, 571 F. Supp. 3d 776, 790 (N.D. Cal. 2021) (collecting cases); *Frangipani v. Boecker*, 64 Cal. App. 4th 860, 864-65 (1998) (similar). The wisdom of that rule could hardly be better demonstrated than by the circumstances here.

When CCDH entered into the TOU, it had zero reason to suspect that X Corp. (then Twitter) would go from banning users who violated its policies against hate

speech and disinformation to declaring a "general amnesty" for those accounts (presumably so it could generate millions of dollars in advertising revenue off of them). ER-58. CCDH also had no reason to foresee that its reporting would allegedly cause advertisers to pause spending with X in response to those reports and withhold tens of millions of dollars in revenue. Each of these suppositions is implausible as a matter of law.

X Corp. argues that CCDH should have known in 2019 that a breach of the TOU would lead to lost advertising revenue because "scraping and manipulating data and causing harm to open social media fora" is CCDH's "modus operandi." Br. 23. But that characterization of "foreseeability" turns the special-damages rule on its head. The entire point of this limitation is that contract law does not allow recovery for "unanticipated injury"—unless a party at the time of entering into the contract has been "advised of the facts concerning special harm which might result from the breach," or unless the very "*nature* of the contract or circumstances in which it is made *compel the inference*" that "such a loss would be 'the probable result' of the defendant's breach," such damages are not available. *Lewis Jorge*, 34 Cal. 4th at 969-70 (emphases added). X Corp. did not communicate these damages to CCDH, and they were not inherent in the nature of the contract or the circumstances, in 2019. In fact, during oral argument below, X Corp. fell back on the absurd assertion that its lost advertising revenue was foreseeable to CCDH in

29

2019, not because CCDH could have foreseen that X would upend its content moderation policies, but because the TOU "say they're subject to change." CCDH-SER-15-16. In other words, they were foreseeable because CCDH agreed in 2019 to whatever X Corp. decided to do. As the district court aptly observed, this concept would "have the effect of "eliminating the requirement of foreseeability altogether." ER-59.[17]

While X. Corp. separately takes issue with the district court's determination that it failed to satisfy Rule 9(g)'s requirement that special damages be "specifically stated," given that the complaint references the same "tens of millions of dollars" for all three of its state-law claims and does not identify the advertisers or the amounts at issue, ER-60-61, neither of the cases X Corp. cites even mentions that rule. Br. 25. In *Carrigan v. California State Legislature*, this Court noted in dicta

---

[17] X Corp. has argued that each time the TOU are updated and CCDH accessed X, it "reaffirmed" the contract, thus bringing the time of contracting forward to that date. As the district court held, even accepting X Corp.'s reaffirmation theory *arguendo*, all of the TOU updates occurred before X dramatically changed its content moderation policies. ER-59. X Corp. now argues that CCDH should have foreseen the lost advertising revenue when the TOU were updated in June 2022 (before publication of the last two reports), because that update happened "two months *after* Elon Musk's highly publicized agreement to buy Twitter and make changes to the platform in April 2022." Br. 24. But the article X Corp. cites merely alluded to Mr. Musk's desire to promote "free speech" and said it was "unclear" how "hands-on Mr. Musk plans to be," Mike Isaac & Lauren Hirsch, *With Deal for Twitter, Musk Lands a Prize and Pledges Fewer Limits*, N.Y. Times (Apr. 25, 2022), https://nyti.ms/3W92uiU. It certainly does not establish that CCDH could have foreseen the major changes in favor of disinformation and hate speech that X Corp. would make.

that plaintiff had alleged "special damages of $20,000" and went on to affirm dismissal for lack of personal jurisdiction. 263 F.2d 560, 568 (9th Cir. 1959). In *Barnett v. Sea Land Services, Inc.*, the Court observed in a footnote that special damages had been broken down as "20,957.79 for lost wages plus $10,412.47 for medical expenses"—actually far more specificity than X Corp. provided here. 875 F.2d 741, 742 n.2 (9th Cir. 1989).

In any event, the point is not whether X Corp. satisfied, or might have been able to satisfy, the requirements of Rule 9(g). The district court acknowledged that X Corp. "could probably" do so if given leave to amend its complaint a third time. ER-61. The point is that greater specificity as to the advertising revenues would not change the fact that those losses are directly based on CCDH's reports, and not its obtainment of the underlying data. *See id.* The district court's determination under Rule 9(g) is relevant only because it highlights how X Corp. has attempted to obfuscate the attenuated connection between its alleged lost advertising revenue and CCDH's alleged breach.

The district court also correctly concluded that X Corp. cannot recover contract damages based on CCDH obtaining data from servers hosted by Brandwatch using ECF's credentials. ER-56 n.12. Those damages were not pled in connection with CCDH's alleged breach of contract, which is predicated on its "scraping" data from X in violation of the TOU, ER-56 n.12, but rather in connection

31

with X Corp.'s tort claims for intentional interference with and inducement of breach of the Brandwatch contracts with X Corp.

Although X Corp. faults the district court for "silo[ing] off" the Brandwatch damages and failing to draw inferences in its favor, Br. 27-28, Judge Breyer was not being overly formalistic. X Corp. is trying to establish contract damages. To establish that its investigation costs into CCDH's access of Brandwatch data are general damages resulting from CCDH's alleged breach of the TOU, X Corp. must plausibly allege that the Brandwatch investigation costs flow *directly and necessarily* from CCDH's "scraping" of X. It cannot do that. The Brandwatch investigation costs do not arise from CCDH's alleged breach of the TOU, but rather from its alleged interference with X's entirely separate agreements with Brandwatch and its contract with ECF. *See, e.g.*, ER-116. The relevant alleged "breaches" are *by Brandwatch* of its agreements with X Corp. And these alleged breaches involve the receipt of data from *Brandwatch*'s servers, not any data from X itself. To the extent that X Corp. argues the Brandwatch investigation costs arise from "both" the "scraping" and acquisition of Brandwatch data, Br. 27 (emphasis added), that conflation of contract and tort claims is precisely what the rule limiting contract damages is supposed to prevent.

32

*ii.    Breach*

The decision below should be affirmed for the independent reasons that X Corp. has not plausibly alleged a breach of the TOU, and even if it had, the TOU would be void as against public policy.  Although the district court did not address these issues, and X Corp. does not address them in its brief, this Court may affirm "on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning." *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003).

CCDH did not breach the anti-"scraping" provision.  Under the TOU, which any one of X Corp.'s hundreds of millions of users must accept to use the platform, X Corp. expressly permitted users to "access or search" X (then Twitter) "through our currently available, published interfaces."  CCDH-SER-73-74.  That includes CCDH's actions in "gather[ing] tweets from each of the ten reinstated accounts" mentioned in the "Toxic Twitter" report "us[ing] the social media web-scraping tool SNScrape, which utilized Twitter's search function to enable data collection."  ER-113.

X Corp. argued below that CCDH nevertheless breached the TOU because the terms go on to state, in the same sentence, that users cannot engage in "scraping the Services."  CCDH-SER-73-74.  But just like any other contract, the TOU's terms must be read in context. *Am. Atl. Ins. Corp. v. Super. Ct. of L.A. Cnty.*, 37 Cal. Rptr.

33

3d 918, 922 (2006). That means that the TOU's proscription of "scraping"—an undefined term—must be read in light of the immediately preceding authorization for users to "access or search the Services … through our currently published interfaces." And as applied to CCDH's utilization of SNScrape, a tool that automates searching of X's own published interface, that creates a serious ambiguity.

That ambiguity is exacerbated by the fact that the meaning of "scraping" is far from clear. X Corp. itself has sought to define it as "extracting *massive* amounts of data from a website through automated means," Br. 5 (citing ER-37) (emphasis added), which CCDH obviously did not do here in searching the public tweets of just *ten* X users. On the other hand, this Court has recognized that "scraping" can even be done "manually" by merely copying "data from a website … into a structured format," *hiQ Labs, Inc. v. LinkedIn Corp.* that 31 F.4th 1180, 1186 n.4 (9th Cir. 2022), which is something that even X Corp. would presumably say is permitted under the TOU, which authorize use of the X interface. Indeed, many millions of individual X Corp. users no doubt access and search posts, and copy data, in this way every single day.[18]

---

[18] *See, e.g.*, Matt Novak, *The 140 Funniest Tweets of All Time*, Gizmodo (Nov. 18, 2022), https://gizmodo.com/the-140-funniest-tweets-of-all-time-elon-musk-twitter-1849800017 (collecting 140 "hilarious tweets" following X Corp.'s acquisition of Twitter, in case the platform disappears "forever"); Jon-Michael Poff, et al., *In*

While this serious ambiguity might not ordinarily suffice for dismissal on the pleadings, there are two additional thumbs on the scale here that make X Corp.'s interpretation of the TOU implausible as a matter of law. First, "courts closely scrutinize waivers of constitutional rights and indulge every reasonable presumption against a waiver." *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515, 531 (2006). The gathering of public information for purposes of research and advocacy, including through "scraping," falls within the ambit of the First Amendment's guarantee of the right to free speech. *See, e.g.*, *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 26-27 (D.D.C. 2018) (citing *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978)) (narrowly construing the CFAA not to cover scraping, which is "merely a particular use of information that plaintiffs are entitled to see"); *see supra* at 18. Moreover, the Liberty of Speech Clause in the California Constitution is "broader" than the First Amendment, *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042 (1986) (en banc), and courts have required that a waiver be "sufficiently clear and definite on its face to imply a waiver of … First Amendment rights," *Fitzgibbons*, 104 Cal. App. 4th at 532.

Second, ambiguities in contracts must be "construed against their drafters." *Sandquist v. Lebo Automotive, Inc.*, 1 Cal. 5th 233, 247 (2016) (affirming order of

---

*Loving Memory of Twitter (2006-2022). Here are the 100 Finniest Tweets Ever Published*, BuzzFeed (Nov. 11, 2022) https://buzzfeed.com/jonmichaelpoff/funniest-tweets-all-time (100 tweets).

dismissal and to compel arbitration). That principle has special force when a contract of adhesion is involved, as here. 1 Witkin, Summary of Cal. Law—Contracts § 780 (11th ed. 2023). And when a contract of adhesion deals with a purported waiver of First Amendment rights, as this one does, this strict construction principle is at its zenith. *See, e.g.*, *A.H.D.C. v. City of Fresno*, 2000 WL 35810722, at *10-11 (E.D. Cal. Aug. 31, 2000) (potential waiver of First Amendment rights "entitled to the narrowest construction," particularly in "contract of adhesion").

Against this backdrop, X Corp.'s claim for breach of contract fails. The TOU do not clearly proscribe CCDH's conduct—the use of an automated tool to access Twitter's interfaces, which any ordinary user could do manually and which the TOU explicitly permit, to pull already public tweets from ten users for non-commercial means. Not surprisingly, no court to our knowledge has allowed "scraping" claims to proceed under circumstances even remotely similar to those present here. Instead, when the courts have allowed such cases, they have involved large-scale scraping, often of non-public data, by competitors for profit. *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 955; *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1232-33 (N.D. Cal. 2022). This Court should not give license to major social media corporations like X Corp. to rely on vague, internally contradictory proscriptions to effectively turn millions of users into targets for

litigation.  If X Corp. wishes to ban the kind of access of its interface here, it should be required to say so plainly and unambiguously.  It did not.

The anti-"scraping" provision violates public policy.  Even if the TOU did prohibit CCDH's conduct here, those terms would violate public policy in light of the constitutional and statutory policies in favor of protecting the collection of information in furtherance of speech.  *See supra* Argument Parts I-II; *see also* Cal. Civ. Code § 1667(2) (prohibiting contract enforcement that is "contrary to the policy of express law, though not expressly prohibited"); *Cariveau v. Halferty*, 83 Cal. App. 4th 126, 131 (2000) (constitutional and statutory provisions establish public policy).

Fundamentally, X Corp. seeks to punish CCDH—and any other user—who would seek to use public information gathered through X's public interface to gain an understanding of the types of speech that are being permitted and how that speech is being presented to society, even if they do so in a targeted and limited manner that has no plausible impact on that interface's systems.  But because "commonplace social media websites" like X constitute "the modern public square," *Packingham v. North Carolina*, 582 U.S. 98, 101, 107 (2017),[19] it would be antithetical to principles of free speech if providers like X could impose prohibitive barriers on collecting and

---

[19]  Mr. Musk has said this too.  *See* @X, X (Nov. 30, 2023), https://x.com/elonmusk/status/ 1730340274289697171 ("X is the global town square—from the people for the people") (reposted by @elonmusk).

analyzing speech in digital public spaces, in furtherance of not-for-profit efforts to educate the public. As this Court recognized in *hiQ*, there is a significant public interest in "maximizing the free flow of information on the internet, with "data scraping" being "a common method of gathering information, used by … academic researchers." "[G]iving social media platforms free rein to decide, on any basis, who can collect and use data—data that the companies themselves do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use—risks the possible creation of information monopolies that would disserve the public interest." 31 F.4th at 1202. Although we recognize that no court has yet addressed this issue, courts in California have not hesitated to strike contractual restrictions on freedom of speech that run contrary to public policy. *See, e.g.*, *Cariveau*, 83 Cal. App. 4th at 136-37 (declining to enforce confidentiality clause that would undermine securities laws, recognizing that "when a statute has been made for the protection of the public, a contract in violation of its provisions is void").

While the Court need not ultimately reach the issue here, because X Corp. fails to plausibly allege damages or a breach, public policy should serve as a final failsafe to prevent X Corp. from imposing the high costs of litigation and possibly "tens of millions of dollars" in lost advertising revenue on a non-profit organization that engaged in small-scale data collection in order to educate the public about the

kinds of posts proliferating on X Corp.—in other words, what is core, constitutionally protected speech.

**B.    CFAA**

X Corp. also fails to state a claim under the CFAA, a federal statute which provides a civil cause of action for "[a]ny person who suffers damage or loss" against one who "intentionally accesses a computer without authorization or exceeds authorized access."  18 U.S.C. § 1030(a), (g).  As the district court held, X Corp. has not alleged cognizable damages under this statute either.  And while the district court did not reach the issue, X Corp. also has not alleged "unauthorized access" of a protected computer.

*i.    Damages*

In *Van Buren v. United States*, the Supreme Court construed the terms "damage" and "loss" for purposes of the CFAA to mean "technological harms," namely, "costs caused by harm to computer data, programs, systems, or information systems," such as "corruption of files."  593 U.S. 374, 391-92 (2021) (citing 18 U.S.C. § 1030(e)(8), (11)).  By contrast, the CFAA does not cover, for example, the costs of "remediating 'misuse' of sensitive information that employees may permissibly access using their computers."  *Id.*  "Limiting 'damage' and 'loss' in this way makes sense in a scheme aimed at preventing the typical consequences of

hacking." *Id.* (citation omitted); *see also Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262 (9th Cir. 2019) ("loss" is "narrow").

X Corp. alleges that it was damaged as a result of CCDH's access to Brandwatch's systems because it had to pay for "internal investigations in efforts to ascertain the nature and scope of CCDH's unauthorized access to the data," as well as "employee resources" and "attorneys' fees." ER-115. As the district court held, however, those damages are not "technological in nature" under *Van Buren*. ER-78-80. X Corp. did not and cannot plausibly allege that its systems were harmed or corrupted in any way. After all, the data that CCDH accessed was not even on X Corp.'s servers, but on servers owned by Brandwatch. ER-79. And the data itself, once on Brandwatch's servers, no longer belonged to X Corp. CCDH-SER-81 (users own their content and grant X Corp. a license).[20]

X Corp. primarily argues in response that *Van Buren* did not actually hold that "*only* technological damages qualify as a 'loss' under the CFAA." Br. 36. But the Supreme Court was clear that it was "limiting" the definition of "'damage' and 'loss' in this way." 593 U.S. at 392. X Corp. also argues that the Supreme Court's statements in this regard were mere dicta because the question presented was the

---

[20] X Corp. argues that it alleges "X 'streamed' *its* data to these servers." Br. 38 (quoting ER-95). But as the district court recognized, "X Corp. did not articulate how CCDH logging into the Brandwatch system using a Brandwatch subscriber's valid login information could cause technological harm to X Corp.'s server." ER-79. This is not the narrow type of harm covered by the CFAA.

meaning of "exceeds authorized access" under Section 1030(a)(2). Br. 35. But the Court identified the definitions of "damage" and "loss" as aspects of the "statute's structure" that further undermined the government's position, which was clearly material to the ultimate decision. 593 U.S. at 389-92. Indeed, in *hiQ*, this Court recognized that "*Van Buren* reviewed the statutory definitions of 'damage' and 'loss' and concluded that this civil remedies provision *requires* a showing of technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." 31 F.4th at 1195 n.12.[21]

As a last resort, X Corp. argues that *Facebook, Inc. v. Power Ventures, Inc.* broadly establishes that "internal investigation expenses qualify as losses under the CFAA." Br. 32-33 (citing 844 F.3d 1058 (9th Cir. 2016)). But *Power Ventures* predates *Van Buren* by five years—it cannot stand for the proposition that any investigation expenses suffice. If it did, investigation expenses aimed at "remediating 'misuse' of sensitive information" would suffice as well, contrary to

---

[21] X Corp.'s pre-*Van Buren* authorities are likewise no longer valid or are distinguishable. *See* Br. 33-34; *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1175 n.2 (11th Cir. 2017) ("loss" is "not limited to damage to a computer or network"); *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1069 (6th Cir. 2014) ("loss" includes "lost revenue," and covered costs of investigating unauthorized access to plaintiff's systems); *United States v. Janosko*, 642 F.3d 40, 42 (1st Cir. 2011) ("loss" covers expenses, of apparently any nature, that "would not have been incurred in the absence of the offence" and included the cost of a credit check); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009) ("loss" is "broadly worded" and equates to "consequential damages … including the investigation of an offense").

41

the requirements of *Van Buren* (and *hiQ*) that damages under the CFAA must involve technological harms to the plaintiff's systems and data.

*Power Ventures* is distinguishable in any event. There, Facebook sent a cease-and-desist letter and then blocked Power's IP address, and Power Ventures "responded by switching IP addresses to circumvent the Facebook block." 844 F.3d at 1062. The "investigation expenses" thus apparently involved dealing with continued interference with Facebook's systems. X Corp. alleges nothing of the sort here: its CFAA claim is based on CCDH's one-time alleged access to Brandwatch's systems, using login credentials provided to it by a Brandwatch subscriber, that had no effect whatsoever on X Corp.'s systems or its data. Moreover, as noted above, the only reason X Corp. knew that CCDH had accessed data on Brandwatch's systems was because CCDH said as much in its reports. *See supra* at 12. As a result, there were no plausible "investigation" costs that X Corp. incurred to determine whether its systems or its data were corrupted or harmed. *See, e.g.*, *hiQ*, 31 F.4th at 1187-88, 1195 n.12 (LinkedIn's efforts to prevent scraping of publicly available profiles, including "implement[ing] technical measures to prevent hiQ from accessing, and assisting others to access, LinkedIn's site, through systems that detect, monitor, and block scraping activity" did not give rise to "technological harms").

*ii.* *Access "without authorization"*

While the district court did not reach the issue, X Corp.'s CFAA claim also fails because it has not plausibly alleged that CCDH accessed a computer "without authorization."

First, while X Corp. alleges that ECF could not authorize CCDH to access Brandwatch's platform, the actual Brandwatch user agreements say otherwise. A "User" is defined as "an individual that Customer [ECF] (directly or indirectly) *has authorized* to use the Services." CCDH-SER-112 (emphasis added). ECF did so.[22] To be sure, the terms were amended in April 2023, *after* the alleged access and reports here, to add a new restriction—that "'User' means an individual *from the entities within the Customer's corporate group* that Customer has authorized to use the Services…." CCDH-SER-133 (emphasis added). But that amendment only underscores the fact that, under the agreement in place at the time of the allegedly improper access, Brandwatch's terms authorized such access.

Second, even if the ECF-Brandwatch agreement did not permit the sharing of login credentials with CCDH, that would not amount to "unauthorized access" within the meaning of the CFAA. As this Court recognized in *hiQ*, the CFAA is "primarily a criminal statute," so its provisions must be construed narrowly, and its

---

[22] ECF's jurisdictional evidence also shows that Brandwatch knew about CCDH's access under ECF's account and knowingly facilitated it, contrary to X Corp.'s central premise. ER-87-88.

proscription on "unauthorized access" is fundamentally about "computer hacking," *i.e.*, "breaking and entering." 31 F.4th at 1196-99. Accordingly, the critical question for purposes of "unauthorized access" is whether authorization "has either never been given or has been revoked." *Id.* at 1199.

*Power Ventures* is instructive on this point. 844 F.3d 1058. There, Power Ventures, a social networking website, operated a promotional campaign that allowed it to access a Facebook user's profile and post a message on Facebook if they signed up. *Id.* at 1062-63. Once Facebook became aware of the campaign, it sent Power Ventures a cease-and-desist letter and blocked its IP address, but Power Venture continued to use Facebook anyway. *Id.* This Court held that so long as Power Ventures "reasonably could have thought that consent for *Facebook users* to share the promotion was permission for Power to access *Facebook's* computers," it was not engaged in unauthorized access. *Id.* at 1067 ("a violation of the terms of use of a website—without more—cannot establish liability under the CFAA"). But once Facebook "expressly rescinded that permission" and Power Ventures knew "*unequivocally*" that Facebook had restricted access, Power Ventures crossed the line to unauthorized access. *Id.* at 1067-68 (emphasis added).

Under *Power Ventures*, CCDH's access to the Brandwatch data via ECF sharing its account was not "unauthorized access." X Corp. has not alleged that it "expressly" or "unequivocally" communicated to CCDH that such access would be

unauthorized: it has not alleged that it communicated with CCDH at all. And whatever X Corp. may say about what CCDH "knew, based on *[its] experience*," about the terms of ECF and Brandwatch's contracts, ER-116 (emphasis added), that is clearly not enough to show "unequivocal" statement of a denial of access. Indeed, this Court has repeatedly rejected more expansive constructions of the CFAA because it is "primarily a criminal statute," so any construction must be narrow. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134-35 (9th Cir. 2009) (no "unauthorized access" where "employer has not rescinded the defendant's right to use a computer, [as] the defendant would have no reason to know that making personal use of the company computer in breach of a state law fiduciary duty to an employer would constitute a criminal violation of the CFAA"); *see also hiQ*, 31 F.4th at 1201-02 (access to publicly available data via scraping was not "unauthorized," even where LinkedIn had sent cease-and-desist but did not own the data).

United States v. Nosal*, relied on by X Corp., is not to the contrary. Br. 30 (citing 844 F.3d 1024 (9th Cir. 2016)). There, the defendant's former employer had "affirmatively," "particularly," and "unequivocally" informed him that he was no longer authorized to access its computer systems, but the defendant continued to do so. *Id.* at 1028, 1034-38. That meant his access was without authorization. X Corp. argues that *Nosal* supports liability here because CCDH "*knew* that it was not

authorized to access the materials." Br. 31. But that conclusory allegation falls well short of an "unequivocal" denial of access. In *Nosal* itself, this Court distinguished *Brekka*—where liability did not attach—as a circumstance where "Brekka had permission to use his employer's computer" because his employer had not removed permission, and "authorization to use an employer's computer depends on actions taken by the employer." *Id.* at 1033-34 (citation omitted). X Corp. identifies nothing even close to that here.

## C. Tort claims

The district court also correctly dismissed X Corp.'s claims for inducement of breach of contract and intentional interference with contractual relations, both of which turn on CCDH's access to the Brandwatch data and Brandwatch's alleged breach of its contracts with X Corp. by failing to secure the data. ER-80-84.

A claim for inducement of breach of contract requires that: (1) the plaintiff "had a valid and existing contract with a third party"; (2) the defendant "had knowledge of the contract and intended to induce its breach"; (3) "the contract was in fact breached by" the third party; (4) "the breach was caused by the defendant's unjustified or wrongful conduct"; and (5) "damages were suffered as a result." *Shamblin v. Berge*, 166 Cal. App. 3d 118, 122-23 (1985) (citation omitted). A claim for intentional interference with contractual relations has similar elements of a contract with a third party and the defendant's "knowledge of [the] contract," but

46

requires that the defendant "committed intentional and unjustified acts designed to interfere with or disrupt the contract," and there is "actual interference with or disruption of the relationship" and "resulting damages." *Id.* at 123 (citation omitted). While interference with contractual relations does not require breach, where, as here, the only allegation is that CCDH's access "prevented Brandwatch from performing," ER-116, the alleged interference is "the functional equivalent" of a breach, *Russomanno v. Fox Children's Network*, 2004 WL 2137405, at *21 (Cal. Ct. App. Sept. 24, 2004); *see also* ER-82.

As the district court held, X Corp.'s tort claims fail because it has not plausibly alleged that CCDH's access to Brandwatch's database "caused" or "induced" Brandwatch to breach its contracts with X Corp. ER-81-82. In addition, while the court did not reach the issues, X Corp. has not plausibly alleged that Brandwatch actually breached the contracts or that CCDH had knowledge of any breach or even of the contracts themselves.[23]

   *i.*  *Causation*

The district court correctly concluded that X Corp. has not alleged causation, which requires X Corp. to show that CCDH's actions caused or induced *Brandwatch*

---

[23] The district court also correctly determined that X Corp. fails to plausibly allege recoverable damages for its tort claims, in the form of alleged lost advertising revenue, because such damages are barred under the First Amendment. *See* ER-83-84; *supra* Part I. While X Corp. argues that it also alleged investigation costs for these claims, Br. 41, that is not accurate, ER-84 n.29.

to breach its contract, *i.e.*, that as result of CCDH's access, Brandwatch acted in a way that amounted to a breach. *See, e.g.*, Restatement (2d) Torts § 766 (tort requires "inducing or otherwise causing the third person not to perform the contract") (cited in *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 56 & n.15 (1998)); *Family Home and Finance Center, Inc. v. Federal Home Loan Mortg. Corp.*, 525 F.3d 822, 825 (9th Cir. 2008) (dismissing claim where defendant had not "influenced or caused National City to terminate its mortgage broker contract").

X Corp. alleges that when CCDH used ECF's account to access the Brandwatch data, it caused or induced Brandwatch to breach its obligation to X Corp. to "*not allow others*" to "access the Licensed Materials" and to "*keep* 'Twitter Content' *secure*." ER-102-03 (emphases added). But that "tortured reasoning" puts the cart before the horse. ER-83. CCDH did not "cause" Brandwatch to do anything—Brandwatch did not even know about CCDH's actions "until recently." ER-106. Rather, to the extent there was any breach, it would have predated CCDH's access and could only have been the result of Brandwatch's own independent failure to prevent "others" from accessing the database and to "keep" the content "secure." *See, e.g.*, "Allow," Merriam-Webster Dictionary (defining as "permit" and "to fail

48

to restrain or prevent"); "Keep," Merriam-Webster Dictionary (defining as "to retain in one's possession or power" or "to refrain from granting, giving, or allowing").[24]

X Corp.'s position that CCDH's access "*prevented* Brandwatch from performing" removes any doubt. Br. 39 (emphasis added). CCDH could not have prevented Brandwatch from performing its obligations to restrict access to the database and keep content secure: those obligations existed at all times—before and after CCDH accessed the database—and it was precisely Brandwatch's failure to meet them, for example by imposing greater restrictions on who Customers could grant access to, that caused the supposed breach of its obligations. *See* ER-115-16 (alleging CCDH obtained access because "Brandwatch failed to secure the data"). *Cf. supra* at 43 (describing Brandwatch's new increased restrictions on who can receive access).

To the extent that X Corp. claims CCDH's access and Brandwatch's breach are one and the same, *see, e.g.*, Br. 40 (CCDH's access "*necessarily caused* Brandwatch's breach"), that confuses the causation standard. As the district court held, X Corp. may not hold CCDH liable for breaching a contract to which it is not a party. ER-83 (citing *Tri-Continent Int'l Corp. v. Paris Sav. & Loan Ass'n*, 12 Cal. App. 4th 1354, 1359 (1993)). It must show that CCDH's access caused or induced

---

[24] *Available at* https://www.merriam-webster.com/dictionary/allow; https://www.merriam-webster.com/dictionary/keep (Last visited September 20, 2024).

*Brandwatch* to breach its agreements. *See* Restatement (2d) Torts § 766 cmt. h ("Inducing or otherwise causing" means "A causes B to choose one course of conduct rather than another."). Because X Corp. cannot do that, its tort claims fail.

### ii. Knowledge

X Corp.'s tort claims also fail because it has not plausibly alleged that CCDH had knowledge of Brandwatch's contracts with X Corp. or their terms. X Corp. alleges that CCDH "knew, based on [its] experience … analyzing data associated with social media platforms" that X Corp. "must have contracts with Brandwatch, and that Brandwatch would be prohibited under the terms … from providing access to unauthorized parties." ER-116. But it is hard to imagine an assertion more conclusory or speculative. X Corp. does not allege that CCDH analyzed Brandwatch data before, or that it even analyzed data from some other specific party that made CCDH aware of the existence of contracts with X Corp. or their generic "terms."

Nor can X Corp. rely on CCDH's conduct to plausibly infer knowledge. X Corp. alleges CCDH received ECF's login credentials, which ECF freely provided, to access Brandwatch data. The ECF contract with Brandwatch specifically allowed ECF to share access with a "User," defined as "[a]ny individual that [it] (directly or indirectly) has authorized to use the Services," CCDH-SER-112, and it was only later amended in April 2023, after CCDH had obtained the data, to restrict "Users" to individuals "from the entities within the Customer's corporate group," CCDH-

SER-133 (emphasis added). Again, X Corp. only knows about CCDH's access of the Brandwatch database because CCDH *disclosed it* in its reports—effectively, in X Corp.'s telling, leaving a calling card to be sued for tens of millions of dollars. These allegations do not make it "plausible" that CCDH knew about Brandwatch's contract with X Corp. or its terms. *See, e.g. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.").[25]

## IV. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION TO DENY AMENDMENT

Finally, the district court correctly determined that X Corp. should not be permitted to amend its complaint a second time to add proposed damages for breach of the TOU in the form of investigation costs and "anti-scraping" measures undertaken to ensure user data and system security. ER-68-76; *Leadsinger*, 512 F.3d at 532.

---

[25] X Corp.'s tort claims also fail because it has not plausibly alleged a breach. X Corp. alleges that its agreements with Brandwatch prohibited Brandwatch from allowing access to the Licensed Material to "any third party." ER-103. But again, CCDH was not a "third party." It was a "User" under Brandwatch's agreement with ECF because ECF "authorized" it to access the database. The district court also correctly dismissed X Corp.'s claims against the Doe Defendants, which were entirely conclusory. ER-84.

First, the amendment would have been futile because the new damages still were not foreseeable to CCDH in 2019 when it entered into the TOU.  ER-70-73.  Again, CCDH had no reason to foresee in 2019 that X Corp. would fundamentally change its content moderation policies, leading CCDH to obtain user data and publish reports.  The only step in the causal chain that X Corp. seeks to change is that, instead of advertisers' pausing spending and its losing millions of dollars in revenue, X Corp. voluntarily chose to undertake a massive "anti-scraping" effort leading to massive costs that it now wants to foist on CCDH.

As the district court recognized, that is not plausible.  When CCDH released the "Toxic Twitter" report, X Corp. knew which ten accounts and data had been scraped, none of which was private, so it was hardly apparent what it needed to investigate, or what measures it was taking to protect user data security.  Although X Corp. argued below that users expect to have control over their data, the district court rightly noted that users—and certainly these ten, high-profile users with large audiences—would not have a reasonable expectation that "publicly disseminated [posts] will not be seen by the public before that user has a chance to amend or remove it."  ER-71.

Moreover, while X Corp. claimed to have undertaken this significant investigation in response to CCDH's "scraping" of ten user accounts, X Corp. knows, like any other major social media company, that "scraping is a common

method of gathering information," used by "academic researchers" and many others. *hiQ*, 31 F.4th at 1202. "LinkedIn blocks approximately 95 million automated attempts to scrape data every day." *Id.* Some scraping might actually pose a risk to the functioning of a website or systems, namely, the sort of "massive" scraping done by for-profit competitors. But that does not mean that every instance of scraping, by anyone, could possibly warrant the sort of response X Corp. proposed to allege here.

All of that matters because X Corp. would need to show that its reaction to CCDH "scraping" ten accounts, and the alleged costs of that reaction, were reasonably foreseeable to CCDH in 2019. But they obviously were not. It cannot be the case that social media companies like X Corp. respond to minor (non-commercial and non-competitor) "scraping" with the gold standard of investigations, or that users would reasonably expect that to be the case. Rather, if X Corp. was motivated "to spend money in response to CCDH's scraping in 2023, it was not because of the harm such scraping posed to the X *platform*, but because of the harm it posed to X Corp.'s *image*." ER-74. "But that motivation would not have been foreseeable to CCDH in 2019." *Id.* No matter how X Corp. wants to characterize its reaction—and justify the absurd damages it wishes to impose on CCDH—that reaction and those damages were not reasonably contemplated because X was fundamentally different in 2019.

Second and independently, the district court acted within its discretion in finding that X Corp. had a "dilatory motive" in seeking to amend its contract claim. ER-43. As Judge Breyer observed, X Corp.'s "motivation in bringing this case is evident": to punish CCDH's speech by asserting "tens of millions of dollars in damages—presumably enough to torpedo the operations of a small nonprofit"—and try to chill other criticism. ER-75 (citing survey of 167 academics that "over 100 studies about X Corp. have been diverted, stalled, or canceled, with over half of those interviewed citing a fear of being sued by X Corp. over their findings or data").[26] Not only that, the "facts" X Corp. wanted to add were certainly "known" to it when it instituted this case, yet it failed to raise them in either its original or its amended complaint. *See Canatella v. City & Cnty. of San Francisco*, 74 F.3d 1245, at *1 (9th Cir. 1996) (no abuse of discretion).

Given X Corp.'s apparent motive for bringing this suit, the massive and "problematic" damages it had already alleged and wished to further allege, ER-76, and the fact that X Corp., a multibillion-dollar corporation represented by sophisticated counsel, easily could have alleged those "facts" and damages in its first amended complaint before the parties engaged in motion practice, it was entirely

---

[26] *See also* Kate Conger & Tiffany Hsu, *Advertising Coalition Shuts Down After X, Owned by Elon Musk, Sues*, N.Y. Times (Aug. 8, 2024), https://www.nytimes.com/2024/08/08/technology/elon-musk-x-advertisers-boycott.html (referring to the Global Alliance for Responsible Media).

appropriate for the district court to refuse to allow X Corp. to impose significant additional litigation costs on a not-for-profit. That is particularly true in the context of this SLAPP suit, since it is the litigation itself that was meant by X Corp. to be the punishment for speech. And that, of course, is exactly what the California Legislature, in its wisdom and as a matter of public policy, chose to discourage by passing California's anti-SLAPP statute in the first place.

## CONCLUSION

For all the reasons set forth above, the judgment below should be affirmed.

Dated: New York, New York        Respectfully submitted,
     September 20, 2024

Roberta A. Kaplan
D. Brandon Trice
KAPLAN MARTIN LLP
156 West 56th Street, Suite 207
New York, New York 10119
(212) 316-9500

*Attorneys for Defendants-Appellees
Center for Countering Digital Hate,
Inc., a Washington, D.C. Non-Profit
Corporation and Center for
Countering Digital Hate Ltd.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 24-2643

The undersigned attorney or self-represented party states the following:

⊙ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/D. Brandon Trice | **Date** | 9/20/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**  *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-2643

I am the attorney or self-represented party.

**This brief contains** | 13,128 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/D. Brandon Trice | **Date** | 9/20/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*