No. 24-2643

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

X CORP.,

*Plaintiff-Appellant*,

v.

CENTER FOR COUNTERING DIGITAL HATE, INC.;
CENTER FOR COUNTERING DIGITAL HATE LTD.;
STICHTING EUROPEAN CLIMATE FOUNDATION,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-03836
Hon. Charles R. Breyer, District Judge

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, ELECTRONIC FRONTIER FOUNDATION, AND KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

Jake Karr
TECHNOLOGY LAW AND POLICY CLINIC
NEW YORK UNIVERSITY SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
(212) 998-6042
jake.karr@nyu.edu

Esha Bhandari
Elizabeth Gyori
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
ebhandari@aclu.org

*Additional Counsel for* Amici Curiae *Listed on Following Page*

Cindy Cohn
Andrew Crocker
Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9993
cindy@eff.org

Ramya Krishnan
Alex Abdo
KNIGHT FIRST AMENDMENT INSTITUTE
   AT COLUMBIA UNIVERSITY
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Nicole Ozer
Matthew T. Cagle
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN
   CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 293-6336
nozer@aclunc.org

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), *amici curiae* state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: September 27, 2024          Respectfully submitted,

*/s/ Esha Bhandari*
Esha Bhandari

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTEREST OF *AMICI CURIAE* ...............................................................1

SUMMARY OF ARGUMENT.....................................................................3

ARGUMENT ...............................................................................................6

I.     Journalists and Researchers Use Scraping to Enable Speech in the Public Interest and Hold Power to Account.................................................6

II.    X Cannot Wield Contract Law to Punish Speech Critical of It......................9

     A.    X Cannot Recover Reputational Damages Merely by Alleging Breach of Its Anti-Scraping Term of Service. .....................................10

     B.    X Cannot Enforce Its Anti-Scraping Term of Service Against Scraping That Enables Speech in the Public Interest.........................16

          i.    Contract Provisions That Chill Speech on Matters of Public Interest Are Void for Public Policy in California.....................16

          ii.    Allowing X to Enforce Its Anti-Scraping Term of Service Against Journalists and Researchers Like CCDH Would Chill Speech on Matters of Public Interest. .......................................20

III.    X's CFAA Claim Is Foreclosed by This Court's Prior Rulings and Would Criminalize a Wide Range of Common Behavior Online.............................24

CONCLUSION ..........................................................................................27

CERTIFICATE OF COMPLIANCE ..........................................................29

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING ................................30

i

# TABLE OF AUTHORITIES

## Cases

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) .............................................................8

*Blatty v. N.Y. Times Co.*,
728 P.2d 1177 (Cal. 1986) ....................................................10, 11, 18

*Bovard v. Am. Horse Enters., Inc.*,
247 Cal. Rptr. 340 (Ct. App. 1988) ..............................................4, 16

*Cariveau v. Halferty*,
99 Cal. Rptr. 2d 417 (Ct. App. 2000) ...............................................17

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991)...........................................................10, 14

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
499 F.3d 520 (6th Cir. 2007) .............................................................11

*Davies v. Grossmont Union High Sch. Dist.*,
930 F.2d 1390 (9th Cir. 1991) ..........................................................17

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ...........................................2, 25, 26

*Fellows v. Nat'l Enquirer, Inc.*,
721 P.2d 97 (Cal. 1986).....................................................................11

*Garrison v. Louisiana*,
379 U.S. 64 (1964)............................................................................13

*Geiser v. Kuhns*,
515 P.3d 623 (Cal. 2022).................................................................19

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)..........................................................................17

*Greenbelt Coop. Publ'g Ass'n v. Bresler*,
398 U.S. 6 (1970)..............................................................................13

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)...................................................................13

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) ....................................................19

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) .................................................2, 21

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) .......................................................2

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988)...................................................10, 11, 13

*Masson v. New Yorker Mag., Inc.*,
  501 U.S. 496 (1991)...................................................................13

*McPhearson v. Michaels Co.*,
  117 Cal. Rptr. 2d 489 (Ct. App. 2002) ...................................17

*Molko v. Holy Spirit Ass'n*,
  762 P.2d 46 (Cal. 1988) ............................................................11

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..........................................................4, 12, 17

*NAACP v. Button*,
  371 U.S. 415 (1963)...................................................................17

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)...................................................................11

*Navellier v. Sletten*,
  52 P.3d 703 (Cal. 2002) ............................................................19

*Olson v. Doe*,
  502 P.3d 398 (Cal. 2022) ..........................................................20

*Packingham v. North Carolina*,
  582 U.S. 98 (2017)..............................................................6, 20, 21

*Paul v. Watchtower Bible Tract Soc'y*,
   819 F.2d 875 (9th Cir. 1987) ............................................................... 11

*People v. Glaze*,
   614 P.2d 291 (Cal. 1980) .................................................................... 18

*Planned Parenthood Fed'n. of Am., Inc. v. Newman*,
   51 F.4th 1125 (9th Cir. 2022) ....................................................... 11, 15

*Reader's Digest Ass'n v. Superior Ct.*,
   690 P.2d 610 (Cal. 1984) .................................................................... 10

*S.C. State Conf. of NAACP v. Kohn*,
   2023 WL 144447 (D.S.C. Jan. 10, 2023) ............................................... 1

*Safeway Stores, Inc. v. Retail Clerks Int'l Ass'n*,
   261 P.2d 721 (Cal. 1953) .................................................................... 17

*Sandvig v. Barr*,
   451 F. Supp. 3d 73 (D.D.C. 2020) ........................................................ 1

*Sandvig v. Sessions*,
   315 F. Supp. 3d 1 (D.D.C. 2018) ............................................... 5, 8, 22

*Sarver v. Chartier*,
   813 F.3d 891 (9th Cir. 2016) ............................................................... 20

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ............................................................ 13

*Time, Inc. v. Hill*,
   385 U.S. 374 (1967) ........................................................................... 11

*Timothy W. v. Julie W.*,
   301 Cal. Rptr. 3d 294 (Ct. App. 2022) ................................................ 20

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) ............................................ 2, 21, 24, 25, 27

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016) .......................................... 2, 24, 25, 26, 27

iv

*United States v. Valle*,
807 F.3d 508 (2d Cir. 2015) ................................................................2

*Van Buren v. United States*,
593 U.S. 374 (2021)................................................................ 1, 2, 24

**Constitutional Provisions**

Cal. Const art. I, § 2 ...........................................................................18

**Statutes**

Cal. Civ. Code § 1667 .........................................................................17

Cal. Civ. Proc. § 425.16 ........................................................... 16, 18, 19

**Other Authorities**

Alan Luscombe, Kevin Dick & Kevin Walby, *Algorithmic Thinking in the Public Interest: Navigating Technical, Legal, and Ethical Hurdles to Web Scraping in the Social Sciences*, 56 Quality & Quantity 1023 (2022)....................................7

Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B.U. J. Sci. & Tech. L. 372 (2018) ............................................6, 8

Benjamin Edelman, Michael Luca & Dan Svirsky, *Racial Discrimination in the Sharing Economy: Evidence from a Field Experiment*, 9 Am. Econ. J.: Applied *Econ*. 1 (2017)....................................................................7

Brian X. Chen, *This Is a Reminder That You're Probably Oversharing on Venmo*, N.Y. Times (Aug. 9, 2023).....................................................23

Emillie de Keulenaar, João C Magalhães & Bharath Ganesh, *Modulating Moderation: A History of Objectionability in Twitter Moderation Practices*, 73 J. Commc'n 273 (2023) ......................................................8

Hang Do Thi Duc, *Public by Default* (July 2018) .....................................8

Katie Benner, Glenn Thrush & Mike Isaac, *Facebook Engages in Housing Discrimination with Its Ad Practices, U.S. Says*, N.Y. Times (Mar. 28, 2019)....9

Laura Edelson & Damon McCoy, *We Research Misinformation on Facebook. It Just Disabled Our Accounts.*, N.Y. Times (Aug. 10, 2021)................................7

Letter from Sam Levine, Acting Director, Bureau of Consumer Protection, to Mark Zuckerberg, CEO, Facebook (Aug. 5, 2021) ............................................21

Muhammad Ali et al., *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proc. ACM on Human-Comput. Interaction 1 (2019) .................................................................................7, 9

Restatement (Second) of Contracts § 178 (1981) .......................................................4

Sam Levin & Johana Bhuiyan, *Exclusive: LAPD Partnered with Tech Firm That Enables Secretive Online Spying*, Guardian (Nov. 17, 2021)............................23

Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, Reuters (Nov. 6, 2023) ........................................22

## INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization dedicated to defending the principles of liberty and equality embodied in the Constitution. The ACLU was counsel for the plaintiffs in *Sandvig v. Barr*, a lawsuit raising researchers' First Amendment right to engage in digital journalism techniques to study online platforms. 451 F. Supp. 3d 73 (D.D.C. 2020). The American Civil Liberties Union Foundation of Northern California is an affiliate of the national ACLU. The ACLU and its affiliates share a longstanding commitment to freedom of speech and digital rights and have served as counsel or *amicus curiae* in multiple cases concerning the rights of academic researchers and data journalists to conduct important investigative work about online platforms that is essential to informing the public. *See*, *e.g.*, *Van Buren v. United States*, 593 U.S. 374 (2021) (*amicus*); *S.C. State Conf. of NAACP v. Kohn*, 2023 WL 144447 (D.S.C. Jan. 10, 2023) (counsel).

The Electronic Frontier Foundation (EFF) is a nonprofit, member-supported civil liberties organization working to protect rights in the digital world. With nearly 30,000 active donors and dues-paying members, EFF represents the interests of

---

[1] *Amici* submit this brief with the consent of all parties. Fed. R. App. P. 29(a)(2). *Amici* declare that no party or party's counsel authored the brief in whole or in part, and no one other than *amici*, their members, or their counsel contributed money intended to fund the preparation or submission of the brief. Fed. R. App. P. 29(a)(4)(E).

1

technology users in court cases and broader policy debates surrounding the application of law in the digital age. EFF's interest in this case is in the principled and fair application of laws, including terms of service and computer crime laws, to online activities like journalism and research. Additionally, as part of its Coders' Rights Project, EFF offers pro bono legal services to researchers engaged in cutting-edge exploration of technology whose work in the public interest may be unjustly chilled by overzealous application of contract law. EFF has also served as counsel or *amicus curiae* in key cases addressing the application of computer crime statutes, including *Van Buren*, 593 U.S. 374 (*amicus*); *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019) (*amicus*); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) (*amicus*); *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (*Nosal I*) (en banc) (*amicus*); *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) (*Nosal II*) (*amicus*); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) (*amicus*); *United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) (*amicus*).

The Knight First Amendment Institute at Columbia University (Knight Institute or Institute) is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

2

The Institute is particularly committed to illuminating the forces that are shaping public discourse online. It represents journalists and researchers who fear legal liability for violating the terms of service of Facebook and other major social media platforms in the course of studying the ways in which these platforms influence public discourse. In an effort to mitigate these fears, the Knight Institute has proposed that Congress establish a legislative safe harbor for privacy-preserving research that is in the public interest.

## SUMMARY OF ARGUMENT

Through this lawsuit, X Corp. seeks to misuse claims under contract law and the Computer Fraud and Abuse Act (CFAA) to stifle criticism. If X is successful, this case could set a dangerous precedent by blocking newsgathering, research, and public commentary about digital tools and platforms on which we all rely every day. Such journalism and research requires understanding how those platforms operate in practice, which in turn often requires the scraping of public information.

X's platform enables users to post public content that can be viewed by hundreds of millions of people. Yet it now seeks to punish the Center for Countering Digital Hate (CCDH), a nonprofit organization, for speaking critically about that content. As the district court correctly recognized, X's lawsuit is merely a defamation lawsuit in disguise. X seeks to circumvent the limitations imposed by the First Amendment on defamation claims by couching its theory of liability in

contract law—alleged violations of terms of service—even though its putative damages flow solely from the reputational harm caused by CCDH's speech. It seeks to further chill such speech by bringing a meritless CFAA claim based on a theory of liability this Court has rejected. Courts cannot, and should not, allow private companies like X to wield breach of contract and computer intrusion claims as weapons to punish criticism.

This Court should therefore hold that X's breach of contract claim fails because it seeks to recover reputational damages through what is effectively a defamation suit, but without pleading that CCDH made false statements with actual malice, as required by the First Amendment. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Even if X were able to assert cognizable damages, the Court should still hold that the term of service prohibiting scraping X's platform cannot be enforced against CCDH as void for public policy because this case involves speech in the public interest. In California, a contract may not be enforced if "the interest in its enforcement is clearly outweighed in the circumstances by a public policy against [its] enforcement." *Bovard v. Am. Horse Enters., Inc*., 247 Cal. Rptr. 340, 344 (Ct. App. 1988) (quoting from Restatement (Second) of Contracts § 178(1) (1981)). The First Amendment, California Constitution, and California anti-Strategic Lawsuit Against Public Participation (anti-SLAPP) law enshrine a firm public policy of protecting speech on matters of public interest. Journalists and researchers scrape

public information to enable speech in the public interest, and, in the context of this public interest work, such scraping is part and parcel of the subsequent speech it produces. *See Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15 (D.D.C. 2018). Where, as here, a party attempts to use an anti-scraping contract term to bypass the high standard for defamation claims and circumvent public policy protections for speech that contributes to public discourse, a court should decline to enforce the contract term as void for public policy.

The Court should further affirm the dismissal of X's CFAA claim because it is meritless and would transform the CFAA into a powerful tool that X and similar companies could use to stifle important speech on matters of public interest. This Court has repeatedly rejected X's legal theory that the CFAA is violated whenever someone transgresses a corporate computer use policy, such as by sharing a password. Giving the CFAA such broad sweep would criminalize a wide swath of innocuous activity, such as families sharing passwords. This Court has thus previously seen through similar efforts to improperly expand the CFAA, and it should not hesitate to reject X's effort here.

## ARGUMENT

### I.  Journalists and Researchers Use Scraping to Enable Speech in the Public Interest and Hold Power to Account.

Contemporary public discourse takes place largely online on platforms operated by private companies. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general . . . and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citation and quotation marks omitted). The Supreme Court has emphasized that, for many, social media platforms are the "principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Id*. at 107.

Journalists and researchers have played a vital role helping the public understand how our digital lives unfold within these "vast realms." Investigating the effects of social media platforms on public discourse requires techniques suited to the study of digital forums. One technique involves the automated collection of data, a practice often referred to as scraping.[2] The utility of scraping for independent

---

[2] *See* Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B.U. J. Sci. & Tech. L. 372, 373, 414–15 (2018) (noting that scraping often, but not always, involves automation and emphasizing that scraping "should

investigation and research in the public interest is well established.[3] Scraping has served as the foundation for research on issues ranging from online discrimination,[4] to misinformation about elections and vaccines,[5] to social media advertising policies.[6] Indeed, systematic collection of public data can serve as an important counterweight to the consolidation of control by large platforms over information

---

not be thought of as inherently more invasive or dangerous than a person at a web browser").

[3] *See, e.g.*, Alan Luscombe, Kevin Dick & Kevin Walby, *Algorithmic Thinking in the Public Interest: Navigating Technical, Legal, and Ethical Hurdles to Web Scraping in the Social Sciences*, 56 Quality & Quantity 1023, 1024 (2022) ("[I]t is becoming increasingly necessary to turn to innovative tools like scraping to carry the social sciences forward into the twenty-first century.").

[4] *See, e.g.*, Benjamin Edelman, Michael Luca & Dan Svirsky, *Racial Discrimination in the Sharing Economy: Evidence from a Field Experiment*, 9 Am. Econ. J.: Applied Econ. 1, 1–3 (2017).

[5] *See*, *e.g.*, Laura Edelson & Damon McCoy, *We Research Misinformation on Facebook. It Just Disabled Our Accounts.*, N.Y. Times (Aug. 10, 2021), https://perma.cc/A9MW-57AA.

[6] *See, e.g.*, Muhammad Ali et al., *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proc. ACM on Human-Comput. Interaction 1, 3–4 (2019).

streams, and as a key accountability mechanism to reveal the platforms' content moderation choices[7] and privacy policies and practices.[8]

In the context of public interest journalism and research, scraping public information is part and parcel of the subsequent speech it enables. This Court, when evaluating First Amendment claims, has held that there is no "distinction between the process of creating a form of *pure* speech . . . and the product of these processes." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010). Here, scraping involves no discrete activity that could not be accomplished manually, though the manual approach would entail greater expense, time, and risk of error.[9] In this context, "[s]craping is merely a technological advance that makes information collection easier; it is not meaningfully different from using a tape recorder instead of taking written notes, or using the panorama function on a smartphone instead of taking a series of photos from different positions." *Sandvig*, 315 F. Supp. 3d at 15–16 (finding, in a case involving public interest research, that "scraping plausibly falls within the ambit of the First Amendment").

---

[7] *See, e.g.*, Emillie de Keulenaar, João C Magalhães & Bharath Ganesh, *Modulating Moderation: A History of Objectionability in Twitter Moderation Practices*, 73 J. Commc'n 273 (2023) (using scraping techniques to analyze Twitter moderation practices from 2006–22).

[8] *See, e.g.*, Hang Do Thi Duc, *Public by Default* (July 2018), https://perma.cc/6CX7-EM7L (using scraping to illustrate how transaction information exposed by default via Venmo can reveal intimate details of specific users' daily lives and routines).

[9] *See* Sellars, *supra* note 2, at 386–88.

When scraping public information is done to advance public interest journalism and research, it is part of the process of creating lawful, constitutionally protected speech. The speech of academics, journalists, and research organizations like CCDH—often made possible only by scraping—has shed crucial light on a panoply of concerns that powerful social media platforms have failed to independently monitor and correct, such as online discrimination,[10] and has provided important information for regulators to take enforcement action.[11]

## II.  X Cannot Wield Contract Law to Punish Speech Critical of It.

X's attempt to enforce its term of service prohibiting scraping against CCDH fails for two reasons. First, X cannot recover reputational damages that sound in defamation without satisfying the First Amendment's limitations on defamation liability. Second, even if X were able to offer a cognizable theory of damages in this

---

[10] *See*, *e.g.*, Ali et al., *supra* note 6.

[11] *See*, *e.g.*, Katie Benner, Glenn Thrush & Mike Isaac, *Facebook Engages in Housing Discrimination with Its Ad Practices, U.S. Says*, N.Y. Times (Mar. 28, 2019), https://perma.cc/BGP2-TNFC (noting that a Department of Housing and Urban Development lawsuit followed "nearly three years of scrutiny of Facebook's ad-targeting practices that started with a 2016 investigation by ProPublica, whose reporters showed that the company made it simple for marketers to exclude specific ethnic groups for advertising purposes").

case, X could not enforce its anti-scraping term of service against scraping that enables speech in the public interest.[12]

### A. X Cannot Recover Reputational Damages Merely by Alleging Breach of Its Anti-Scraping Term of Service.

Courts have long held that a plaintiff may not plead around the First Amendment's requirements for a defamation suit by simply bringing a claim other than defamation to recover reputational damages, noting that the First Amendment's protections "apply to all claims whose gravamen is the alleged injurious falsehood of a statement." *Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1182 (Cal. 1986) (quoting *Reader's Digest Ass'n v. Superior Ct.*, 690 P.2d 610, 624 (Cal. 1984)); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 52–53 (1988). Courts have been clear: "[C]onstitutional protection does not depend on the label given the stated cause of action." *Reader's Digest Ass'n*, 690 P.2d at 624. Rather, the key to determining when a plaintiff must plead and satisfy the required showing of actual malice is if the damages sought by the plaintiff could have been incurred even if the speech on a matter of public concern had never been published. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991); *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125,

---

[12] *Amici* note that whether CCDH in fact breached X's term prohibiting scraping is contested. *See* ER-54–55. *Amici* take no position on that issue, and argue that the term should not be enforced, in these circumstances, as void for public policy.

1132, 1134 (9th Cir. 2022), *cert. denied sub nom. Ctr. for Med. Progress v. Planned Parenthood Fed'n. of Am.*, 144 S. Ct. 263 (2023).

Time and again, courts have rejected alternative causes of action "based on the same acts which would not support a defamation action," because they "would allow plaintiffs to do indirectly what they could not do directly." *Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97, 104 (Cal. 1986) (en banc) (citation omitted) (rejecting a claim of invasion of privacy); *see also, e.g.*, *Hustler Mag.*, 485 U.S. 46 (intentional infliction of emotional distress); *Paul v. Watchtower Bible Tract Soc'y*, 819 F.2d 875 (9th Cir. 1987) (same); *Time, Inc. v. Hill*, 385 U.S. 374 (1967) (invasion of privacy); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) (malicious interference with business); *Blatty*, 728 P.2d 1177 (intentional interference with prospective economic advantage); *Molko v. Holy Spirit Ass'n*, 762 P.2d 46 (Cal. 1988) (fraud); *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007) (breach of contract).

Such an end-run is precisely what X attempts to do here, by seeking to enforce its anti-scraping term of service to punish CCDH for its speech without having to contend with the First Amendment. The Amended Complaint reveals that the gravamen of X's claim is one of defamation in a contract claim's clothing. The Amended Complaint is centered on the content of CCDH's reports about X— namely, criticism about the prevalence on X's platform of dis- or misinformation

related to issues ranging from climate change to the COVID-19 pandemic. *See* ER-99–101. The damages X seeks—tens of millions of dollars in lost advertising revenue—are tied to reputational harm only, with no basis in any direct physical, operational, or other harm that CCDH's alleged scraping activities inflicted on X. *See* ER-111–12. What's more, X seeks to hold CCDH liable for these reputational damages—a classic defamation claim—without alleging any specific false statements of fact, let alone that CCDH satisfied the actual malice standard first established in *Sullivan*, 376 U.S. at 279–80. Rather, the Amended Complaint amounts to a disagreement over the quality and presentation of CCDH's research, alleging that the organization's methodologies are flawed because it uses "rudimentary tactics," "do[es] not include meaningful discussion or analysis" of certain posts, and "fail[s] to include context," leading to "misleading narratives." ER-99. Had CCDH praised rather than criticized X, there would be no damages to claim and therefore no lawsuit.

On appeal, X attempts to make an issue out of whether CCDH "intended" the reputational harm that X alleges it suffered. Appellant's Br. 22, 26. But the intent of a speaker engaged in speech on a matter of public concern is irrelevant—it cannot transform reputational damages into economic damages that can be recovered without having to meet the requirements of a defamation claim. The Supreme Court has clearly held that motive in publishing speech about matters of public concern

alone is never sufficient to constitute actual malice for defamation. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989) ("[A] newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice"); *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970))); *see also Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) ("It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice."). This rule does not change in other civil cases in which a plaintiff seeks recovery for reputational damages flowing from speech on issues of public concern; actual malice is required when "intent to cause injury . . . is the gravamen of the tort," such as intentional infliction of emotional distress. *Hustler Mag.*, 485 U.S. at 53 ("[W]hile such a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures."). Nor does it change in the criminal law context, where the Court has held that the First Amendment bars punishment for false statements made with ill-will, but without actual malice. *Garrison v. Louisiana*, 379 U.S. 64, 78 (1964) (striking

13

down state statute on First Amendment grounds because it both "punishes false statements without regard to [the *Sullivan*] test if made with ill-will" and allows for punishment "even if ill-will is not established" so long as "a false statement concerning public officials [is] not made in the reasonable belief of its truth").

Rather, the key to determining if the actual malice standard must be met for recovery to be permissible is whether the alleged damages could have been incurred even if the speech had not been published. For example, in *Cohen* the Supreme Court held that a confidential source could recover under a state's promissory estoppel law against two newspapers for breaching their agreement to keep the source's name confidential. 501 U.S. at 663, 665. The Court's decision to allow recovery turned on the facts (1) that the information published was not public and the newspapers "obtained [the plaintiff's] name only by making a promise that they did not honor"; and (2) that the damages the plaintiff sought were not for "injury to his reputation or his state of mind" but flowed directly from the revelation of his name, which "caused him to lose his job and lowered his earning capacity." *Id*. at 666, 671. Critically, even if the newspapers had not published the plaintiff's name in their articles but had, instead, revealed it directly to the source's employer, the *Cohen* plaintiff would have suffered the same harm. The damages that flowed from the breach of the newspapers' promise of confidentiality did not turn on the publishing activity they undertook.

14

Similarly, the damages at issue in *Planned Parenthood* did not arise out of publication. This Court held that Planned Parenthood could recover economic damages stemming from "violation of civil RICO, federal wiretapping law, state wiretapping laws, civil conspiracy, breach of contracts, trespass, and fraud" after anti-abortion activists used falsified documents to solicit access to industry conferences, all for the purpose of surreptitiously recording Planned Parenthood employees without notice or consent and publishing those recordings. 51 F.4th at 130–34. The Court explained that infiltration damages "related to Planned Parenthood's costs to prevent a future similar intrusion" and security damages for "Planned Parenthood's costs for protecting their doctors and staff" from violence and harassment were properly recoverable without implicating the First Amendment because "Planned Parenthood would have been able to recover the infiltration and security damages even if [the intruders] had never published videos of their surreptitious recordings." *Id*. at 1132, 1134.

Here, X's claimed reputational damages flow from CCDH's subsequent speech via its published reports. X's claim turns on the fact that CCDH published reports based on its scraping activity and the alleged violation of X's anti-scraping term of service. But unlike in *Cohen* and *Planned Parenthood*, CCDH collected publicly available information on X's platform, and the damages X seeks for lost advertising revenue flow from CCDH's published reports. For these reasons, X has

failed to plead any cognizable or permissible damages. The dismissal of X's claim can be upheld on this basis alone.

### B. X Cannot Enforce Its Anti-Scraping Term of Service Against Scraping That Enables Speech in the Public Interest.

X's invocation of its scraping prohibition against CCDH takes aim at speech in the public interest that is critical of the company. This tactic runs afoul of a robust body of positive law enshrining California's public policy against litigation that chills speech that contributes to public discourse. By selectively enforcing its anti-scraping term against CCDH and invoking millions of dollars in damages based on reputational harm, X is attempting to suppress speech that constitutes "participation in matters of public significance," Cal. Civ. Proc. § 425.16(a), and which the First Amendment, California Constitution, and California anti-SLAPP law protect. Thus, allowing X to enforce its anti-scraping term of service against journalists and researchers like CCDH would be contrary to California's public policy, rendering the provision void and unenforceable in this context.

### i. Contract Provisions That Chill Speech on Matters of Public Interest Are Void for Public Policy in California.

Under California law, a contract may not be enforced if "the interest in its enforcement is clearly outweighed in the circumstances by a public policy against [its] enforcement." *Bovard*, 247 Cal. Rptr. at 344. California has codified its broad void for public policy defense to contract enforcement, which applies not only to

16

contracts that are contrary to express law, but also "contrary to the policy of express law, though not expressly prohibited." Cal. Civ. Code § 1667(2). Any provision that "tends to undermine [a] sense of security for individual rights, whether of personal liberty or private property . . . is against public policy." *Safeway Stores, Inc. v. Retail Clerks Int'l Ass'n*, 261 P.2d 721, 726 (Cal. 1953). Courts interpreting California law have refused to enforce a variety of contract provisions on public policy grounds, including ones that circumscribe a party's ability to speak freely on matters of public interest. *See, e.g.*, *Cariveau v. Halferty*, 99 Cal. Rptr. 2d 417, 421–24 (Ct. App. 2000) (refusing to enforce agreement not to report securities violation to investigative agency); *McPhearson v. Michaels Co.*, 117 Cal. Rptr. 2d 489, 493 (Ct. App. 2002) (finding that agreement not to testify would be contrary to public policy); *cf. Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1397–99 (9th Cir. 1991) (refusing to enforce agreement not to run for public office).

The First Amendment, California Constitution, and California anti-SLAPP law enshrine a firm public policy of protecting speech on matters of public interest. The First Amendment imposes a high bar for defamation claims to "assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)); *see also*, *e.g.*, *Sullivan*, 376 U.S. at 279–80 (requiring "actual malice" for public officials pleading defamation).

17

The California Supreme Court has repeatedly noted that article I, section 2 of the California Constitution creates a more expansive zone of protection than its federal analogue. *See*, *e.g.*, *People v. Glaze*, 614 P.2d 291, 293 n.2 (Cal. 1980) (deeming the provision "more protective of speech than the First Amendment"); *Blatty*, 728 P.2d at 1182 (same). Though the federal Constitution states only that Congress cannot legislate to constrain speech, its California counterpart couches protection of speech as an affirmative right for "[e]very person." Cal. Const. art. I, § 2(a). The California Constitution's protection for freedom of speech provides an additional, express source of public policy protecting speech in the public interest.

Finally, California's anti-SLAPP law manifests the state's decisive public policy in favor of protecting speech on matters of public interest, and confirms that the policy animating the First Amendment and article I, section 2 bears upon disputes between private parties. The statute allows defendants to move to strike complaints against them if they are sued for "any act . . . in furtherance of [their] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Civ. Proc. § 425.16(b). Among the activities protected is any conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with "an issue of public interest," *id.* § 425.16(e)(4), including speech that "concern[s] a person or entity in the public eye[,] . . . conduct that could directly affect a large number of

people beyond the direct participants[,] . . . or a topic of widespread, public interest," *Geiser v. Kuhns*, 515 P.3d 623, 629–30 (Cal. 2022) (citation omitted). The preamble to the statute puts the legislative intent in particularly stark terms, noting the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," and characterizing such suits as an "abuse of the judicial process." Cal. Civ. Proc. § 425.16(a); *see also Geiser*, 515 P.3d at 635 (emphasizing that the California legislature enacted the anti-SLAPP statute to safeguard the legal tradition of recognizing "the importance of speech and other expressive activity even when— perhaps especially when—it is uncomfortable or inconvenient"). To protect against such abuses, the California legislature directed that the statute "shall be construed broadly." Cal. Civ. Proc. § 425.16(a); *see also*, *e.g.*, *Hilton v. Hallmark Cards*, 599 F.3d 894, 906 (9th Cir. 2010) (construing the statute broadly in light of its "stated purpose to encourage participation in matters of public importance or consequence").

Of particular relevance here, courts have held that the anti-SLAPP statute applies even to standard breach of contract claims that do not implicate the important public policy concerns presented by this case. *Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002) ("[C]onduct alleged to constitute breach of contract may . . . come within constitutionally protected speech or petitioning."). This Court has dismissed breach

19

of contract claims when they "masquerade as ordinary lawsuits but are brought to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016) (citation omitted); *see also, e.g.*, *Olson v. Doe*, 502 P.3d 398, 404–08 (Cal. 2022) (dismissing breach of non-disparagement clause claim); *Timothy W. v. Julie W.*, 301 Cal. Rptr. 3d 294, 308 (Ct. App. 2022) (dismissing breach of confidentiality agreement claim).

### ii. Allowing X to Enforce Its Anti-Scraping Term of Service Against Journalists and Researchers Like CCDH Would Chill Speech on Matters of Public Interest.

X's tactic of attempting to tamp down on critical speech through a breach of contract claim runs contrary to California's public policy of protecting speech that aims to inform the public or contribute to public discourse. As discussed above, scraping is an essential tool for digital research and journalism in the public interest. *See supra* Section I. If digital researchers and journalists were forced to abandon this method of digital investigation, we would be left with less insight into the "modern public square," *Packingham*, 582 U.S. at 107—both what it contains and its effect on society broadly.

To allow X to proceed on this theory would equip it with a tool to suppress the speech of users who scrape in the public interest. It would dramatically circumscribe public interest journalism and research, leading to consolidation of information in the hands of platforms in a manner that undermines the public good.

Corporations like X have incentives to prevent research that could portray them negatively or even expose them to liability—as a result, these corporations may see research based on public user posts as adversarial to the platform.[13] But as this Court recently recognized, giving social media platforms "free rein to decide, on any basis, who can collect and use data—data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use—risks the possible creation of information monopolies that would disserve the public interest." *hiQ Labs, Inc.*, 31 F.4th at 1202.[14]

Further, X's theory of damages—tens of millions of dollars from lost advertising revenue resulting from the publication of non-defamatory speech—will chill other speakers who scrape in service of public interest journalism and research. Indeed, such chill has already taken hold. A recent survey of 167 academics and

---

[13] For example, Meta threatened NYU's Ad Observatory with legal action, pointing to Meta's consent decree with the Federal Trade Commission (FTC) to justify the decision. The FTC later condemned Meta's actions, noting that the decree did not bar Meta from "creating exceptions for good-faith research in the public interest." Letter from Sam Levine, Acting Director, Bureau of Consumer Protection, to Mark Zuckerberg, CEO, Facebook (Aug. 5, 2021), https://perma.cc/WQ9F-BY28.

[14] Enforcing X's prohibition on scraping against CCDH is particularly problematic in a context where the contract stems from a unilaterally imposed website term of service. Not only are terms of service generally "lengthy, opaque, subject to change and seldom read," *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (*Nosal I*) (en banc), but they are written solely by platforms in their own interest with independent researchers subject to those terms simply in order to access the "modern public square," *Packingham*, 582 U.S. at 107.

21

researchers found that over 100 studies about X have been diverted, stalled, or canceled, with over half of those interviewed citing a fear of being sued by X over their findings or data.[15] Affected studies include those about child safety, how the subject of rape is discussed on the platform, and the platform's content moderation decisions.[16] Critical research of this nature, often reliant on scraping, is important to understanding how major social media platforms operate and interact with users at scale. Yet it is being stifled by the mere prospect of liability in the millions of dollars. The result is a more opaque Internet in which powerful platforms can control what research is done about them.

Recognizing that scraping public information for research in the public interest is foundational to the subsequent speech it enables does not require courts to decline enforcement of the vast majority of platforms' terms of service—only in situations where enforcement would threaten a "First Amendment right to record at least some matters of public interest, in order to preserve and disseminate ideas." *Sandvig*, 315 F. Supp. 3d at 15–16.[17] Nor does it mean that platforms and regulators

---

[15] Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, Reuters (Nov. 6, 2023), https://perma.cc/E4N8-H5KA.

[16] *Id.*

[17] Because CCDH's alleged scraping activities enable speech critical of the powerful in the public interest, they are distinct from the practices of other entities, including those that may scrape user information for surveillance software products that those entities sell to police and other government agencies, which surveillance raises First

are powerless to protect platform users' privacy. Legislators can codify protections for sensitive data, and there are many tools at a platform's disposal to limit the public exposure of user information, including enabling privacy settings that restrict what information is shared by default.[18]

What a platform cannot do, however, is make information available to users and then use contract law to seek damages from them for their critical speech based on that information. Such is the case here, where CCDH observed content it deemed problematic dis- or misinformation, and is facing liability for what it said about that content. Even if the Court were to find that CCDH breached X's terms of service by scraping X's platform, the Court should hold that enforcing X's anti-scraping term of service here is contrary to public policy because CCDH scraped public content to engage in speech on matters of public interest. California's policy, as reflected in the First Amendment and California law, robustly protects speakers who contribute to public discourse from fear of liability and the burdens of costly litigation.

---

Amendment concerns and risks harm to marginalized communities. *See, e.g.*, Sam Levin & Johana Bhuiyan, *Exclusive: LAPD Partnered with Tech Firm That Enables Secretive Online Spying*, Guardian (Nov. 17, 2021), https://perma.cc/DY96-FLPV.

[18] *See, e.g.*, Brian X. Chen, *This Is a Reminder That You're Probably Oversharing on Venmo*, N.Y. Times (Aug. 9, 2023), https://perma.cc/E9TF-U8UE (noting that technology platforms are constantly adjusting default privacy settings).

### III. X's CFAA Claim Is Foreclosed by This Court's Prior Rulings and Would Criminalize a Wide Range of Common Behavior Online.

X similarly aims to chill actors like CCDH from speaking critically of it by pursuing a meritless CFAA claim. Allowing X to pursue its CFAA claim would open the door to criminalizing a wide range of innocuous conduct online, the very outcome this Court has sought to avoid in its CFAA case law. The Court has consistently expressed a need to be "mindful" that the CFAA's "ill-defined terms may capture arguably innocuous conduct, such as password sharing among friends and family, inadvertently making criminals of large groups of people who would have little reason to suspect they are committing a federal crime." *United States v. Nosal*, 844 F.3d 1024, 1038 (9th Cir. 2016) (*Nosal II*) (interpreting access "without authorization") (citation and quotation marks omitted); *United States v. Nosal,* 676 F.3d 854, 859–860 (9th Cir. 2011) (*Nosal I*) (en banc) (broad construction of "exceeds authorized access" would "transform whole categories of otherwise innocuous behavior into federal crimes simply because a computer is involved"). The Supreme Court recently sounded a similar warning, rejecting a broad interpretation of the CFAA because it "would attach criminal penalties to a breathtaking amount of commonplace computer activity." *Van Buren v. United States*, 593 U.S. 374, 393 (2021).

X's claim that CCDH violated the CFAA by accessing X using a third party's login credentials raises a question already answered by this Court: "Whether the

24

CFAA [can] be interpreted broadly to cover violations of corporate computer use restrictions." *Nosal II*, 844 F.3d at 1034 (citation and quotation marks omitted). The Court has repeatedly and "unequivocally said 'no'" to X's legal theory. *Id.*; *see also Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1067 (9th Cir. 2016). Upholding X's claim would require the Court to repudiate its prior cases and would "transform the CFAA from an anti-hacking statute into an expansive misappropriation statute." *Nosal I*, 676 F.3d at 857.

Indeed, this Court's decision in *Power Ventures* addressed the factual scenario at issue here and foreclosed CFAA liability. In that case, Facebook users gave Power permission to use their login credentials to access Facebook on their behalf, even though such access violated Facebook's terms of service. This Court held that violation of these terms, "*without more*, would not be sufficient to impose liability" under the CFAA. 844 F.3d at 1067 n.3 (emphasis added). The Court instead held that Power's access was "without authorization" only after Facebook took further action, by sending an individualized cease-and-desist letter that "expressly rescinded" Power's authorization. *Id.* at 1067.

Here, however, X alleges a violation of written use agreements "without more." X asserts that CCDH's access to its website was "without authorization" because CCDH's use of third-party logins violated written agreements between those third parties and X. *See* Appellant's Br. 39. The claim is therefore premised solely

on a violation of a written agreement—to which CCDH was not even a party—which is "insufficient" as a basis of liability under the CFAA. *Nosal II*, 844 F.3d at 1038; *Power Ventures*, 844 F.3d at 1069. X does not allege that it affirmatively rescinded CCDH's permission to access its network either explicitly or otherwise; it claims only that CCDH was "aware" its access was prohibited.[19]

Responding to concerns that its holding in *Nosal II* would threaten a wide range of behavior online, the Court wrote that the requirement of an "unequivocal revocation of computer access" along with the requirement that unauthorized access be done "knowingly and with intent to defraud" meant "that the statute will not sweep in innocent conduct, such as family password sharing." *Nosal II*, 844 F.3d at 1028. But X's claim in this case is indistinguishable from paradigmatic innocuous password sharing: CCDH's access was not revoked. And the only allegations of culpable *mens rea* here turn on CCDH's purported knowledge of written prohibitions on its access, akin to the prohibitions on sharing passwords or other login credentials found in most online streaming services. If this is the "knowing and specific conduct" relied on by the court in *Nosal II*, 844 F.3d at 1032, then millions of ordinary Internet users are routinely risking criminal liability.

---

[19] X relies on this Court's decision in *Nosal II*, but that case also involved a defendant whose access was "affirmatively revoked" by the computer owner. 844 F.3d at 1038. It was this fact, not the defendant's awareness that the employer did not want him to access its computers, that allowed the CFAA charge to go forward. *Id.*

26

This Court has never condoned CFAA liability based on a defendant's mere awareness of a written computer use policy, *see Nosal I*, 676 F.3d at 859–60, and it should not start now. Doing so would hand website owners like X a powerful weapon—the threat of CFAA liability—to wield against individuals who merely violate the websites' written terms of service, including prohibitions on scraping. *See supra* Section II. This Court should decline to let the CFAA become a means for shutting down important speech in the public interest.

## CONCLUSION

This Court should hold that X cannot hold CCDH liable for the alleged breach of contract and CFAA violations. Doing so will ensure that journalists and researchers can continue to engage in important newsgathering online in support of speech in the public interest that holds powerful platforms to account.

Dated: September 27, 2024

Respectfully submitted,

*/s/ Esha Bhandari*

Jake Karr
TECHNOLOGY LAW AND POLICY CLINIC
NYU SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
(212) 998-6042
jake.karr@nyu.edu

Cindy Cohn
Andrew Crocker
Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street

Esha Bhandari
Elizabeth Gyori
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
ebhandari@aclu.org

Nicole Ozer
Matthew T. Cagle

San Francisco, CA 94109
(415) 436-9993
cindy@eff.org

Ramya Krishnan
Alex Abdo
KNIGHT FIRST AMENDMENT INSTITUTE
    AT COLUMBIA UNIVERSITY
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN
    CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 293-6336
nozer@aclunc.org

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 6,599 words, excluding the items exempted by Fed. R. App. P. 32(f), and complies with the length specifications set forth by Fed. R. App. P. 29(a)(5) and 32(a)(7). I further certify that this brief was prepared using 14-point Times New Roman font, in compliance with Fed. R. App. P. 32(a)(5) and (6).

Dated: September 27, 2024          Respectfully submitted,

*/s/ Esha Bhandari*
Esha Bhandari

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

I hereby certify that on September 27, 2024, I electronically filed the foregoing Brief of *Amici Curiae* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system, which effects service upon all counsel of record.

Dated: September 27, 2024         Respectfully submitted,

                                              */s/ Esha Bhandari*
                                              Esha Bhandari

                                              *Counsel for* Amici Curiae