**No. 24-2643**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

X CORP.,

*Plaintiff-Appellant,*

v.

CENTER FOR COUNTERING DIGITAL HATE, INC.
CENTER FOR COUNTERING DIGITAL HATE LTD. and
STICHTING EUROPEAN CLIMATE FOUNDATION,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:23-cv-03836 (Hon. Charles R. Breyer)

---

**BRIEF OF *AMICI CURIAE* COALITION FOR INDEPENDENT
TECHNOLOGY RESEARCH AND INTEGRITY INSTITUTE
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

Seth D. Berlin
Maxwell S. Mishkin
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
berlins@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* state that neither has a parent corporation and that no publicly held corporation owns 10% or more of either of their stock.

*Amicus* Coalition for Independent Technology Research further states that it is a fiscally sponsored project of Aspiration, a Washington nonprofit public benefit corporation.  Aspiration also has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.......................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*..................1

SOURCE OF AUTHORITY TO FILE ...................................................2

RULE 29(a)(4)(E) CERTIFICATION......................................................2

INTRODUCTION .............................................................................3

ARGUMENT ...................................................................................6

I.     INDEPENDENT RESEARCH ABOUT SOCIAL MEDIA
       PLATFORMS BENEFITS THE PUBLIC AND THE
       PLATFORMS ALIKE.............................................................6

       A.     Independent Research About The Platforms Informs
              The Public..................................................................7

              1.     Political and electoral speech..................................7

              2.     The platforms' representations about themselves....................10

       B.     Independent Research Also Benefits The Platforms............................14

II.    PLATFORMS OFTEN TARGET UNFLATTERING
       RESEARCH BY CLAIMING TECHNICAL VIOLATIONS
       THAT RESULT ONLY IN REPUTATIONAL INJURY ...........................16

III.   THE DISTRICT COURT CORRECTLY RECOGNIZED THIS
       ACTION AS A TRANSPARENT EFFORT TO PUNISH AND
       CHILL INDEPENDENT RESEARCH.........................................21

       A.     Independent Technology Research Is Part Of A Long
              Tradition Of Investigators And Testers................................21

       B.     Courts Routinely Protect Investigators And Researchers
              From Retaliatory Claims Over Their Information-Gathering
              Methods ..................................................................23

C.    The District Court Correctly Saw Through X's Claims To
      Recognize That The Platform Targeted CCDH's Speech ..................27

CONCLUSION ........................................................................................29

CERTIFICATE OF COMPLIANCE........................................................30

CERTIFICATE OF SERVICE ................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Illinois v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) ...................................................24, 25, 26

*Animal Legal Defense Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018) ......................................................25, 26

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963)..............................................................................28

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984)...........................................................................28

*Counterman v. Colorado*,
    600 U.S. 66 (2023).............................................................................26

*Desnick v. ABC, Inc.*,
    44 F.3d 1345 (7th Cir. 1995) ......................................................23, 24

*Edenfield v. Fane*,
    507 U.S. 761 (1993).............................................................................4

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
    194 F.3d 505 (4th Cir. 1999) ............................................................24

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) .....................................................20, 21

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988).............................................................................28

*Lieberman v. KCOP Television, Inc.*,
    110 Cal. App. 4th 156 (2003) ...........................................................27

*Masry v. Lowe's Cos.*,
    2024 WL 3228086 (N.D. Cal. June 28, 2024).................................27

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024).................................................................6, 7, 8

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)...................................................................13

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013) .......................................................11

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)...................................................................2, 7

*Sandvig v. Barr*,
    451 F. Supp. 3d 73 (D.D.C. 2020) ............................................20

*Sandvig v. Sessions*,
    315 F. Supp. 3d 1 (D.D.C. 2018) ..............................................21

*Underwager v. Salter*,
    22 F.3d 730 (7th Cir. 1994) .......................................................11

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012) .....................................................20

*Van Buren v. United States*,
    593 U.S. 374 (2021)...................................................................20

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer
    Council, Inc.*,
    425 U.S. 748 (1976)..............................................................3, 4, 5

*Washington Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) .......................................................8

*Wilson v. Super. Ct.*,
    13 Cal. 3d 652 (1975) ................................................................27

## Statutes and Other Authorities

15 U.S.C. § 45b.............................................................................27

Brief of Tech. Cos. as Amici Curiae, *Van Buren v. United States*,
    No. 19-783, 2020 WL 4003432 (U.S. July 8, 2020) ...................14, 19

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*

The Coalition for Independent Technology Research ("CITR") is a non-partisan organization of researchers, research organizations, academics, and journalists who study emerging digital technologies, including social media, and their social and political impacts. CITR believes that technology is changing society in ways that are essential for the public—as well as the government and the social media platforms themselves—to understand, and that independent research is critical to that understanding. CITR has a particular interest in this case given that a group of CITR members conducted a "survey of 167 academic and civil society researchers" which "show[ed] a majority of survey respondents fear being sued by X over their findings or use of data." *See* Sheila Dang, *Exclusive: Elon Musk's X restructuring curtails disinformation research, spurs legal fears*, Reuters (Nov. 6, 2023), https://www.reuters.com/technology/elon-musks-x-restructuring-curtails-disinformation-research-spurs-legal-fears-2023-11-06/. A list of CITR's members can be found at https://independenttechresearch.org/members/.

Integrity Institute is a nonprofit organization whose members include engineers, product managers, researchers, data scientists, operations specialists, policy experts, and others with decades of experience working at technology companies. Integrity Institute members either currently work, or have worked, at X (formerly known as Twitter), as well as at Meta (Facebook, Instagram, and

— 1 —

WhatsApp), PayPal, YouTube, and almost every other prominent technology company. Members have been instrumental in helping build the architecture of social media platforms, as well as their internal trust and safety programs. Integrity Institute's full formal name is Tech Integrity Institute, and a current list of its public members can be found at https://integrityinstitute.org/members.

Amici offer this brief to illustrate the danger that lawsuits like X's pose to independent research into the massive social media platforms that constitute "the modern public square." *Packingham v. North Carolina*, 582 U.S. 98, 101, 107 (2017). *Amici* respectfully submit that the district court correctly ruled that X should not be permitted to assert technical violations of its terms of service—or worse, violation of a federal criminal statute—to punish and chill research evaluating the truth of X's public statements about content on its platform.

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiff-Appellant and Defendants-Appellees have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## RULE 29(a)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* certify that (1) no party or party's counsel authored this brief in whole or in part or contributed money intended to fund preparing or submitting this brief; and (2) the preparation of this brief was funded in part by non-party Tech Justice Law Project.

**INTRODUCTION**

Modern social media companies are both platforms for massive quantities of speech and corporate juggernauts that, like other providers of commercial services, regularly engage in their own speech to make representations about the nature of their platforms. At its core, X's case takes aim at technologists' ability to study the political and ideological speech moving across these immense networks and to evaluate—and, where appropriate, to challenge—a platform's own commercial representations about its services. Put differently, this case involves the fundamental right of researchers to respond with their own counter-speech to both speech *on* the platforms and *by* the platforms.

Nearly 50 years ago, the Supreme Court recognized that the First Amendment protects speech not only about the candidates and officials competing for voters in the electoral marketplace, or about the philosophies and worldviews competing for believers in the marketplace of ideas, but also about the companies and services competing for consumers in the actual marketplace. Recognizing the connection between the political and economic arenas, the Court explained that, "[s]o long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed." *Virginia State Bd. of Pharmacy v.*

*Virginia Citizens Consumer Council, Inc.* ("*Virginia Pharmacy*"), 425 U.S. 748, 765 (1976).  In protecting such speech, the Court explained that "the best means to that end is to open the channels of communication rather than to close them."  *Id.* at 770; *see also Edenfield v. Fane*, 507 U.S. 761, 767 (1993) ("The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish.").

In the intervening years, our political and social fabric has become even more closely intertwined with private economic actors, namely, the global social media platforms now at the heart of political and social discourse—companies with vast resources, including to trumpet claims about their online environments.  It has therefore become even more important to protect speech about those services.

For decades, to ensure an informed public, our Nation has relied on independent researchers, scholars, and investigative journalists to study and report on big businesses, from Upton Sinclair's revelations about the Chicago meatpacking industry, to Ralph Nader's expose of General Motors, to John Carreyrou's bombshell reporting on Theranos.  The audience for this research includes not only potential consumers, but also regulators and lawmakers who might—even recognizing the challenges in regulating a service that facilitates speech—use that information to fashion regulations, say, mandating substantial accuracy in platforms' public statements about their services.  Research of this type

is therefore "indispensable" not only "to the proper allocation of resources in a free enterprise system," but also "to the formation of intelligent opinions as to how that system ought to be regulated or altered." *Virginia Pharmacy*, 425 U.S. at 765.

In the present social media era, independent researchers like *Amici*'s members—technologists, computer scientists, academics, and civil society scholars, among others—are a vital part of this information ecosystem. As explained below, their research is essential to public understanding of social media platforms. Moreover, as many members of *Amici* who work or have worked for social media companies know first-hand, *the platforms themselves* often benefit from this research by discovering new ways to improve their services.

Even though independent research helps the public and platforms alike, technology companies have repeatedly tried to thwart that work. The instant lawsuit is case in point. X essentially manufactured various legal claims against CCDH, and sought millions in claimed damages barred by settled law, in a transparent effort to punish CCDH for its published reports detailing tweets that had already been *widely and publicly disseminated*, and challenging X's *public* representations about the nature of the speech on its platform.

In sum, X wants robust protection for the speech on its platform, even if harmful, and for its own speech about its platform, even if false or misleading, but wants to punish CCDH for engaging in counter-speech. And X wants to make

— 5 —

assertions about posts on its platform, based on its *own* review of them, while at the same time hamstringing independent researchers in their ability to do the same. As such, this is a classic case of "free speech for me, but not for thee." Despite X's creative pleading, the district court correctly saw X's claims for what they were: an ill-conceived effort to punish CCDH's speech about a matter of vital public concern and to chill future independent researchers' speech. The court's ruling dismissing X's amended complaint with prejudice should be affirmed.

## ARGUMENT

## I. INDEPENDENT RESEARCH ABOUT SOCIAL MEDIA PLATFORMS BENEFITS THE PUBLIC AND THE PLATFORMS ALIKE.

The information that technologists like *Amici*'s members gather and report about social media platforms is of vital public importance. As the Supreme Court recently noted, "[t]he biggest social-media companies—entities like Facebook and YouTube—host a staggering amount of content. Facebook users, for example, share more than 100 billion messages every day. And YouTube sees more than 500 hours of video uploaded every minute." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2395 (2024) (citations omitted). Given this deluge of material, "[t]he key to the scheme is prioritization of content, achieved through the use of algorithms. Of the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list, only the tiniest fraction do." *Id.* at 2403.

As if that were not complicated enough, platforms sometimes decide that "removing a post is the right course," and their "content-moderation policies also say when that is so." *Id.* at 2404. YouTube, for example, prohibits "videos falling within categories like: hate speech, violent or graphic content, child safety, and misinformation (including about elections and vaccines)." *Id.* "The platforms thus unabashedly control the content that will appear to users, exercising authority to remove, label or demote messages they disfavor." *Id.*

Independent technology research helps the public better understand how the platforms exercise such awesome power over "the modern public square." *Packingham*, 582 U.S. at 107. This research also helps the platforms better understand the operation of their systems and content-moderation polices.

## A. Independent Research About The Platforms Informs The Public.

The public benefits in myriad ways from greater access to information about the major social media platforms. For one, the public has a tremendous interest in transparency into how the platforms handle speech about political and social issues of the day. For another, the public has a powerful interest in assessing the representations that the platforms make about themselves.

### 1. Political and electoral speech

It is beyond dispute that public officials, candidates, and campaigns rely heavily on social media to communicate with potential voters and potential

supporters.  *See, e.g.*, *Moody*, 144 S. Ct. at 2423 (noting that "[d]eleting the account of an elected official or candidate for public office may seriously impair that individual's efforts to reach constituents or voters, as well as the ability of voters to make a fully informed electoral choice"); *Washington Post v. McManus*, 944 F.3d 506, 517 (4th Cir. 2019) (noting that, in response to Maryland law regulating political advertising on platforms, Google "stopped hosting political advertisements in the state," in turn causing candidates to find it "difficult to communicate with voters").  The platforms thus have a powerful impact on our democracy in the decisions they make about what speech to permit or prioritize and what speech to prohibit.  For example, regardless of what one thinks about the merits, the decisions by Twitter and Facebook to suspend then-President Trump from their platforms following the January 6, 2021 riot indisputably "prevent[ed] him from posting messages to his more than 88 million followers on Twitter and 35 million followers on Facebook."  *See, e.g.*, Kate Conger et al., *Twitter and Facebook Lock Trump's Accounts After Violence on Capitol Hill*, The New York Times (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/technology/capitol-twitter-facebook-trump.html.  The platforms' subsequent decisions to reinstate his accounts likewise had a profound effect on political debate.

Given the extraordinarily powerful role played by the platforms, the public has an equally powerful interest in understanding the content carried on those

platforms.  For example, research from the Technology Transparency Project

("TTP") showed that, during the 2022 midterm elections, Google was "serving

misleading ads in English and Spanish to Americans looking for information on

how to vote."  *See Google Ads Mislead Voters Ahead of Midterms*, TTP (Nov. 7,

2022), https://www.techtransparencyproject.org/articles/midterms-approach-

google-ads-mislead-voters.  Specifically, researchers found that

> search terms such as 'voter registration,' 'register to
> vote,' and 'early voting' generated ads that directed users
> to low-quality, third-party search engines filled with a
> muddle of useless information or dubious sites that
> charge a fee to look up voter registration status—
> something that is entirely free for Americans.

*Id.*  As the researchers noted, "[t]hese ads violate[d] Google's policies

against abusing its ad network and seeking payment for information that is already

available from the government."  *Id.* (hyperlinks omitted).

Other researchers "tested whether three of the most widely-used social

media platforms in the United States—Google's YouTube, Meta's Facebook, and

TikTok—were able to detect election-related disinformation in ads in the run-up to

the [2022] midterm elections."  *See TikTok and Facebook fail to detect election

disinformation in the US, while YouTube succeeds*, Global Witness (Oct. 21,

2022), https://www.globalwitness.org/en/campaigns/digital-threats/tiktok-and-

facebook-fail-detect-election-disinformation-us-while-youtube-succeeds/.  These

researchers found that TikTok "approved a full 90% of the ads containing outright

false and misleading election misinformation," that "Facebook was only partially effective in detecting and removing the problematic election ads," and that "YouTube succeeded both in detecting the ads and suspending the channel carrying them, though this is in glaring contrast to the platform's record in Brazil, where similar ads were approved." *Id.*

As these examples illustrate, independent technology researchers help the public better understand content they see on the platforms and empower them to be savvier consumers of the platforms they use and the speech appearing on them.

### 2. The platforms' representations about themselves

Independent researchers also help the public to better assess the validity and trustworthiness of the claims that social media platforms make about themselves, which likewise empowers members of the public to make more informed choices about which platforms to use and how to interact with them.

In 2023, for example, researchers found that "Antisemitic and white supremacist groups and their supporters are using Facebook Pages, Instagram profiles, YouTube channels, and X accounts to raise money for their causes." *See Fundraising for Hate: Platforms' Revenue-Generating Opportunities*, ADL (Nov. 30, 2023), https://www.adl.org/resources/blog/fundraising-hate-platforms-revenue-generating-opportunities. These researchers discovered "hate groups using Meta platforms to raise money, in some cases using Facebook's own product features for

fundraising." *Id.* One such Facebook page offered for sale, among other works, *The Protocols of the Elders of Zion* and *Mein Kampf. Id.* As the researchers noted, "Facebook says that Pages on the platform and their content must comply with its Community Standards," which "prohibit content that 'praises, substantively supports or represents ideologies that promote hate,' including Nazism and white supremacy." *Id.* On Twitter, those same researchers "found users sharing links to donate on GoyimTV, the video platform of Goyim Defense League, the virulently antisemitic network." *Id.* Such content violated Twitter's policies at the time, which "prohibit[ed] linking to content that 'promotes violence against, threatens or harasses other people on the basis of race, ethnicity, national origin' and other attributes." *Id.*[1]

---

[1] Echoing his company's approach here, X owner Elon Musk has publicly threatened to sue the Anti-Defamation League for libel, blaming the organization "for lost advertising revenue since his acquisition" of the company. *See* Doha Madani, *Elon Musk blames ADL for lost revenue, says he opposes antisemitism 'of any kind'*, NBC News (Sept. 4, 2023), https://www.nbcnews.com/tech/tech-news/elon-musk-blames-adl-lost-revenue-says-anti-semitism-kind-rcna103292. Musk is of course free to disagree with the ADL's or CCDH's research methods, conclusions, or advocacy; indeed, *Amici*'s members may not agree with one another on how they conduct their research or what it shows. But courts regularly recognize that such disagreements must be hashed out through speech and counter-speech, not in the courts. *See, e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013) ("Needless to say, courts are ill-equipped to undertake to referee such controversies. Instead, the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury."); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) ("More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us.").

In yet another study, researchers "found more than 450 ads on Instagram and Facebook selling an array of pharmaceutical and other [illicit] drugs," many of which "made no secret of their intentions, showing photos of prescription drug bottles, piles of pills and powders, or bricks of cocaine, and encouraging users to place orders." *See Meta Allows Drug Ads Selling Everything from Opioids to Cocaine*, TTP (July 31, 2024), https://www.techtransparencyproject.org/articles/meta-allows-drug-ads-selling-everything-from-opioids-to-cocaine. The researchers noted that "Facebook's Community Standards prohibit attempts to sell 'high-risk drugs' and other 'non-medical drugs' that are 'used to achieve a high,'" and that "Meta's advertising standards also bar ads that 'promote the sale or use of illicit or recreational drugs, or other unsafe substances, products or supplements,' as well as attempts to sell prescription drugs." *Id.* (hyperlinks omitted). Moreover, although "Meta says it reviews ads before they appear on Facebook or Instagram to ensure they meet its advertising standards," the researchers "found that Meta often approved ads that were very clear about their drug dealing agenda in both their text and images." *Id.*

These examples underscore how independent researchers—when not facing the threat of legal onslaught—provide vital information to the public as it assesses whether powerful platforms are making accurate representations about themselves and their services. That knowledge empowers members of the public to make

informed decisions—for themselves and their families—about whether and to what extent to interact with those platforms. It also empowers other businesses to make informed decisions about whether and to what extent to advertise on those platforms, including what kind of content will be juxtaposed with their brand. *See, e.g.*, Brian Fung et al., *Major advertisers flee X, deepening crisis at Elon Musk's social media site*, CNN (Nov. 18, 2023), https://www.cnn.com/2023/11/17/tech/lionsgate-suspends-advertising-x-musk/index.html ("Ads for IBM and other major brands were found appearing alongside pro-Nazi content on the platform, according to a report on Thursday by progressive media watchdog group Media Matters.") (hyperlink omitted).[2]

---

[2] Further illustrating its campaign to squelch critical speech, X is now suing Media Matters for defamation, *see X Corp. v. Media Matters for America*, No. 4:23-cv-1175 (N.D. Tex. Nov. 20, 2023) (ECF 1), in a lawsuit that has been widely criticized as "contrary to the First Amendment," *see* Brian Fung, *Legal critics blast Elon Musk's lawsuit against Media Matters as 'weak' and 'bogus'*, CNN (Nov. 21, 2023), https://www.cnn.com/2023/11/21/tech/elon-musk-texas-lawsuit-media-matters/index.html. Even more recently, X also sued the World Federation of Advertisers and several prominent corporate members, alleging they conspired to violate antitrust laws. *See* Kate Conger, *X, Owned by Elon Musk, Brings Antitrust Suit Accusing Advertisers of a Boycott*, The New York Times (Aug. 6, 2024), https://www.nytimes.com/2024/08/06/technology/x-antitrust-suit-advertisers-elon-musk.html; *see also X Corp. v. World Fed'n of Advertisers*, No. 7:24-cv-114 (N.D. Tex. Aug. 6, 2024) (ECF 1). X filed suit even though the advertisers were of course lawfully entitled to boycott X's platform and to join together in doing so—whether to protest its content and/or to avoid tarnishing their brands by having their advertisements appear next to controversial or hateful content. *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 906-12 (1982) (unanimously holding that boycott of merchants to protest their expressed beliefs about race was constitutionally protected speech and association).

## B.      Independent Research Also Benefits The Platforms.

Despite X's campaign to silence critics, *the platforms themselves* have long

benefitted from independent research because it routinely helps them identify ways

to modify or improve their services.  As a group of technology companies

explained in an amicus brief that they submitted to the Supreme Court just a few

terms ago:

> Modern computer systems are so complex that no
> company can hire enough security engineers to identify
> every possible vulnerability that might lie in its
> software—or in the interactions between its own software
> and third-party software, which is also constantly
> evolving.  Just as a city must rely on motorists to report
> potholes because it cannot monitor every road every day,
> companies like *amici* must rely on external users to
> report bugs and vulnerabilities that their security staff
> may not catch.  Companies like *amici*, nonprofits, and
> even the government itself have thus turned to the robust
> independent security research community to probe and
> prod our systems.  We believe that collaborating openly
> with many experts and creating a mechanism for
> responsible disclosure of vulnerabilities will lead to more
> fruitful results—and, ultimately, more secure systems.

*See* Br. of Tech. Cos. as *Amici Curiae*, *Van Buren v. United States*, No. 19-783,

2020 WL 4003432, at *5-6 (U.S. July 8, 2020) (cleaned up).

There are numerous concrete examples illustrating how such independent

research benefits the platforms themselves.  For instance, researchers discovered in

2011 that the "microtargeting capabilities of Facebook's advertising system" could

be used to "infer a variety of private information about a user."  *See* Aleksandra

— 14 —

Korolova, *Privacy Violations Using Microtargeted Ads: A Case Study*, Journal of Privacy & Confidentiality (2011), https://journalprivacyconfidentiality.org/index.php/jpc/article/view/594/577.  As the researcher noted, that work "raise[d] awareness of the many ways that information leakage can happen in microtargeted advertising systems." *Id.*  It also allowed Facebook to "implement[] changes to their advertising system that make [such] attacks … much harder to execute." *Id.*

More recently, researchers found that "it is possible to prevent unruly behavior and also increase newcomer participation in public discussions of science" on social media merely by posting a "'sticky comment' that displayed community rules at the top of a discussion," where that message "welcomes participants, names the unacceptable behavior, describes the enforcement consequences, reports that many people agree with the norm, and indicates the community's capacity to monitor and enforce its policies." *See* J. Nathan Matias, *Preventing harassment and increasing group participation through social norms in 2,190 online science discussions*, Proceedings of the Nat'l Academy of Sciences (Apr. 29, 2019), https://www.pnas.org/doi/full/10.1073/pnas.1813486116. Platforms can now incorporate this research as they promote discourse and seek to increase participation by new users.

As *Amicus* Integrity Institute's members have experienced first-hand, independent research along these lines has become even more important as the

platforms decrease their investment in their own trust-and-safety research. *See, e.g.*, Hayden Field & Jonathan Vanian, *Tech layoffs ravage the teams that fight online misinformation and hate speech*, CNBC (May 27, 2023), https://www.cnbc.com/2023/05/26/tech-companies-are-laying-off-their-ethics-and-safety-teams-.html ("Across the tech industry, as companies tighten their belts and impose hefty layoffs to address macroeconomic pressures and slowing revenue growth, wide swaths of people tasked with protecting the internet's most-populous playgrounds are being shown the exits."). To be sure, independent researchers are not a sufficient replacement for platforms' internal teams. But technologists at the platforms will, of necessity, increasingly rely on the work of outside researchers. That, in turn, will only further heighten the importance of legal protection for independent technology research.

## II. PLATFORMS OFTEN TARGET UNFLATTERING RESEARCH BY CLAIMING TECHNICAL VIOLATIONS THAT RESULT ONLY IN REPUTATIONAL INJURY.

As the examples above illustrate, independent technology researchers provide important insights into some of the most powerful companies in the world, and their research benefits the public and the platforms alike. Despite these benefits, platforms often try to thwart that research through legal threats and lawsuits. *See, e.g.*, notes 1-2 *supra*.

As pertinent here, they often argue, as X has, that the researchers have violated their terms of service ("TOS").[3]  For example, in order to study how online political advertising on Facebook can be used to spread disinformation, researchers at NYU's Tandon School of Engineering developed a research tool that allowed users to voluntarily submit their own information about ads they were shown.  Following several unflattering reports about the results, and just weeks before the 2020 presidential election, those researchers received a cease-and-desist letter from Facebook claiming that they had violated the platform's TOS, and threatening litigation.  *See, e.g.*, Jeff Horwitz, *Facebook Seeks Shutdown of NYU Research Project Into Political Ad Targeting*, The Wall Street Journal (Oct. 23, 2020), https://www.wsj.com/articles/facebook-seeks-shutdown-of-nyu-research-project-into-political-ad-targeting-11603488533.  Facebook demanded that the researchers discontinue use of their research tool, stop publishing the results of their research, and take down the previously-published results.  *Id.*  Facebook made these extraordinary demands even though it had previously lauded those same researchers for their earlier work in "bring[ing] more transparency to the messages people see and increas[ing] accountability and responsibility over time, not just for us but advertisers as well."  *See* Sheera Frenkel, *The Biggest Spender of Political*

---

[3] *Amici* use the phrase "terms of service" generically, as some platforms prefer other labels such as "terms of use" or "terms and conditions."

*Ads on Facebook? President Trump*, The New York Times (July 17, 2018),

https://www.nytimes.com/2018/07/17/technology/political-ads-facebook-trump.html.

     Another example is research by ProPublica and others that found "Facebook let housing marketers exclude African Americans and others from seeing some of their advertisements." *See* Ariana Tobin & Ava Kofman, *Facebook Finally Agrees to Eliminate Tool That Enabled Discriminatory Advertising*, ProPublica (June 22, 2022), https://www.propublica.org/article/facebook-doj-advertising-discrimination-settlement. These researchers acted as the digital equivalent of testers—purchasing discriminatory Facebook advertisements for housing that would not lead to a genuine transaction—and through their efforts they found that the platform continued to allow discriminatory advertisements long after having "pledged to fix the loopholes [they] identified." *Id.* The research ultimately led to a settlement between Meta and the Department of Justice to resolve claims that the platform had violated the Fair Housing Act. *Id.*

     Even more recently, research by *The Wall Street Journal* and an independent technologist (and CITR member) found that Instagram "continued pushing adult-oriented content to minors after parent Meta Platforms said … that it was giving teens a more age-appropriate experience by restricting what it calls sensitive content including sexually suggestive material." *See* Jeff Horwitz, *Instagram*

— 18 —

*Recommends Sexual Videos to Accounts for 13-Year-Olds, Tests Show*, The Wall Street Journal (June 20, 2024), https://www.wsj.com/tech/instagram-recommends-sexual-videos-to-accounts-for-13-year-olds-tests-show-b6123c65.  To obtain this information, The Journal and the technologist separately created "new accounts with ages listed as 13" on Instagram and other platforms.  *Id.*  In conducting these tests, the researchers took the risk that the platforms would claim a violation of their TOS, which, for example, require users to "provide us with accurate and up to date information" about themselves.  *See, e.g.*, *Terms of Use*, Instagram (July 26, 2022), https://help.instagram.com/581066165581870/ ("Your Commitments").

These examples are not an isolated phenomenon.  As the technology companies explained in the Supreme Court *amicus* brief described above, researchers often "rely on common testing techniques—for example, automatically collecting (or 'scraping') data, reverse engineering software, or creating fake accounts—in order to discover vulnerabilities (or 'bugs') and investigate whether companies' systems work as intended."  *See* Br. of Tech. Cos., *Van Buren*, 2020 WL 4003432, at *5-6 (cleaned up).  The problem, they noted, is that "many company terms of service generally prohibit these commonly used techniques."  *Id.* at *6.  Thus, by selectively policing those terms, platforms assert "free rein to decide, on any basis, who can collect and use data—data that the companies do not own, that they otherwise make publicly available to viewers, and that the

— 19 —

companies themselves collect and use," in turn "risk[ing] the possible creation of information monopolies that would disserve the public interest." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022).

These concerns are exacerbated because, as this Court has observed, platforms' terms of service are "a series of private agreements and policies that most people are only dimly aware of and virtually no one reads or understands." *United States v. Nosal*, 676 F.3d 854, 861-62 (9th Cir. 2012) (adding that "[n]ot only are the terms of service vague and generally unknown—unless you look real hard at the small print at the bottom of a webpage—but website owners retain the right to change the terms at any time and without notice"); *see also Sandvig v. Barr*, 451 F. Supp. 3d 73, 87 (D.D.C. 2020) ("These protean contractual agreements are often long, dense, and subject to change."). Moreover, all manner of inconsequential acts—"everything from embellishing an online-dating profile to using a pseudonym on Facebook"—may nominally be deemed to violate a platform's TOS. *Van Buren v. United States*, 593 U.S. 374, 394 (2021).

Even if platforms were justified in enforcing often-ambiguous contracts of adhesion against a competitor seeking a commercial gain from, say, scraping a platform's data, *see, e.g.*, *hiQ Labs*, 31 F.4th at 1201-02, it is altogether a different matter to use them to deter responsible, noncommerical research and to squelch researchers' ability to publish sometimes-unflattering speech about the results of

that research, *see id.* (noting that data scraping is a "common method of gathering information" used by "academic researchers"); *see also Sandvig v. Sessions*, 315 F. Supp. 3d 1, 26-27 (D.D.C. 2018) (recognizing that gathering public information for research and advocacy is constitutionally protected).

## III. THE DISTRICT COURT CORRECTLY RECOGNIZED THIS ACTION AS A TRANSPARENT EFFORT TO PUNISH AND CHILL INDEPENDENT RESEARCH.

In assessing X's claims against CCDH, the district court properly observed that X's complaint is "unabashedly and vociferously about one thing," namely "punishing [CCDH] for [its] speech." ER-34. The district court thus correctly recognized that the *methods* CCDH used to gather the information were tightly interwoven with its ability to *speak* on a matter of pressing public concern.

### A. Independent Technology Research Is Part Of A Long Tradition Of Investigators And Testers.

X is hardly the first subject of unflattering research to rush to court in the hopes of punishing researchers. Fortunately, America boasts a long and proud tradition of independent researchers, journalists, and scholars, whose information-gathering and reporting has sometimes displeased big businesses and governments, yet whose work has inspired important advances in society. As part of his research for *The Jungle*, for instance, Upton Sinclair "wandered through the vast Armour facilities in shabby clothes, lunch bucket in hand," taking advantage of the fact that "[t]here was very little security at the plant." *See* David Denby, *Uppie Redux?*,

— 21 —

The New Yorker (Aug. 20, 2006), https://www.newyorker.com/magazine/2006/08/28/uppie-redux.  Despite Sinclair's apparent surreptitious trespassing, within a year *The Jungle* had "played a major role in pushing forward the Pure Food and Drug Act," *id.*, which laid the foundation for today's safeguards for food safety.

Sixty years later, members of the Chicago Freedom Movement, led by Dr. Martin Luther King, Jr., investigated discrimination in the housing market by "sending teams of black and white couples into real estate offices to see where realtors would offer the test couples' homes to rent or buy."  *See* Cheryl Corley, *50 Years Ago, Martin Luther King Jr. Fought For Open Housing In Chicago*, NPR (Aug. 29, 2016), https://www.npr.org/2016/08/29/491848087/50-years-ago-martin-luther-king-jr-fought-for-open-housing-in-chicago.  These testers, even though misrepresenting that they were actual buyers, documented discriminatory housing practices that were ultimately addressed in the Fair Housing Act in 1968.  *Id.*

In another example, from 1977, "the *Chicago Sun-Times* bought a tavern in downtown Chicago and set up one of the most elaborate undercover stings in American journalism history."  *See* Jackie Spinner, *A toast to undercover journalism's greatest coup, when reporters bought a bar*, Columbia Journalism Review (Jan. 26, 2018), https://www.cjr.org/united_states_project/chicago-sun-times-mirage.php.  The fake bar, aptly dubbed The Mirage Tavern, had "a hole in the ceiling for cameras, and bar stools were positioned just so, to catch city

inspectors accepting bribes in exchange for ignoring health and safety violations." *Id.* Despite using "undercover tactics" and misrepresentations "to expose the corruption," the investigation gathered enough information to fuel a 25-part series in the *Sun-Times*, which "ultimately led to indictments for a third of the city's electrical inspectors, and major reforms in city and state codes." *Id.*

In recognizing X's lawsuit as an effort to punish disfavored research in the public interest, the district court firmly placed this case within our Nation's long tradition of protecting such research and reporting.

### B. Courts Routinely Protect Investigators And Researchers From Retaliatory Claims Over Their Information-Gathering Methods.

X is also not the first subject of unflattering research to try to attack researchers or reporters over the *methods* they used to gather the information underlying a truthful—and therefore nonactionable—report about that research. Courts have long recognized that such research methods warrant protection under free speech principles because the process of *gathering* valuable information is inextricably intertwined with the researchers' ability to *communicate* their research to the public.

In *Desnick v. ABC, Inc.*, 44 F.3d 1345 (7th Cir. 1995), for example, the Seventh Circuit rejected claims for trespass brought by an ophthalmic clinic that had been the subject of a "highly critical" ABC investigative report. The court explained that even if the journalists had made "a misrepresentation or a

— 23 —

misleading omission" in securing permission to film in plaintiffs' offices, those

actions could not give rise to a trespass claim. *Id.* at 1351. Indeed, without such

protection, "a restaurant critic could not conceal his identity when he ordered a

meal." *Id.* The court therefore analogized the "test patients" that ABC used for its

reporting to "'[t]esters' who pose as prospective home buyers in order to gather

evidence of housing discrimination," and who "are not trespassers even if they are

private persons not acting under color of law." *Id.* at 1353.

In *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999),

the Fourth Circuit reached a similar conclusion in a case against two ABC

reporters who had worked undercover at Food Lion supermarkets and "secretly

videotaped what appeared to be unwholesome food handling practices" for use in

an ABC investigative report. *Id.* at 510. Citing *Desnick*, the Fourth Circuit

rejected Food Lion's theory of trespass-by-misrepresentation, concluding that a

mere "misrepresentation on a job application" was not enough to render tortious

the reporters' entry onto Food Lion's property for their newsgathering. *Id.* at 518.

Then, in *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012), the

ACLU challenged the application of Illinois' incredibly broad wiretap statute to the

organization's plan to have citizens record police encounters. In finding that

activity to be part-and-parcel of the First Amendment's protection for freedom of

speech, the court recognized that the "act of *making* an audio or audiovisual

— 24 —

recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Id.* at 595.

This Court drew upon *Desnick*, *Food Lion*, and *Alvarez* just a few years ago in *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018). There, the Court concluded that Idaho's so-called "ag-gag" law violated the First Amendment by making it a crime to enter into an agricultural production facility by "misrepresentation" or to make audio or video recordings of such a facility's operations without the owner's consent. *Id.* As an initial matter, this Court found the origin of the ag-gag law deeply "problematic," noting that "a number of the legislators made clear and the dairy lobby underscored" that it "was intended to quash investigative reporting on agricultural production facilities." *Id.* at 1196-97. In invalidating the misrepresentation provision, this Court also observed that "criminalization of these misrepresentations opens the door to selective prosecutions—for example, pursuing the case of a journalist who produces a 60 Minutes segment about animal cruelty." *Id.* at 1197.

Turning to the recording ban, this Court, citing *Alvarez*, ruled that "the creation of audiovisual recordings" warrants "First Amendment protection" because "the recording process is itself … 'inextricably intertwined' with the resulting recording." *Id.* at 1204. The Court further recognized that the recording

ban was plainly intended to "singl[e] out for suppression one mode of speech—audio and video recordings of agricultural operations—to keep controversy and suspect practices out of the public eye." *Id.* at 1205 (internal marks omitted).  The Court therefore invalidated the recording-without-consent ban because it "gives agricultural facility owners veto power, allowing owners to decide what can and cannot be recorded, effectively turning them into state-backed censors able to silence unfavorable speech about their facilities." *Id.*

This line of authorities confirms that platforms like X cannot bring pre-textual claims against researchers and investigative journalists over the manner in which they gather information where it is integral to performing and disseminating their research and where, as here, it is clear the claim targets the content of that speech.  Indeed, without this protection, powerful companies "could effectively control or suppress speech by the simple expedient of restricting an early step in the speech process rather than the end result." *Alvarez*, 679 F.3d at 597.

Using the courts to achieve such a lopsided result turns the First Amendment on its head.  And even the prospect that the legal system will be used that way in the future will chill similar research. *See, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 75 (2023) (articulating the "chilling effect" and "self-censorship" flowing from apprehension "about the expense of becoming entangled in the legal system").  Yet that is precisely what X is trying to do in this case: suppress and punish CCDH's

— 26 —

speech by attempting to impose liability for the manner in which CCDH acquired the information that is essential to facilitating its speech.

### C.    The District Court Correctly Saw Through X's Claims To Recognize That The Platform Targeted CCDH's Speech.

Given the public's powerful interest in receiving information about the social media platforms, independent technology research that collects valuable data warrants the same speech-protective treatment as the information-gathering and reporting in *Desnick*, *Food Lion*, *Alvarez*, and *Wasden*.  Moreover, to the extent that all but one of X's claims are premised on California state law, the California Constitution provides even greater protection than the First Amendment.  *See, e.g.*, *Wilson v. Super. Ct.*, 13 Cal. 3d 652, 658 (1975).  Indeed, this interest is protected as well by California's expansive anti-SLAPP law, which protects not only reporting itself but also information gathering that furthers that "right to free speech."  *See Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 166 (2003).  Finally, this same interest in protecting the ability to obtain information needed to speak is also embodied in the federal Consumer Review Fairness Act, which voids any term in a form contract – including a TOS – that would prohibit a person from conducting a "performance assessment of, or other similar analysis of, *including by electronic means*, the goods, services, or conduct" under contract.  15 U.S.C. § 45b (emphasis added); *see also Masry v. Lowe's Cos.*, 2024 WL

3228086, at *8 (N.D. Cal. June 28, 2024) (noting that the CRFA likely applies to terms of service).

In the face of this expansive body of law, X's claims against CCDH properly failed. The district court correctly recognized that X's real gripe was with CCDH's speech and that the alleged TOS violation was mere pretext. On appeal, X's primary complaint is that the district court ignored the labels on X's claims and instead focused on the fact that the claims targeted CCDH's speech. But doing so is actually mandated by Supreme Court precedent that requires courts in free speech cases to look at what is really going on. *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (plaintiff cannot evade First Amendment limits on defamation claims by re-labeling claim as one for intentional infliction of emotional distress); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963) (state cannot evade First Amendment limits on prior restraints by imposing system of "informal sanctions"); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (requiring independent appellate review of the record to ensure that there is no "forbidden intrusion on the field of free expression" and ruling in favor of consumer publication's evaluation of manufacturer's claims about its own product).

In those cases, as in this one, courts necessarily "look through forms to the substance," *Bantam Books*, 372 U.S. at 58, and deploy the First Amendment's

— 28 —

protections even in the face of artful pleading by those seeking to punish or restrict disfavored speech.

## CONCLUSION

The district court's order of dismissal with prejudice should be affirmed.

Dated:  September 27, 2024          Respectfully submitted,

                                    BALLARD SPAHR LLP

                                    By: */s/ Seth D. Berlin*_____
                                         Seth D. Berlin
                                         Maxwell S. Mishkin
                                    1909 K Street NW, 12th Floor
                                    Washington, DC 20006
                                    Tel: (202) 661-2200
                                    Fax: (202) 661-2299
                                    berlins@ballardspahr.com
                                    mishkinm@ballardspahr.com

                                    *Counsel for Amici Curiae CITR and*
                                    *Integrity Institute*

— 29 —

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**      <u>No. 24-2643</u>

I am the attorney or self-represented party.

**This brief contains 6,449 words,** excluding the items exempted by Fed. R.

App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[    ] complies with the word limit of Cir. R. 32-1.

[    ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
       Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[    ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[   ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
       only one)*:
       [ ] it is a joint brief submitted by separately represented parties;
       [ ] a party or parties are filing a single brief in response to multiple briefs; or
       [ ] a party or parties are filing a single brief in response to a longer joint brief.

[   ] complies with the length limit designated by court order dated _____.

[   ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** *<u>/s/ Seth D. Berlin</u>*      **Date** <u>September 27, 2024</u>

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2024, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All of the participants in this case are registered CM/ECF users, and will be served by the appellate CM/ECF system.

*/s/ Seth D. Berlin*
Seth D. Berlin