No. 24-2643

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

X CORP.,

*Plaintiff-Appellant*,

v.

CENTER FOR COUNTERING DIGITAL HATE, INC.;
CENTER FOR COUNTERING DIGITAL HATE LTD.;
STICHTING EUROPEAN CLIMATE FOUNDATION,

*Defendants-Appellees*.

On Appeal from the United States District Court
For the Northern District of California
No. 3:23-cv-03836
Hon. Charles R. Breyer, District Judge

**BRIEF OF *AMICUS CURIAE* PUBLIC PARTICIPATION PROJECT IN
SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

Alejandra Caraballo
Harvard Cyberlaw Clinic
1557 Massachusetts Ave
Lewis Center, 4th Fl
Cambridge, MA 02138
(617) 384-8511
acaraballo@law.harvard.edu

*Counsel* for Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amicus curiae* Public Participation Project states that it does not have a parent corporation, nor does any publicly held corporation own 10% or more of their stock.

Dated: September 27, 2024

s/ Alejandra Caraballo

Alejandra Caraballo

*Counsel* for Amicus Curiae

# TABLE OF CONTENTS

STATE MENT OF INTEREST OF *AMICUS CURIAE*............................................1

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ...................................................................................3

I.  The District Court's Application of the California Anti-SLAPP Statute and Ruling in Favor of CCDH Should Be Affirmed....................................3

   A.  X Corp.'s state law claims arise from CCDH's protected activity, researching and publishing reports. .................................................6

   B.  CCDH's speech and underlying conduct were made in connection with an issue of public interest. ...............................................................9

   C.  Failing to strike the claims against CCDH as a matter of law poses grave First Amendment risks....................................................................10

II. Failure To Affirm the Application of the Anti-SLAPP Statute Will Allow Companies Like X Corp. to Silence and Intimidate Critics of its Platform.......13

   A.  X Corp.'s Legal Attacks Have Already Caused Significant Harm Towards Critics of its Platform. ....................................................14

   B.  X Corp.'s Legal Assault Have Already Chilled the Speech of Researchers and Academics ........................................................19

III.CONCLUSION...........................................................................22

CERTIFICATE OF COMPLIANCE .......................................................23

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING ...........................24

# TABLE OF AUTHORITIES

## Cases

*Baral v. Schnitt*,
376 P.3d 604 (Cal. 2016) .................................................................... 5, 6

*Barrett v. Rosenthal*,
146 P.3d 510 (Cal. 2006) ....................................................................... 5

*Bonni v. St. Joseph Health Sys.*,
491 P.3d 1058 (Cal. 2021) ..................................................................... 6

*Church of Scientology v. Wollersheim*,
49 Cal. Rptr. 2d 620 (Cal. Ct. App. 1996) ........................................... 11

*Erlich v. Menezes*,
21 Cal. 4th 543 (1999) ........................................................................... 9

*Food Lion, Inc. v. Cap. Cities/ABC, Inc.*,
194 F.3d 505 (4th Cir. 1999) ............................................................... 11

*Foothills Townhome Ass'n. v. Christiansen*,
65 Cal. App. 4th 688 (1998) .................................................................. 5

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ................................................................................. 4

*Gordon v. Marrone*,
155 Misc. 2d 726 (N.Y. Sup. Ct. 1992) ........................................... 4, 13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ......................................................... 7, 12

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) ............................................................................... 11

*Lee v. Silveira*,
211 Cal. Rptr. 3d 705 (Cal. Ct. App. 2016) ......................................... 9

*Makaeff v. Trump Univ., LLC*,
715 F.3d 254 (9th Cir. 2013) ................................................................ 4

*Media Matters for Am. v. Paxton*,
  2024 WL 1773197 (D.D.C. Apr. 12, 2024) ........................................ 14

*Media Matters for Am. v. Bailey*,
  2024 WL 3924573 (D.D.C. Aug. 23, 2024) ........................................ 14

*Park v. Bd. of Trs. of the Cal. State Univ.*,
  393 P.3d 905 (Cal. 2017) ........................................................ 6

*Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*,
  946 F. Supp. 2d 957 (N.D. Cal. 2013) ........................................... 9

*Sandvig v. Sessions*,
  315 F. Supp. 3d 1 (D.D.C. 2018) ............................................... 6

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) .................................................. 12

*X Corp. v. Ctr. for Countering Digital Hate, Inc.*,
  2024 WL 1246318 (N.D. Cal. Mar. 25, 2024) ..................................... 2

*X Corp. v. Media Matters for Am.*,
  2023 WL 8091661 (N.D. Tex.) ......................................... 13, 16, 17

*X Corp. v. World Fed'n of Advertisers*,
  7:24-CV-00114 (N.D. Tex.) .................................................... 13

## Statutes

Cal. Civ. Proc. Code § 425.16 ........................................ 3, 4, 5, 9, 10

## Other Authorities

About Us, Media Matters for America (2024), .................................... 13

Alex Botoman, *Divisional Judge-Shopping*, 49 COLUMBIA HUMAN RIGHTS LAW
  REVIEW 297 (2018) ............................................................ 16

Conference Acts to Promote Random Case Assignment | United States Courts ... 16

Elon Musk (@elonmusk), *ADL Seems To Be Responsible For Most Of Our
  Revenue Loss.*, X (Sep. 4, 2023, 7:04 PM) ..................................... 8

iv

Elon Musk (@elonmusk)*, I Strongly Encourage Any Company Who Has Been Systematically Boycotted by Advertisers to File a Lawsuit. There May Also Be Criminal Liability via the RICO Act.*, X (2024) .................................................. 14

Eric Hananoki, *As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi Content*, Media Matters for America (2023), ................................................... 15

Freedom of the Press Foundation, *Media Matters layoffs underscore need to crack down on SLAPPs* (May 24, 2024)........................................................... 15

*Guarding Against The Chill: A Survival Guide for SLAPP Victims,* The First Amendment Project.............................................................................. 20

*Increasing SLAPP Protection: Unburdening the Right of Petition in California*, 32 U. Cal. Davis L. Rev. 965 (1999) .................................................... 4

Kat Abu (@abughazalehkat), *Bad News: I've Been Laid off from @mmfa, along with a Dozen Colleagues. Theres a Reason Far-Right Billionaires Attack Media Matters with Armies of Lawyers: They Know How Effective Our Work Is, and It Terrifies Them.*, Twitter (2024)............................................................... 17

Joseph Menn, *Attacks on U.S. Jews and Gays Accelerate as Hate Speech Grows on Twitter*, Washington Post (Jan. 23, 2023),.......................................... 10

Kate Conger & Remy Tumin, *Elon Musk Uses a Crude Insult to Slam Advertisers for Pulling Back From X.,* N.Y. Times (Nov. 29, 2023) ...................................... 7

Kate Conger & Tiffany Hsu, *Advertising Coalition Shuts Down After X, Owned by Elon Musk, Sues*, N.Y. Times (Aug. 8, 2024).................................................... 19

Leadership Conference on Civil and Human Rights, *Letter for the Record: Hearing on "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation"* (Mar. 25, 2021) ......................................................... 8

Mattathias Schwartz, *New Federal Judiciary Rule Will Limit 'Forum Shopping' by Plaintiffs*, N.Y. Times, (Mar. 12, 2024),............................................... 16

Platform manipulation and spam policy | X Help Center, ...................................... 17

Sheera Frenkel & Kate Conger*, Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022) ........................................... 10

Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, Reuters (Nov. 6, 2023) ........................................ 22

Steven Lee Myers, *Free Speech vs. Disinformation Comes to a Head*, N.Y. Times (Feb. 9, 2023) .................................................................................... 20

Taylor Lorenz, *Extremist Influencers Are Generating Millions for Twitter, Report Says,* Washington Post (Feb. 9, 2023) ............................................................. 9

Ted Johnson, *Media Matters For America Undergoes Round Of Layoffs,* Deadline (May 23, 2024) ...................................................................................... 18

*World Federation of Advertisers discontinues small brand safety initiative after Elon Musk's X sues*, Associated Press (Aug. 9, 2024) ........................................ 15

X, *Terms of Service* ............................................................................... 17

## STATE MENT OF INTEREST OF *AMICUS CURIAE*

Public Participation Project is a non-profit organization that works to protect citizens against Strategic Lawsuits Against Public Participation ("SLAPPs") through the enactment of legislation in Congress and the states. Founded in 2008, it educates the public about SLAPPs and how these damaging lawsuits chill free speech. PPP also provides legal resources and referrals to those who are facing litigation aimed at preventing them from speaking out on issues of public interest.

## SUMMARY OF ARGUMENT

Freedom of speech is a fundamental value of the United States. To uphold that value, individuals and organizations must be able to speak freely on matters of public importance without the fear of retaliation and retribution from wealthy and powerful individuals in the form of ruinous litigation costs. X Corp.'s (formerly Twitter) retaliatory lawsuit against the Center for Countering Digital Hate ("CCDH") for publishing the multiple reports detailing hateful extremist content, illustrates the insidious effects of frivolous litigation aimed at chilling the exercise of CCDH's speech. This type of litigation has a devastating effect on public discourse.

Although X Corp. alleges breaches of contract, intentional interference with contractual relationships, and inducing breach of contract (hereinafter "state law claims"), the legal circumstances are straightforward: X Corp. is attempting to

1

suppress CCDH's protected speech, and it seeks to circumvent clear legal protections for that speech from defamation claims by framing the dispute purely in terms of contractual and tortious conduct. Recognizing the limitations on specious defamation claims, X Corp. carefully crafted its claims hoping to circumvent protections for CCDH's public speech regarding the X platform. California's anti-SLAPP statute is designed to protect against precisely the type of abusive litigation that X Corp. has brought in this case, but it provides little help if plaintiffs can cleverly plead around it. Despite the paper-thin veneer of a contractual dispute, this pretextual case is a classic SLAPP suit that, as the court below recognized, "is about punishing [CCDH] for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc.*, No. 23-CV-03836-CRB, 2024 WL 1246318 (N.D. Cal. Mar. 25, 2024). The harm that the anti-SLAPP statute aims to prevent will be realized if this Court allows X Corp.'s claims to prevail.

X Corp.'s legal theories, if accepted by this Court, could profoundly chill broad swathes of speech. If large online platforms can intimidate and weaponize their terms of service against researchers and commentators they dislike, they may turn any contract of adhesion into a "SLAPP trap." Websites' terms of service would be converted into means for large companies to silence criticism and stifle legitimate inquiry by their users. Businesses of all types could hold their critics liable for loss of revenue resulting from public criticism, as long as some alleged

2

technical contractual breach might have occurred somewhere in the causal chain. Such a precedent would tip the scales of power towards the wealthy and would be antithetical to the fundamental right of free expression. Individuals and organizations must be able to engage in research about the harms and benefits of social media platforms without the risk of ruinous litigation, which is, without a doubt, in the public interest. If X Corp.'s claims are allowed to proceed, such public interest research would be chilled. To avoid that chill, this Court should affirm the district court ruling applying the anti-SLAPP statute and soundly reject X Corp.'s legal claims. The mere possibility that CCDH will prevail at a later stage in litigation is insufficient. Absent a clear decision affirming the district court's ruling, the free speech interests that the California legislature sought to protect will vanish in piles of discovery motions and legal fees. For the reasons set forth herein, *amicus* urges this Court to affirm the district court's ruling and grant CCDH's motion to strike under the California anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, and thus dispose of X Corp.'s claims.

## ARGUMENT

### I. The District Court's Application of the California Anti-SLAPP Statute and Ruling in Favor of CCDH Should Be Affirmed.

By their very nature, SLAPP lawsuits threaten First Amendment protections by "chill[ing] the right of free expression and free access to government, a double-

3

barreled assault on the core values of our society."[1] Even more importantly, "[speech] concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). SLAPPs interfere with these vital democratic functions because they "masquerade as ordinary lawsuits but are intended to deter ordinary people from exercising their political or legal rights or to punish them for doing so." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013). "Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined." *Gordon v. Marrone*, 155 Misc. 2d 726, 736 (N.Y. Sup. Ct. 1992), *aff'd*, 616 N.Y.S.2d 98 (N.Y. App. Div. 2d Dept. 1994) (holding that a legal challenge by a landowner to a non-profit's tax assessment constituted a SLAPP action in retaliation for that non-profit's opposition to subdividing his land).

To combat the increasing use of the court system to silence speech rather than pursue justice, many states have created specific procedural protections for defendants. California is one such state. It passed its first anti-SLAPP law in 1992 and has subsequently revised the law to broaden its scope. *See* Cal. Civ. Proc. Code § 425.16 (West 1993), *amended by* Cal. Legis. Serv. Ch. 1239 (S.B. 9) (amending the statute to expand protected conduct). California's anti-SLAPP

---

[1] Jerome I. Braun, *Increasing SLAPP Protection: Unburdening the Right of Petition in California*, 32 U. CAL. DAVIS L. REV. 965, 971 (1999).

statute was enacted specifically to "combat frivolous lawsuits brought primarily to chill the valid exercise of the constitutional right of freedom of speech and petition for the redress of grievances." *Foothills Townhome Ass'n. v. Christiansen,* 65 Cal. App. 4th 688, 694 (1998).

Under California's anti-SLAPP statute, a defendant must show that a claim arises from conduct or speech that is both in furtherance of the defendant's constitutional right of free speech and in connection with a matter of public interest. Then, the burden shifts to the plaintiff to prove that its claims are both legally and factually sufficient. *See* Cal. Civ. Proc. Code § 425.16; *Baral v. Schnitt,* 376 P.3d 604, 608 (Cal. 2016). Here, X Corp.'s claims concerned reports and commentary by CCDH on X Corp.'s moderation practices which it does not contest the veracity of. It is plain on the face of the complaint that these reports and commentary are written statements—made in a public forum on a matter of public interest—and that they thus fall within the scope of the anti-SLAPP statute. *See, e.g.*, Amended Complaint at ¶¶17; *see also Barrett v. Rosenthal*, 146 P.3d 510, 514 (Cal. 2006) ("Web sites accessible to the public. . . are "public forums" for purposes of the anti-SLAPP statute."),

Because of this, X Corp. has framed its claims so that they focus not on CCDH's speech but on contractual relationships, alleging that CCDH breached the terms of service that CCDH agreed to when it signed up for a Twitter account. X

5

Corp. further argued that CCDH intentionally interfered with contractual relations and induced a breach of contract through its alleged use of a third-party service called Brandwatch to gather data. X Corp. should know that reframing has its limits. The California Supreme Court has rejected the idea that "artful pleading" allows plaintiffs to shield claims based protected activity—like the research and reporting activities of CCDH at issue here—from an anti-SLAPP motion. *Baral*, 376 P.3d at 615; *see also Park v. Bd. of Trs. of the Cal. State Univ.*, 393 P.3d 905, 909 (Cal. 2017) (explaining that claims are covered under the anti-SLAPP statute when speech provides the basis for liability).

### A.  X Corp.'s state law claims arise from CCDH's protected activity, researching and publishing reports.

When determining whether claims are subject to an anti-SLAPP motion to strike, the court must determine if the elements of those claims "arise from protected activity," considering both "the actions alleged to establish those elements" and "whether those actions are protected." *Bonni v. St. Joseph Health Sys.*, 491 P.3d 1058, 1070 (Cal. 2021). All three of the state law claims rely on CCDH's protected activity, and each is thus subject to being stricken in accordance with California's anti-SLAPP statute.

X Corp.'s claim that CCDH violated X Corp.'s terms of service by scraping X, the alleged breach of contract, arises directly from protected activity. *See Sandvig v. Sessions*, 315 F. Supp. 3d 1, 16 (D.D.C. 2018) (holding that the use of

6

scraping by researchers is conduct that is "arguably affected with a constitutional interest"). Use of "data scraping is a common method of gathering information, used by search engines, *academic researchers*, and many others" to obtain data in an efficient matter that is otherwise freely available to the public. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022) (emphasis added). Moreover, CCDH allegedly scraped data from X Corp.'s platform in furtherance of protected First Amendment speech — i.e., the creation and publication of reports that detailed how X Corp.'s platform handled disinformation and hate speech. Amended Complaint at ¶¶ 51, 54, 56-57.

X Corp.'s state law claims arise from protected conduct because they allege damages stemming from CCDH's speech. As set forth in the Amended Complaint, X Corp. alleges millions of dollars in lost revenues, because multinational advertisers decided to pause advertising on X Corp.'s platform or withdraw from the platform altogether. Amended Complaint at ¶¶ 66-70.[2] X Corp. repeatedly states in the Amended Complaint that CCDH used data acquired via Brandwatch in CCDH reports, such as its February 9, 2023 "Toxic Twitter" report, and that those

---

[2] X Corp's. Chief Technical Officer and principal owner, Elon Musk, certainly has not helped the advertiser exodus from the X platform by saying to advertisers at the New York Times Book Summit "don't advertise" and to "go f*ck [themselves]." Kate Conger & Remy Tumin, *Elon Musk Uses a Crude Insult to Slam Advertisers for Pulling Back From X.*, N.Y. Times (Nov. 29, 2023), https://www.nytimes.com/2023/11/29/business/dealbook/elon-musk-advertisers-blackmail-iger.html.

reports were relied on by advertisers to limit ad spends and thus decrease X Corp.'s ad revenue.[3] Amended Complaint at ¶¶ 68-70.

To illustrate the central role that protected conduct plays in X Corp.'s state law claims claims, it is perhaps easiest to imagine alternative claims that X Corp. could have brought. X Corp. could have alleged damages stemming from CCDH's failure to pay on a contract or X Corp.'s inability to gain the benefit of the bargain that it negotiated at the time that the parties entered the Terms of Service. On the claims based upon the Brandwatch contract, X Corp. could have sued for the value of the contract with which CCDH allegedly interfered or the direct costs of the breach that CCDH and the other defendants allegedly induced. Instead, X Corp. claims damages that are wholly the result of CCDH's speech.

The allegations made by X Corp. in its state law claims, even when taken as true, are firmly within the reach of the anti-SLAPP statute as X Corp. failed to plead damages that are not a direct result of protected conduct.

---

[3] Outside of the context of this litigation, X. Corp representatives have suggested that advertiser withdrawal had other causes. A post by X's Chief Technology Officer on September 4th blamed the Anti-Defamation League for the decline in advertising revenue, stating that the "ADL seems to be responsible for most of our revenue loss." Elon Musk (@elonmusk), X (Sep. 4, 2023, 7:04 PM), https://twitter.com/elonmusk/status/1698834460131651883 [https://perma.cc/499V-WDJ7].

**B.      CCDH's speech and underlying conduct were made in connection with an issue of public interest.**

In order to meet its burden under step one of the anti-SLAPP statute, CCDH's statements must be in connection with an issue of public interest. *See* Cal. Code Civ. Proc. §§ 425.16(e)(3), (4). While the statute does not provide a direct definition of "an issue of public interest," courts construe it broadly, covering activities that concern a substantial number of people. *See Piping Rock Partners, Inc. v. David Lerner Assocs., Inc*., 946 F. Supp. 2d 957, 968 (N.D. Cal. 2013), *aff'd*, 609 Fed. Appx. 497 (9th Cir. 2015) (unpublished). An issue is especially likely to be of public interest when, like here, the private entity is a "large, powerful organization [that] may impact the lives of many individuals." *Lee v. Silveira*, 211 Cal. Rptr. 3d 705, 715 (Cal. Ct. App. 2016) (quoting *Church of Scientology v. Wollersheim*, 49 Cal. Rptr. 2d 620, 633 (Cal. Ct. App. 1996)).

CCDH's reports involve matters of disinformation and hate speech on social media platforms, particularly on X. Public debate and interest on matters of disinformation and hate speech on social media platforms have been profound in recent years, including multiple congressional hearings and constant coverage by national media.[4]

---

[4] Leadership Conference on Civil and Human Rights, *Letter for the Record: Hearing on "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformatio*n" (Mar. 25, 2021); Taylor Lorenz, *Extremist Influencers Are Generating Millions for Twitter, Report Says*, WASHINGTON POST (Feb. 9, 2023),

CCDH's work is of national interest. Indeed, its reports—the very speech targeted by X Corp.'s claims—received significant media coverage. Amended Complaint at ¶¶ 56-57. Major news outlets, including the New York Times, shared CCDH's work with their readers.[5] If this combination of the public debate on the topic of the speech, as well as direct media coverage and attention on the speech itself is not sufficient to qualify CCDH's speech as "in connection with a public issue" under the anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16, it is unclear what would qualify.

**C.    Failing to strike the claims against CCDH as a matter of law poses grave First Amendment risks.**

As CCDH's activities fall within the scope of the anti-SLAPP statute, the burden shifted to X Corp. to show that it can legally and factually substantiate its

---

https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/ [https://perma.cc/6Z4V-ECPX]; Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html; Joseph Menn, *Attacks on U.S. Jews and Gays Accelerate as Hate Speech Grows on Twitter*, WASHINGTON POST (Jan. 23, 2023), https://www.washingtonpost.com/technology/2023/01/18/hate-speech-antisemitism-antigay-twitter/; Steven Lee Myers, *Free Speech vs. Disinformation Comes to a Head*, N.Y. TIMES (Feb. 9, 2023), https://www.nytimes.com/2023/02/09/business/free-speech-social-media-lawsuit.html.

[5] Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. TIMES (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

claims. *Amicus* leaves it to CCDH and its co-defendants to contest the merits. But, this Court risks chilling future speakers should it reverse the district court decision. As discussed above, all three state law claims seek to hold CCDH liable for lost advertising revenues that allegedly flow from CCDH's criticism of X Corp.'s policies. Under X Corp.'s theory, a plaintiff could sue for negative consequence that they face due to speech based on the allegation that somewhere in the casual chain, a contract was violated.[6] Endorsement of such a theory could have wide-ranging consequences, far beyond CCDH. For example:

An academic researcher writes an op-ed that opens with an anecdote about how they see inappropriate advertisements on a social media platform. X Corp.'s theory would allow the platform to sue the academic for damages flowing from reduced user signups following the op-ed's release, based on the academic's violation of a contractual term that allowed accountholders to make only "personal" use of the platform.

A film critic borrows their roommate's username and password for a popular on-demand video platform, streams a movie, and writes a searing review. X Corp.'s theory would allow the platform to sue the critic for damages flowing from

---

[6] Such claims would not be possible in the context of an intentional tort or contract claims without a showing of falsehood and, for a public figure, actual malice. *See, e.g.*, *Food Lion, Inc. v. Cap. Cities/ABC, Inc*., 194 F.3d 505, 522-24 (4th Cir. 1999) (citing *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988)).

11

diminished viewership, based on the critic's inducement of the roommate's violation of a contractual term that prohibited sharing of account credentials.

A journalist provides a fake name when downloading a report from a company's website, then writes an article about financial irregularities described in the report. X Corp.'s theory would allow the company to sue the journalist for damages based on a reduction in its stock price, because the journalist violated a term requiring that people provide truthful information when accessing the company's website.

These outcomes would be as absurd as they are untenable. The Ninth Circuit has long recognized that hinging one's legal rights in high stakes matters on compliance with "private agreements and policies that most people are only dimly aware of" creates significant risks. *United States v. Nosal*, 676 F.3d 854, 861-62 (9th Cir. 2012) (rejecting argument that allowed for Computer Fraud and Abuse act liability to turn on violations of terms of service). Giving large tech companies "free rein to decide, on any basis, who can collect and use data—data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use—risks the possible creation of information monopolies that would disserve the public interest." *hiQ Labs, Inc.*, 31 F.4th at 1202.

X Corp.'s theory amounts to a hunting license for critics. Even if such claims fail at summary judgment, that ultimate disposition would only amount to a "pyrrhic victory." *See Gordon*, 155 Misc. 2d at 736. The SLAPP trap would have already done its job.

## II. Failure To Affirm the Application of the Anti-SLAPP Statute Will Allow Companies Like X Corp. to Silence and Intimidate Critics of its Platform.

The concerns of speech being punished are not merely hypothetical as X Corp. has undertaken a significant lawfare campaign against its critics beyond CCDH. Since the filing of the underlying matter in this case, X Corp. threatened to sue the Anti-Defamation League for criticizing X Corp.'s moderation of antisemitic content, sued Media Matters for America ("MMFA")[7] after they released a report showing Nazi content appearing alongside ads for major advertisers, and sued the World Federation of Advertisers ("WFA") along with several major companies for their reluctance to advertise on the X platform.[8] More insidiously, state Attorneys General who seek to curry favor from Mr. Musk have launched baseless politically-motivated

---

[7] MMFA, based in Washington, D.C., is a web-based, nonprofit research organization dedicated to monitoring, analyzing and correcting misinformation in media while providing resources for direct action. About Us, MEDIA MATTERS FOR AMERICA (2024), https://www.mediamatters.org/about-us [https://perma.cc/G8Q4-QHCA].

[8] *X Corp. v. Media Matters for Am.*, 2023 WL 8091661 (N.D. Tex.); *X Corp. v. World Fed'n of Advertisers*, 7:24-CV-00114 (N.D. Tex.).

civil investigations into MMFA that constituted First Amendment retaliation and have since been enjoined in federal court.[9] Mr. Musk has since publicly threatened more lawsuits and is encouraging others to file similar lawsuits while wrongfully suggesting anyone refusing to advertise on his platforms could be held criminally liable under RICO.[10] These statements demonstrate not only a vengeful attitude towards Mr. Musk's critics, but a willingness to utilize his sizeable wealth and influence to act on it.

### A. X Corp.'s Legal Attacks Have Already Caused Significant Harm Towards Critics of its Platform.

The lawsuits filed by X Corp. have already achieved significant success in silencing and harming its critics. In the wake of X Corp.'s lawsuit and investigations by the Texas and Missouri Attorneys General, MMFA laid off a

---

[9] Both investigations by Missouri AG Andrew Bailey and Texas AG Ken Paxton have been blocked in court. *Media Matters for Am. v. Bailey*, No. 24-CV-147 (APM), 2024 WL 3924573, at *14 (D.D.C. Aug. 23, 2024) (finding that the "Defendant's investigation thus began with a political bent"); *Media Matters for Am. v. Paxton*, No. 24-CV-147 (APM), 2024 WL 1773197, at *18 (D.D.C. Apr. 12, 2024) (finding that "Defendant's investigation of Media Matters is [a] retaliatory action") (cleaned up).

[10] Elon Musk (@elonmusk), X (Aug. 6, 2024, 11:55 AM), https://twitter.com/elonmusk/status/1820851090138505570 [https://perma.cc/FQ9L-JJMF] (Musk wrote on X that he "strongly encourage[d] any company who has been systematically boycotted by advertisers to file a lawsuit" and that "there may also be criminal liability via the RICO Act.").

substantial portion of its workforce.[11] Similarly, days after X Corp.'s lawsuit against WFA alleging antitrust violations, WFA dissolved its Global Alliance for Responsible Media, an industry group dedicated to promoting digital safety by mitigating the harm of malicious content and disinformation.[12] Unfortunately, the intended effect of punishing X Corp.'s critics has thus far been successful.

The MMFA matter, in particular, highlights the importance of anti-SLAPP laws. In circumstances similar to those presented by the instant case, MMFA issued a report demonstrating that neo-Nazi content ran alongside the advertisements of major corporations on the X platform. This spurred a further exodus of advertisers from the platform.[13] Although, at the time of filing, none of the parties involved in the lawsuit were incorporated, headquartered, or primarily conducting business in Texas, X Corp. filed in the Northern District of Texas,

---

[11] Freedom of the Press Found., *Media Matters layoffs underscore need to crack down on SLAPPs*, (May 24, 2024), https://freedom.press/news/media-matters-layoffs-underscore-need-to-crack-down-on-slapps/ [https://perma.cc/SWD2-YQ6G].

[12] *World Federation of Advertisers discontinues small brand safety initiative after Elon Musk's X sues*, ASSOCIATED PRESS (Aug. 9, 2024) https://apnews.com/article/x-twitter-advertiser-lawsuit-garm-discontinues-e64b99a501d9f69abbeebc1c479688d7.

[13] Eric Hananoki, *As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi Content*, Media Matters for America (2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle [https://perma.cc/52PM-NWDE].

which is notable for two reasons: first, Fifth Circuit precedent precludes the ability

of MMFA to avail themselves of Texas' anti-SLAPP statute protections in federal

court; second, the filing in N.D. Tex. (Wichita Falls) gives the appearance of X

Corp. engaging in forum and judge shopping. Indeed, both cases were initially

assigned to the same judge, Reed O'Connor, who has since recused himself from

the lawsuit against WFA.[14] Moreover, a close examination of the details in both the

MMFA and CCDH lawsuits reveals significant similarities between X Corp.'s

allegations. In *X Corp. v. Media Matters for America*, X Corp. alleged that MMFA

intentionally interfered with contracts between X Corp. and its advertisers,

engaged in wrongful conduct that interfered with X Corp.'s economic prosperity,

and disparaged the quality of X Corp.'s products by publishing a report stating X

Corp. placed advertisements next to anti-Semitic, neo-Nazi, and racist content. *X

Corp. v. Media Matters for America*, 2023 WL 8091661 (N.D. Tex.); *see also*

---

[14] The issue of judge shopping, especially filing in specific divisions in the
Northern District of Texas, has become a major concern for the Judicial
Conference of the United States which adopted a new policy of random judicial
case assignment to deter this practice. Additionally, judge shopping has been the
subject of concern for Chief Justice Roberts, members of Congress, and legal
scholars. Conference Acts to Promote Random Case Assignment, United States
Courts (Mar. 12, 2024), https://www.uscourts.gov/news/2024/03/12/conference-
acts-promote-random-case-assignment [https://perma.cc/P5K8-CECS]; Mattathias
Schwartz, *New Federal Judiciary Rule Will Limit 'Forum Shopping' by Plaintiffs*,
N.Y. Times (Mar. 12, 2024), https://www.nytimes.com/2024/03/12/us/judge-
selection-forum-shopping.html; *See also* Alex Botoman, *Divisional Judge-
Shopping*, 49 COLUMBIA HUMAN RIGHTS LAW REVIEW 297 (2018).

Amended Complaint at ¶¶ 50. Notably, X Corp. did not dispute the veracity that ads had indeed run next to neo-Nazi content on their platform. Rather, X Corp. claimed that MMFA engaged in platform manipulation to achieve those results. *Id.* at 3, 7.[15] Despite a federal judge finding that the investigations into MMFA's report on X Corp.'s platform constituted likely First Amendment retaliation, the district court in Texas in *X Corp. v. Media Matters* denied a motion to dismiss by MMFA and permitted the case to proceed. *X Corp. v. Media Matters for Am.*, 2023 WL 8091661 (N.D. Tex.). This will most certainly result in further ruinous litigation costs.

Since the SLAPP suit was filed by X Corp., MMFA has suffered severe consequences including having to furlough multiple staff members who took to social media to vent about the importance of their work and the opposition they've faced.[16] MMFA President Angelo Carusone emphasized that in response to this

---

[15] Giving more credence to the appearance of forum and judge shopping, the choice of forum provision in the terms of service that confined the instant case to the Northern District of California did not apply to the MMFA matter as there was no formal claim by X Corp. that MMFA violated the terms of service. This is despite the terms of service containing an explicit platform manipulation provision. *See* X Help Center, *Platform manipulation and spam policy*, https://help.x.com/en/rules-and-policies/platform-manipulation; *see also* X, *Terms of Service*, https://x.com/en/tos [https://perma.cc/4ZM3-MD42].

[16] Kat Abu (@abughazalehkat), X (May 23, 2024, 1:13 PM), https://x.com/abughazalehkat/status/1793691841113805312 [https://perma.cc/F9GD-AALB] (Abu wrote on X: "Bad news: I've been laid off from @mmfa, along with a dozen colleagues" and "There's a reason far-right

"legal assault", the layoffs were required by the organization to maintain
sustainability through a changing media landscape.[17] As evidenced by MMFA,
these SLAPP suits can hinder the general public from getting information by
causing brutal disruptions in organization's and researcher's efforts to critique X
Corp.'s actions.

    X Corp.'s most recent litigation against WFA indicates not only a
willingness to punish critics but also to engage in retribution against advertisers
that refuse to advertise on the X platform. On August 6, 2024, X Corp. filed an
antitrust action against WFA, Unilever, Mars, Inc., CVS Health Corporation, and
Ørsted claiming that these organizations were engaged in an unlawful boycott
against X Corp. *See* Complaint at 2; *X Corp. v. World Fed'n of Advertisers*, 7:24-
CV-00114 (N.D. Tex.). WFA created the Global Alliance for Responsible Media
("GARM") in 2019 as a voluntary committee constituting leading advertisers in
order to ensure consistent brand safety standards and minimize the harm of hate
speech, misinformation, and disinformation. Within two days of X Corp.'s filing
its lawsuit, WFA announced that it would be shutting down GARM with the chief

---

billionaires attack Media Matters with armies of lawyers: they know how effective
our work is, and it terrifies them (him).").

[17] Ted Johnson, *Media Matters For America Undergoes Round Of Layoffs*,
DEADLINE (May 23, 2024), https://deadline.com/2024/05/media-matters-layoffs-
elon-musk-1235929171/ [https://perma.cc/9UUC-EAEP].

executive of WFA stating the "decision was not made lightly, but GARM is a not-for-profit organization, and its resources are limited."[18] Once again, given the filing in the Northern District of Texas, WFA was unable to avail itself of anti-SLAPP protections in federal court. This highlights yet again the importance of anti-SLAPP protections to defend against frivolous suits seeking to silence critics.

**B.**     **X Corp.'s Legal Assault Have Already Chilled the Speech of Researchers and Academics**

The legal actions against MMFA and WFA have had a devastating chilling effect on speech. SLAPP suits are intended to have a broad silencing impact; rarely are just the public participation rights of the defendant(s) at issue in any one controversy. As The First Amendment Project details,

> "Most SLAPPs are ultimately legally unsuccessful. While most SLAPPs lose in court, they 'succeed' in the public arena. This is because defending a SLAPP, even when the legal defense is strong, requires a substantial investment of money, time, and resources. The resulting effect is a "chill" on public participation in, and open debate on, important public issues. This "chilling" effect is not limited to the SLAPP target(s): fearful of being the target

---

[18] Kate Conger & Tiffany Hsu, *Advertising Coalition Shuts Down After X, Owned by Elon Musk, Sues*, N.Y. TIMES (Aug. 8, 2024), https://www.nytimes.com/2024/08/08/technology/elon-musk-x-advertisers-boycott.html.

of future litigation, others refrain from speaking on, or participating in, issues of public concern."[19]

A study conducted of 167 academic and civil society researchers by the Coalition for Independent Technology Research showed that "a majority of survey respondents fear being sued by X Corp. over their findings or use of data." The report, authored with Reuters, directly cites the filing of this very case as an explanation why.[20] The report highlighted that the changes in X Corp.'s policies have resulted in "30 canceled projects, 47 stalled projects, and 27 where researchers changed platforms."[21] Bond Benton, an assistant professor at Montclair State University, explained that the "move against CCDH" showed that there was "intrinsic liability in publicly disseminating findings."[22]

Social media companies are among the most valuable, influential, and powerful companies on the planet. The public benefits from having a healthy robust debate on disinformation, hate speech, and how social media platforms

---

[19] *Guarding Against The Chill: A Survival Guide for SLAPP Victims,* THE FIRST AMENDMENT PROJECT, https://www.thefirstamendment.org/media/Guarding-Against-the-Chill.pdf [https://perma.cc/W77N-JFKR] (last visited Sept. 24, 2024).

[20] Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, REUTERS (Nov. 6, 2023), https://www.reuters.com/technology/elon-musks-x-restructuring-curtails-disinformation-research-spurs-legal-fears-2023-11-06/.

[21] *Id.*

[22] *Id.*

handle these issues. The public loses when a debate is stifled through meritless lawsuits designed to intimidate researchers from being able to independently research disinformation and hate speech on X or other social media platforms. Corporations like X Corp. should not be allowed to pollute the atmospheric values in California's anti-SLAPP statute by chilling speech. This chilling is precisely what the anti-SLAPP statute was designed to prevent. To forestall any further silencing of researchers, journalists—and yes, critics—it is imperative that the court affirm the district court's ruling on behalf of CCDH and eliminate the frivolous claims under the anti-SLAPP law.

Ultimately, the resolution of X Corp.'s litigation against CCDH matters not just for CCDH, or for the California anti-SLAPP law's utility against claims with similar legal theories. Affirming the District Court's ruling of this case may be one of the few opportunities that deter organizations like X Corp. from weaponizing the legal system against those who seek to hold them accountable. Similar allegations are present in this case except explicit defamation claims because X Corp. looks to circumvent SLAPP statutes to further chill and silence researchers and organizations.

### III.   CONCLUSION

For the foregoing reasons, X Corp. has failed to carry it onerous burden of proving anti-SLAPP does not apply. *Amicus* respectfully urge this Court to affirm the district court's order and dismiss the claims in X Corp.'s lawsuit.[23]

Dated: September 27, 2024                      Respectfully submitted,

                                               s/ Alejandra Caraballo
                                               Alejandra Caraballo
                                               Harvard Cyberlaw Clinic
                                               1557 Massachusetts Ave
                                               Lewis Center, 4th Fl
                                               Cambridge, MA 02138
                                               (617) 384-8511
                                               acaraballo@law.harvard.edu
                                               *Counsel* for Amicus Curiae

---

[23] Amicus curiae thank Cyberlaw Clinic students Lenisha Gibson, Eden Miller, and Cory Zayance for their valuable contributions to this brief.

22

## CERTIFICATE OF COMPLIANCE

Pursuant to the Fed. R. App. P. 29(a)(4)(G), I hereby certify that:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(b) and Ninth Circuit Rule 32-1(a) because it contains 4985 words as calculated by the word count feature of Microsoft Word 365, excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5)(A) and the typestyle requirement of Fed. R. App. P. 32(a)(6) because it uses 14-point proportionally spaced Times New Roman font.

Dated: September 27, 2024                Respectfully submitted,

                                    s/ Alejandra Caraballo

                                  Alejandra Caraballo

                                  *Counsel* for Amicus Curiae

**CERTIFICATE OF SERVICE FOR ELECTRONIC FILING**

I hereby certify that on September 27, 2024, I electronically filed the foregoing Brief of *Amicus Curiae* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which effects service upon all counsel of record.

Dated: September 27, 2024                    Respectfully submitted,

                                                 s/ Alejandra Caraballo
                                               Alejandra Caraballo

                                               *Counsel* for Amicus Curiae