No. 24-2643

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

X CORP.,

*Plaintiff-Appellant*,

v.

CENTER FOR COUNTERING DIGITAL HATE, INC.;
CENTER FOR COUNTERING DIGITAL HATE LTD.;
STICHTING EUROPEAN CLIMATE FOUNDATION,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of California
Civil Case No. 3:23-cv-03836
(Honorable Charles R. Breyer)

## REPLY BRIEF OF PLAINTIFF-APPELLANT

November 12, 2024

James Jonathan Hawk
MCDERMOTT WILL & EMERY
2049 Century Park East
Suite 3200
Los Angeles, CA 90067
(310) 788-4181
jhawk@mwe.com

Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
Samuel D. Adkisson
Athanasia O. Livas
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com

*Attorneys for Plaintiff-Appellant X Corp.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................ii

INTRODUCTION ...............................................................1

ARGUMENT ....................................................................5

    I.     The First Amendment Does Not Apply to X's Claims.........................5

    II.    X Has Stated a Claim for Breach of Contract.....................................16

       A. X Has Plausibly Alleged Foreseeable Damages.................................16

       B. X Has Plausibly Alleged Breach. ...............................................17

    III.   X Has Stated a Claim Under the CFAA. ............................................20

       A. X's Damages Are Cognizable under the CFAA.................................20

       B. X Has Plausibly Alleged that CCDH Violated the CFAA. ...............24

    IV.   X Has Stated Claims for Tortious Interference. ................................26

    V.    ECF Is Subject to Personal Jurisdiction.............................................28

       A. ECF Purposefully Directed Conduct at the United States. ................28

       B. X's Claims Arise out of and Relate to ECF's Conduct. ....................32

       C. Jurisdiction Is Reasonable. .................................................33

    VI.   The District Court Erred in Denying Leave to Amend.......................34

CONCLUSION ...................................................................35

i

## TABLE OF AUTHORITIES

**Cases**                                                         **Page**

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009).................................................................21

*Brainerd v. Governors of the University of Alberta*,
873 F.2d 1257 (9th Cir 1989)..........................................................29, 30

*Brown Jordan Int'l, Inc. v. Carmicle*,
846 F.3d 1167 (11th Cir. 2017)...........................................................21

*Browne v. McCain*,
2021 WL 1947578 (N.D. Cal. May 14, 2021) .................................31, 32

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991)...........................................................2, 6, 7, 8

*Dietemann v. Time, Inc.*,
449 F.2d 245 (9th Cir. 1971)..........................................2, 9, 10,
11, 15, 16

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016)..........................................................21, 25

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021)...........................................................32, 33

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)...........................................................8

*HiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) .................................................................23

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988)...........................................................2, 3, 7

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
102 P.3d 257 (Cal. 2004) .................................................................16

*Lieberman v. KCOP Television, Inc.*,
110 Cal. App. 4th 156 (Cal. Ct. App. 2003) ......................................20

*Lindke v. Freed*,
601 U.S. 187 (2024)...........................................................20

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009)...........................................................25

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008)..................................................................23

*Morrill v. Scott Fin. Corp.*,
    873 F.3d 1136 (9th Cir. 2017)..........................................................5, 28, 30

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    402 F. Supp. 3d 615 (N.D. Cal. 2019) ...........................................................9

*Planned Parenthood Federation of America, Inc. v. Newman*,
    51 F.4th 1125 (9th Cir. 2022) ...........................................................2, 3, 6, 9,
    11, 12, 13,
    14, 15

*Pope v. Cnty. of San Diego*,
    2024 WL 897843 (S.D. Cal. Mar. 1, 2024) .................................................19

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)....................................................................................33

*Sandvig v. Sessions*,
    315 F. Supp. 3d 1 (D.D.C. 2018) ...............................................................20

*United States v. Janosko*,
    642 F.3d 40 (1st Cir. 2011) .........................................................................21

*United States v. McAdory*,
    935 F.3d 838 (9th Cir. 2019)......................................................................23

*Van Buren v. United States*,
    593 U.S. 374 (2021)....................................................................................22

*Veilleux v. NBC*,
    206 F.3d 92 (1st Cir. 2000) .........................................................................12

*Walden v. Fiore*,
    571 U.S. 277 (2014)....................................................................................30

*Westmoreland v. Kindercare Educ. LLC*,
    90 Cal. App. 5th 967 (Cal. Ct. App. 2023) .................................................18

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
    472 F. Supp. 3d 649 (N.D. Cal. 2020) ........................................................32

*Yamashita v. LG Chem, Ltd.*,
    62 F.4th 496 (9th Cir. 2023) .................................................................32, 33

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)....................................................................................31

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*,
    774 F.3d 1065 (6th Cir. 2014)...................................................................21

## **Constitutional Provisions**

18 U.S.C.
    § 1030(a)(1)...................................................................................................24
    § 1030(e)(11).......................................................................................4, 21, 22

## **Other Authorities**

First Am. Compl., *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.
    Progress*, 2016 WL 2586748 (N.D. Cal. Mar. 24, 2016) .............................13

*Labour-linked censorship group plans to 'kill Musk's Twitter'*,
    SPECTATOR (Oct. 23, 2024), https://bit.ly/3CjiVBy......................................17

## INTRODUCTION

Defendants' briefs are heavy on rhetoric falsely seeking to paint X and its owner, Elon Musk, as purveyors of "hate speech" and "misinformation," and engaging in a supposed campaign of "suing its critics to try to silence them," CCDH Br. 3, rather than as champions of free speech who opened Twitter (now X) to all voices, including those Defendants and their ilk seek to cancel. But that debate is irrelevant here.

The relevant facts at the center of this case are simple. Defendants—the Center for Countering Digital Hate ("CCDH") and the Stichting European Climate Foundation ("ECF")—conspired in 2021 to steal, scrape, and manipulate X's private data for use in "reports" that CCDH would then publish attacking X and calling for advertisers to boycott the company. Defendants' conduct violated X's terms of service ("TOS"), which expressly prohibited CCDH, a registered user, from scraping X's data. It was also contrary to the contractual provisions governing X's relationship with the third party from whom Defendants stole X's private data— Brandwatch—which required that that data be kept confidential and secure. The security breach cost X thousands of dollars in reasonable investigation and response expenses, and CCDH's use of the ill-gotten data in published reports further caused X to lose tens of millions of dollars in advertising revenue—just as Defendants knew and intended. X's suit arising out of this theft and misuse of its data alleges textbook

contract, data security, and tort claims. The district court's dismissal of those claims was based largely on Defendants' briefs (it cites them as authority no fewer than 25 times), which in turn are based on fatal legal and analytical errors, and nothing in Defendants' briefs shows otherwise.

CCDH begins by trying to rehabilitate the district court's decision to convert X's vanilla breach of contract and tortious interference claims for economic damages into a defamation claim for reputational damages—a claim X never pleaded and a form of relief X never sought—and then to dismiss those claims for failing to meet the First Amendment "actual malice" standard that *would* have applied to X's claims *if they had been* for defamation. The district court's decision to treat X's contract and tortious interference claims as defamation claims is contrary to the Supreme Court's binding precedent in *Cohen v. Cowles Media Co*., 501 U.S. 663 (1991), as well as this Court's binding decisions in *Planned Parenthood Federation of America, Inc. v. Newman*, 51 F.4th 1125 (9th Cir. 2022), and *Dietemann v. Time, Inc.,* 449 F.2d 245, 247 (9th Cir. 1971), all of which hold that "the publisher of a newspaper has no special immunity from the application of general laws," *Cohen*, 501 U.S. at 670 (cleaned up).

The line drawn by all of these cases is both simple and sensible. Where a plaintiff seeks only "damages for emotional distress or reputational loss" stemming from a publication, *Newman*, 51 F.4th at 1134, it must meet the *New York Times v.*

2

*Sullivan* standard regardless of how it contrives to plead its claim. *See also Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 52–56 (1988). But where, as here, the plaintiff seeks "damages for economic harms" stemming from the defendant's "violations of generally applicable laws," the First Amendment standard simply does not apply. *Newman*, 51 F.4th at 1134. This is true even where the "economic damage award" is "reliant on publication," as it was in Cohen. *Id.* The district court's resort to First Amendment limitations to bar X's claims was founded on a plain misreading of the controlling precedents.

CCDH's efforts to avoid liability for its breach of X's TOS by unlawfully scraping X's data also come up short. It claims (in an argument that the district court did not endorse) that its scraping of the platform did not violate the TOS in the first place, based on a disingenuous parsing of a provision it reads as impliedly authorizing it to "access or search the Services" with "currently available, published interfaces." CCDH Br. 8. But that reading is belied by *the rest of the very same sentence*, which says that "scraping the Services without the prior consent of Twitter *is expressly prohibited*," CCDH-SER-74 (emphasis added).

Nor does X's contract claim fail for the reason the court below actually adopted: the purported lack of foreseeable damages. Like the district court, CCDH conflates the question whether the parties anticipated *breaching* the contract at the time of formation with the separate question whether they anticipated that the alleged

3

damages would ensue *if a breach occurred*. The latter is the only foreseeability showing the law demands. Given that CCDH's whole modus operandi involves calling for advertiser boycotts of companies, and given X's allegations that CCDH improperly obtained the data in question and then manipulated and published it for the intended and express purpose of causing such a boycott, the damages X suffered from the ensuing loss of revenue were plainly foreseeable from the beginning.

Defendants' unlawful use and access of X's Brandwatch data also violated the CFAA and tortiously interfered with X and Brandwatch's contract. CCDH reads ECF's contract with Brandwatch as somehow entitling ECF to authorize CCDH—a non-party to the contract with no legal relationship to ECF whatsoever—as a "user" on ECF's account. But that interpretation runs headlong into the contractual language limiting ECF's authorized "users" to "individual[s]" that use the Brandwatch services for ECF's "own internal use," CCDH-SER-113, and it also makes no sense: why would Brandwatch, a company that makes money by providing access to its services on a fee basis, allow one of its customers to re-grant that access free of charge to anyone in the wide world? Contrary to the district court and CCDH, X has also alleged losses cognizable under the CFAA: the costs of investigating and responding to the breach. The statute expressly authorizes "any reasonable cost to any victim, including the cost of responding to an offense [and] conducting a damage assessment," 18 U.S.C. § 1030(e)(11), and none of the stray dicta cited by CCDH

4

comes close to foreclosing the recovery of those costs. And because CCDH's unauthorized access to X's Brandwatch data directly caused the breach of Brandwatch's contractual obligation to X to keep its data private and secure, CCDH and ECF are also liable for tortious interference.

Finally, ECF is subject to personal jurisdiction in the United States. That is so, first, under the "well-established rule" that when "a defendant engages in tortious activity toward a plaintiff in the [jurisdiction] where that plaintiff resides" it "is subject to personal jurisdiction there." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1148 (9th Cir. 2017). ECF did just that: it tortiously shared its Brandwatch credentials with CCDH *in the United States*, and this was the root, direct, and proximate cause of the breach. As in its lower-court briefing, ECF tip-toes around that fact without ever actually contradicting it (or submitting any evidence to the contrary). Therefore, X's unambiguous allegations on this point must stand.

Because X's claims for tortious interference both arise out of and relate to this United-States-directed conduct, ECF is subject to specific jurisdiction.

The district court erred in dismissing this case.

## ARGUMENT

### I.    The First Amendment Does Not Apply to X's Claims.

In urging affirmance of the district court's order dismissing X's claims of breach of contract and breach-related torts, Defendants rely primarily on their First

Amendment defense, offering largely the same arguments presented to, and adopted wholesale by, the district court. None of their arguments, however, can survive an objective encounter with the controlling precedents of the Supreme Court and this Court.

The constitutional analysis starts with the Supreme Court's decision in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991). And that is also where it ends, for *Cohen* squarely forecloses the district court's decision. But *Cohen* is not alone. Equally fatal to the ruling below are this Court's binding precedents, including the case on which Defendants principally rely—*Planned Parenthood Federation of America, Inc., v. Newman*, 51 F.4th 1125 (9th Cir. 2022)—which "reiterated [*Cohen's*] holding … that 'the First Amendment right to gather news within legal bounds does not exempt journalists from laws of general applicability.'" *Id.* at 1133 (quoting *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1190 (9th Cir. 2018)).

*Cohen* held that the First Amendment did not preclude an award of economic damages against newspapers that breached a promise to keep Cohen's identity confidential in exchange for information for an article, a breach that cost Cohen his job and lowered his earning capacity. The Court reasoned that publication of information gathered in violation of Minnesota's law of promissory estoppel, a "generally applicable law[]," is not protected by the First Amendment:

> It is … beyond dispute that the publisher of a newspaper has no special immunity from the application of general laws. He has no special

6

> privilege to invade the rights and privileges and liberties of others…. Accordingly, enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.

*Cohen*, 501 U.S. at 669–70 (cleaned up).

It mattered not that the publication of Cohen's name was truthful, for even "truthful information sought to be published must have been lawfully acquired." *Id.* at 669. What mattered was that the newspaper "obtained Cohen's name only by making a promise that they did not honor." *Id.* at 671. And because Minnesota's law of promissory estoppel "requires those making promises to keep them," *id.*, it followed that the First Amendment did not preclude an award of Cohen's economic damages "for breach of a promise that caused him to lose his job and lowered his earning capacity." *Id.*

*Cohen* thus controls this case, for X seeks only to recover economic damages proximately caused by defendants' violations of generally applicable California laws that require promises to be kept and that prohibit interfering with a contractual relationship. The First Amendment simply does not apply.

To evade *Cohen*, as well as this Court's decision in *Newman*, Defendants offer largely the same arguments they offered below. They are wrong at every turn.

1. All of the Defendants' arguments are designed to bring this case within the teaching of *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), which the district court described as an unqualified holding that "a public figure could not

7

recover publication damages on a non-defamation claim without showing actual malice." 1-ER-62. But *Hustler*'s holding did not apply broadly to *all* publication damages. Rather, it held that the actual malice standard applies to a specific and narrow *type* of publication damages—those intangible damages stemming from injury caused by the defendant to the plaintiff's reputation or to his emotional well-being.[1] The Court in *Cohen* specifically distinguished *Hustler* on that very ground, emphasizing that Cohen sought only tangible *economic* damages suffered from a "breach of a promise that caused him to lose his job and lowered his earning capacity," and that he did not seek "damages for injury to his reputation or his state of mind." 501 U.S. at 671. Indeed, the dissenting Justices in *Cohen* condemned the majority for "attempt[ing] to distinguish *Hustler*" on this ground, for they could "perceive no meaningful distinction between" damages for "published speech in order to protect the individual's psychological well being" and damages "to compensate the loss of employment or earning potential." *Id.* at 675 n.3 (Blackmun, J., dissenting).

    2.    The district court also held that the First Amendment categorically bars an award of damages for harm "'caused by the actions and reactions of third parties

---

[1] The noneconomic damages recoverable on claims of defamation and intentional infliction of emotional distress overlap, covering "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349–50 (1974).

[X's advertisers] to' speech" by CCDH, 1-ER-67 (quoting *Planned Parenthood Fed'n of America, Inc. v. Center for Med. Progress,* 402 F. Supp. 3d 615, 643 (N.D. Cal. 2019)), even speech based on information gathered through antecedent violations of contract and law. But the district court's analysis runs headlong into *Cohen*, for the economic damages sought by Cohen were also caused by the reaction of a third party—his firing by his employer—resulting from the published articles. And this Court has likewise flatly rejected the district court's analysis. As the *Newman* Court noted, "[m]ore than fifty years ago," in *Dietemann v. Time, Inc.*, this Court rejected the notion that the First Amendment shields media defendants from liability for economic damages caused by the reactions of third parties to publication of information obtained through antecedent wrongdoing. 51 F.4th at 1134.

In *Dietemann*, this Court considered a state law tort action for invasion of privacy arising from the wrongful conduct of two Life magazine reporters who misrepresented their identities to gain access to the plaintiff's premises and then used hidden cameras and transmitters to gather material for a story depicting the plaintiff as a dangerous quack who practiced medicine without a license. The Court, presciently anticipating the Supreme Court's analysis in *Cohen*, expressly rejected the media defendants' argument that under *New York Times* and its progeny "(1) publication of news, however tortiously gathered, insulates defendant from liability for the antecedent tort, and (2) even if it is not thus shielded from liability, those

9

cases prevent consideration of publication as an element in computing damages."
*Dietemann*, 449 F.2d at 249.

The Court turned first to the defendant's "claims that the First Amendment immunizes it from liability for invading plaintiff's den with … concealed electronic instruments because its employees were gathering news, and its instrumentalities 'are indispensable tools of investigative reporting.'" *Id.* Although the Court "agree[d] that newsgathering is an integral part of news dissemination," it emphasized that "[t]he First Amendment has never been construed to accord newsmen immunity from torts and crimes committed during the course of newsgathering. The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office." *Id.* The Court then addressed the question of damages, and its analysis, which is flatly at odds with the decision below, bears quoting at length:

> Publication is not an essential element of plaintiff's cause of action…. No interest protected by the First Amendment is adversely affected by permitting damages for intrusion to be enhanced by the fact of later publication of information the publisher improperly acquired…. A rule forbidding the use of *publication as an ingredient of damages* would deny to the injured plaintiff recovery for real harm done to him without any countervailing benefit to the legitimate interest of the public in being informed. The same rule would encourage conduct by news media that grossly offends ordinary men.

*Id*. at 249–50 (emphasis added).

10

There can be no doubt that *Dietemann* is good and binding law, for this Court in *Newman* expressly "[a]dher[ed]" to it, along with *Cohen*, in holding "that journalists must obey laws of general applicability. Invoking journalism and the First Amendment does not shield individuals from liability for violations of laws applicable to all members of society." *Newman,* 51 F.4th at 1134.

3.      Which brings us to Defendants' efforts to transform *Newman* from their foe into their friend, seizing upon passages from the opinion that plainly do not mean what Defendants, and the district court, say they mean. Defendants first quote the *Newman* Court's observation, in dicta, that Planned Parenthood, unlike X here, would have suffered the same economic losses "even if [defendants] had never published videos of their surreptitious recordings." CCDH Br. 22–23 (quoting *Newman*, 51 F.4th at 1134). This may have been true in *Newman*, but it clearly was not true in *Cohen,* where the plaintiff would not have lost his job had his name not been published, nor in *Dietemann,* where the damages assessed for plaintiff's injury resulted in part "when the wrongfully acquired data [was] purveyed to the multitude." 449 F.2d at 250.

But the fundamental point is that *Newman* specifically rejected the argument that the award of economic damages "for losses caused by Appellants' violations of generally applicable laws" was "impermissible publication damages" under *Hustler*, emphasizing that, just as in *Cohen*, "the jury awarded damages for economic harms

11

suffered by Planned Parenthood, not the reputational or emotional damages sought in *Hustler Magazine*." 51 F.4th at 1134. *Newman* thus drew the same line between permissible and impermissible publication damages that the Supreme Court drew expressly in *Cohen*—the line "between economic damages and 'damages for injury to [one's] reputation or his state of mind.'" *Id.* (quoting *Cohen*, 501 U.S. at 663). That is the line that holds media defendants "to the letter of the law, just like all other members of our society." *Id.* at 1134. And that line plainly permits recovery against media defendants of economic damages proximately caused by the publication of information obtained through unlawful conduct antecedent to the publication.[2]

4.    Defendants next argue, again echoing the district court, that *Newman* is distinguishable because "everyone agrees" that the video recordings of Planned Parenthood's activities were "true," and so Planned Parenthood had no defamation claim in that case. But because X's complaint, they argue, "alleges that CCDH's methodologies are 'flawed' and that [CCDH] is spreading an 'incorrect narrative,'"

---

[2] The *Newman* Court also cited approvingly the First Circuit's decision in *Veilleux v. NBC*, 206 F.3d 92 (1st Cir. 2000). There, a truck driver and his employer sued NBC, alleging that the network had induced their participation in a "Dateline" program with a promise not to include in the program a particular group critical of the trucking industry, but NBC featured the group anyway. *Id.* at 102. The First Circuit held, applying *Cohen*, that the actual malice standard did not apply to the plaintiffs' claim of common-law misrepresentation. Under *Cohen,* the court held, "the *type* of damages sought bears on the necessity of constitutional safeguards." *Id.* at 127. The First Circuit accordingly approved an award of "damages only for [plaintiffs'] pecuniary loss (primarily the loss of trucking customers) flowing from the misrepresentations, not reputation or emotional distress damages." *Id.*

CCDH Br. 24 (quoting 1-ER-97–100), X is attempting to make "an end-run around 'the strict requirements' for proving defamation and 'seeking damages for injury to its reputation,'" CCDH Br. 24 (quoting *Cohen*, 501 U.S. at 671).

For starters, Defendants are simply wrong that Planned Parenthood in *Newman* "agreed" that the videos of its activities were "true." To the contrary, Planned Parenthood's complaint alleged, in a variety of formulations, that the "videos were heavily manipulated, with critical content deliberately deleted, and disconnected portions sewn together to create a misleading impression." First Am. Compl. ¶ 7, *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2016 WL 2586748 (N.D. Cal. Mar. 24, 2016); *see id.* ¶¶ 8, 126–131, 133–34, 139, 141.

More importantly, Defendants attack, and the district court dismissed, a complaint of their own joint invention, not the one X actually brought. We repeat, X did not bring a defamation claim, and it is not seeking damages for injury to its reputation or its emotions. It sued Defendants only for breach of contract and for breach-related torts—claims that are indifferent to the truthfulness of the publication. Such claims lie "even though the publication was truthful and made without malice." *Newman*, 51 F.4th at 1134–35.

Finally, the rule implied by this argument—that economic damages proximately caused by a *true* publication of unlawfully obtained information are recoverable on a *lower* standard of proof than are such damages caused by a false

and defamatory publication—is nonsensical on its face, and no court to our knowledge has ever held such a thing.

5.    The final argument offered by Defendants and the district court is to distinguish *Cohen* on the ground of *causation.* Because the newspapers in *Cohen* had promised "to limit [their] speech by omitting Cohen's name," the "'conduct that gave rise to the damages in *Cohen was* the publishers' speech'—they were one and the same." CCDH Br. 24 (quoting 1-ER-66). Here, Defendants argue, the breach alleged by X "is the obtainment of data" that was subsequently used in Defendants' publication, and so there was an "additional *step* in the causal chain from breach (speech) to damages." *Id.* at 24–25.

In grasping for *anything* to escape *Cohen*, Defendants and the district court overlook this Court's binding decisions in *Newman* and *Dietemann*, both of which sanctioned recovery of concrete economic damages resulting from the publication of information obtained through antecedent wrongdoing. And neither Defendants nor the district court explain why their proffered "distinction" should matter. The whole point of *Cohen*, and *Newman*, is that media defendants must be "held to the letter of the law, just like all other members of our society," for they "have no special license to break laws of general applicability in pursuit of a headline." *Newman*, 51 F.4th at 1134. This applies to the general law of proximate causation no less than to other generally applicable laws.

6.     There is an additional fundamental problem with Defendants' reliance on *Hustler*: X's claims are not defamation in disguise because Defendants' wrongful conduct *did not involve publication*. The wrongdoing for which Rev. Falwell sought damages was the *publication itself*—the offensive parody that caused emotional distress. Here, Defendants' wrongful conduct involved unlawful access to Brandwatch data and scraping X's platform. That conduct could not possibly give rise to a defamation claim, and it therefore would make no sense for the First Amendment to cabin Defendants' liability for the harm proximately caused by that conduct. Defendants' arguments to the contrary are foreclosed by this Court's decision in *Dietemann*. There, Time Magazine argued that the First Amendment "prevent[ed] consideration of publication as an element in computing damages" flowing from its act of obtaining information through antecedent unlawful conduct (invasion of privacy). *Dietemann*, 449 F.2d at 249. As discussed above, this Court squarely rejected Time's argument, reasoning that "publication [was] not an essential element of plaintiff's cause of action" and that "[n]o interest protected by the First Amendment is adversely affected by permitting damages for intrusion to be enhanced by the fact of later publication of the information that the publisher improperly acquired." *Id*. at 250. The same is true here. *Dietemann* is on all fours with this case and mandates that Defendants' arguments be rejected.

15

**II.    X Has Stated a Claim for Breach of Contract.**

**A. X Has Plausibly Alleged Foreseeable Damages.**

Turning to the substance of X's contract claim, CCDH parrots the district court's conclusion that X failed to allege special damages because CCDH did not anticipate, when it agreed to the TOS in 2019, that "X Corp. (then Twitter) would go from banning users who violated its policies against hate speech and disinformation to declaring a 'general amnesty' for those accounts." CCDH Br. 28–29. In other words, CCDH claims that it was not foreseeable *that it would breach* the terms of use. This argument fails for the reasons explained in our opening brief. The question in assessing whether special damages are available is not whether the breaching party anticipated from the beginning *that it would breach* the contract; the question is whether the "nature of the contract or circumstances in which it is made" give rise to the inference that *if* a breach occurs, the alleged damages "would be the probable result." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 262 (Cal. 2004) (quotation marks omitted). CCDH, like the district court, has no answer to this point.

CCDH instead argues that it "also had no reason to foresee that its reporting would allegedly cause advertisers to … withhold tens of millions of dollars in revenue," CCDH Br. 29, but that is totally implausible. CCDH's whole business model is preparing and publishing misleading "reports and articles" that "openly

16

target organizations and individuals" for "de-platforming." 1-ER-99–100. Having deliberately published articles explicitly "call[ing] for companies not to advertise on X," 1-ER-102,[3] CCDH cannot now claim that it did not foresee that this would result in companies not advertising on X.[4]

## B. X Has Plausibly Alleged Breach.

Apparently nervous that the district court's reasons for dismissing X's contract claim will not withstand scrutiny, CCDH presses a new one: that "CCDH did not breach" the TOS because they "permit users to search posts using X's interface." CCDH Br. 5. This argument is insubstantial, and it is no surprise that the district court did not go for it.

The provision of the TOS CCDH relies on as "direct[ing] users to utilize the search function if they want to access and search user posts," *id.* at 10–11, actually states that users like CCDH "may not … access or search or attempt to access or

---

[3] Indeed, recently uncovered documents reveal that since early 2024 CCDH has been endeavoring to "kill Musk's Twitter." *See Labour-linked censorship group plans to 'kill Musk's Twitter'*, SPECTATOR (Oct. 23, 2024), https://bit.ly/3CjiVBy.

[4] CCDH also attempts to defend the district court's conclusion that X's damages were not stated with sufficient specificity under Rule 9(g). But CCDH ultimately is forced to acknowledge that "the point is not whether X Corp. satisfied … Rule 9(g)," but rather "that greater specificity as to the advertising revenues would not change the fact that those losses are directly based on CCDH's reports, and not its obtainment of the underlying data." CCDH Br. 31. That argument—which has nothing to do with Rule 9(g)—fails for reasons already discussed, *supra* pp. 14–15.

search the Services by any means (automated or otherwise) other than through *our* currently available, published interfaces." CCDH-SER-73 (emphasis added). The SNScrape software CCDH used to scrape the X platform was not an interface provided by X.

Moreover, as CCDH is forced to admit, the TOS "go[es] on to state, in the same sentence," CCDH Br. 33, that "scraping the Services without the prior consent of Twitter *is expressly prohibited*." CCDH-SER-74 (emphasis added). Even assuming CCDH's use of the SNScrape software may have "utilized Twitter's search function," CCDH Br. 33, it did so *by scraping X's data—as X squarely alleged and CCDH has admitted*. 1-ER-109; CCDH Br. 33.

Because the provision of the TOS "expressly prohibit[ing]" "scraping the Services" unambiguously "prohibit[s]" CCDH from scraping X's data, CCDH's remaining arguments collapse like a house built on sand. Its contention that the TOS should be "construed against their drafter[ ]," CCDH Br. 35, fails because that "rule applies only as a last resort when the meaning of a provision remains ambiguous after exhausting the ordinary methods of interpretation," *Westmoreland v. Kindercare Educ. LLC*, 90 Cal. App. 5th 967, 978 (Cal. Ct. App. 2023) (cleaned up). And its attempt to leverage the First Amendment by invoking the "presumption against a waiver" of "constitutional rights," CCDH Br. 35 (quotation marks omitted), fails for the same reason: these tiebreaker presumptions simply have no force when

the contractual language is "clear and unambiguous on its face," *Pope v. Cnty. of San Diego*, 2024 WL 897843, at *10 (S.D. Cal. Mar. 1, 2024).

CCDH's reliance on the presumption against waiver of First Amendment rights—and the stronger medicine of invalidating contract terms that "violate public policy," CCDH Br. 37—also fail on their own terms. CCDH composes an ode to "principles of free speech" in "the modern public square" of social media, *id.*, and its amici offer an even more extended peroration on the point, *see* Br. of Amici Curiae ACLU *et al.*, Doc. 42.1 at 16–24 (Sept. 27, 2024) ("ACLU Br."). But none of them ultimately comes close to justifying the proposition that CCDH necessarily must establish: that there is a First Amendment right to illegally scrape any private social-media company's data in express violation of their terms of service. CCDH says that "no court has yet addressed this issue," CCDH Br. 38, but as explained *supra* in Part I, that is not so: binding precedent from the Supreme Court in *Cohen* and this Court in *Newman* and *Dietemann* reject any such interpretation of the First Amendment. And more generally, at least two established First Amendment principles squarely foreclose it.

First, the First Amendment "prohibits only *governmental* abridgment of speech, not *private* abridgment of speech." *Lindke v. Freed*, 601 U.S. 187, 195 (2024) (quotation marks omitted). And second, even if the First Amendment (or California's analogue) could conceivably be understood to protect the right of

"newsgathering" against *private* restrictions in addition to governmental ones—and CCDH has identified no case going that far, *cf. Sandvig v. Sessions*, 315 F. Supp. 3d 1, 17 (D.D.C. 2018) (applying First Amendment to information gathering only because "plaintiffs claim injury from a potential criminal action against them)—even those courts that have granted some constitutional protection to "newsgathering" activities have also recognized that "reporters are not privileged to commit crimes and independent torts in gathering the news," *Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 165–66 (Cal. Ct. App. 2003) (quotation marks omitted). The Free Speech Clause simply does not require X, a private actor, to make the information it hosts available to all comers using whatever unlawful means they choose, no matter how harmful to X's own digital infrastructure, economic interests, or the interests of its other users.

### III.   X Has Stated a Claim Under the CFAA.

#### A. X's Damages Are Cognizable under the CFAA.

X has also stated a claim under the CFAA, based on CCDH's unauthorized access of X's proprietary data stored by Brandwatch, which cost X over $5,000 in investigating and responding to the breach. 1-ER-115. CCDH argues that these investigation and response costs do not qualify as cognizable "loss" under the CFAA, but the statute says this: "'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and

restoring the data, program, system, or information to its condition prior to the offense." 18 U.S.C. § 1030(e)(11). CCDH's suggestion that X's expenses "responding to [CCDH's] offense" and "conducting a damage assessment" do not qualify as "losses" when the statute defines the term to include these very things verbatim is baffling. And as CCDH does not meaningfully dispute, it is contrary to the uniform precedent of all five Circuits—including this Court—that have considered the issue. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016); *United States v. Janosko*, 642 F.3d 40, 42 (1st Cir. 2011); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009); *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1074 (6th Cir. 2014); *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1175 n.2 (11th Cir. 2017). CCDH does attempt to distinguish *Power Ventures*, speculating that the investigation expenses in that case "apparently involved dealing with continued interference with Facebook's systems" rather than a "one-time alleged access." CCDH Br. 42. But nothing in the CFAA, *Power Ventures*, or any other authority draws any such arbitrary line.

Instead, CCDH bases its entire argument on the untenable notion that in *Van Buren v. United States*, 593 U.S. 374 (2021), the Supreme Court overruled this uniform circuit precedent and adopted a completely atextual interpretation of the CFAA's text, in a case that *did not even involve the loss provision*. The scope of the

21

loss provision was not presented in *Van Buren*, none of the parties briefed it, and the Court did not engage in any meaningful discussion of the provision's text or even cite the uniform circuit precedent interpreting it.

What is more, nothing in the Court's opinion touching on the provision *is contrary* to the interpretation advanced by X. All *Van Buren* says about Section 1030(e)(11) is that it defines "loss" as "relat[ed] to costs caused by harm to computer data, programs, systems, or information services" and "focus[es] on technological harms"—features that "make[ ] sense" under the interpretation it adopted of the CFAA provision actually at issue in the case (the "exceeds authorized access" clause). 593 U.S. at 391–92). All of this is indisputable; much of the statutory definition is indeed "focused" on technological harm. *See* 18 U.S.C. § 1030(e)(11). But *Van Buren* does *not* say that "loss" under the CFAA *is limited* to such harms; and again, any such limitation would be flatly contrary to the statute's text, which "include[s]" such harms *but also* explicitly encompasses "*any* reasonable cost," "*including* the cost of responding to an offense" and "conducting a damage assessment," *id.* (emphasis added)—decidedly *not* "technological harms."

That leaves CCDH with nothing but dicta from a footnote in this Court's decision in *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022). But *HiQ* did not concern the loss provision either—the "pivotal CFAA question" there was the scope of the term "without authorization." *Id.* at 1195. To be sure, in a footnote

the Court quoted *Van Buren*'s "technological harms" language and stated that "LinkedIn has not alleged … any such technological harms." *Id.* at 1195 n.12. But *Van Buren* did not *even cite Power Ventures* or the uniform circuit precedent adopting X's interpretation, nor did it engage in any discussion of the loss provision's text. The observations in *HiQ*'s footnote are the very epitome of non-binding "comments made casually and without analysis, uttered in passing without due consideration of the alternatives, or done as a prelude to another legal issue that commands the panel's full attention." *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (cleaned up).

Finally, CCDH contests whether X's investigation and response costs were reasonable. CCDH Br. 42. But the operative complaint squarely alleges that these costs "were reasonably incurred," 1-ER-112, and that allegation must be taken as true at the pleading stage, *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

## B. X Has Plausibly Alleged that CCDH Violated the CFAA.

Contrary to CCDH's new argument, X has also more than plausibly alleged that CCDH "accessed" the Brandwatch computers containing X's private data "without authorization." 18 U.S.C. § 1030(a)(1). X's complaint alleges that CCDH "ha[s] never been provided with login credentials that would enable them to permissibly access the data with authorization," that it "knew that … ECF's

23

agreement with Brandwatch prohibited ECF from, among other things, sharing its login credentials [or] any of the Licensed Materials with CCDH," but that it nonetheless "impermissibly and without authorization accessed the Licensed Materials on several occasions" by unlawfully using ECF's login credentials. 1-ER-106–07. What more could X allege to state a textbook claim for violation of the CFAA?

CCDH resists this conclusion, arguing that the contract between Brandwatch and ECF purportedly allowed ECF to authorize CCDH—a third party with no legal relationship to ECF—as a "user" under ECF's own Brandwatch account. That interpretation of the contract was apparently too much for the district court, *see* CCDH Br. 43, and it is contrary to the complaint's unambiguous allegations, contrary to the Brandwatch contract's own language, and makes no sense. The "users" who may validly use a Brandwatch customer's services are plainly limited to *the customer's own agents and employees*. That is clear from the contract's definition of "[u]ser" as "*an individual* that Customer … has authorized to use the Services." CCDH-SER-112 (emphasis added). And it is also clear from the contract's provision restricting "[u]se of the Services," which provides that a customer may not "sell, resell, license, sublicense, distribute, or otherwise make the Services (or the results of the Services, including Supplier Data) available to anybody other than its Users for their own internal use." CCDH-SER-113. CCDH is

24

not an employee or agent of ECF, and when ECF unlawfully conveyed its Brandwatch credentials to CCDH it was not for ECF's "own internal use." *Id.*

CCDH's interpretation of Brandwatch's contract is patently unreasonable. For if every Brandwatch customer can authorize anyone on Planet Earth to access Brandwatch's services under their account, then the contractual restriction on reselling, sublicensing, or distributing the services is a nullity, and multiple other clauses of the contract are rendered meaningless as well. *See, e.g.*, *id.* (separate "[o]rder" system for resale of the Services; requirement that passwords be kept confidential; limitations on disclosing confidential information).

This Court's precedent finding CFAA violations where access has been affirmatively revoked are thus inapposite. *See Facebook*, 844 F.3d at 1058; *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009). CCDH was *never permitted to access X's Brandwatch data to begin with*.

## IV.    X Has Stated Claims for Tortious Interference.

Defendants also fail to justify the district court's dismissal of X's tortious interference claims. X squarely and plausibly alleged that both CCDH and ECF knew or should have known "that for Brandwatch to have access to X Corp. data for its [services], X Corp. must have contracts with Brandwatch, and that Brandwatch would be prohibited under the terms of the Brandwatch Agreements from providing access to unauthorized parties, or allowing any unauthorized parties to access that

data." 1-ER-116. Yet the "direct and proximate result" of ECF and CCDH's conduct enabling CCDH to unlawfully access X's Brandwatch data using ECF's credentials "prevented Brandwatch from performing" those contractual obligations to X. *Id.*

Defendants, echoing the district court, claim that their unlawful conduct "did not cause or induce Brandwatch to breach its contractual obligations to X," CCDH Br. 5, but Brandwatch's contract with X provided that Brandwatch would "not attempt to (*and will not allow others* to) … provide access to [X's data] in whole or in part," 1-ER-103 (emphasis added), and that obligation was clearly breached when ECF allowed CCDH to gain unauthorized "access to" the protected data. ECF's unauthorized sharing of the credentials, and CCDH's use of them, was clearly the but-for cause of the breach: without that unauthorized credential-sharing, no prohibited access would have occurred. And Defendants' conduct is also the proximate, direct, and immediate cause, since, contrary to ECF's contention, ECF Br. 42, there are zero intervening links in the causal chain between the unlawful provision and use of ECF's Brandwatch credentials and the unauthorized access to X's data that breached the contract.

ECF also argues that such "intervening and superseding acts" as "CCDH's preparation and publication" of its reports and "advertisers' independent spending decisions" mean that there is no "foreseeable connection between ECF facilitating CCDH's access to Brandwatch UK and X's downstream loss of advertising

revenue." ECF Br. 43. But the complaint squarely alleges—far from implausibly—that when ECF shared its Brandwatch credentials it "intended for CCDH to mischaracterize the data regarding X in the various reports and articles." 1-ER-116. X's loss of advertising revenue was the very purpose, and thus the obviously foreseeable result, of CCDH's publication of reports calling for advertisers to boycott X. *See supra*, pp. 16–17.

The complaint also alleges that CCDH "knew … that for Brandwatch to have access to X Corp. data," it "must have contracts with Brandwatch" that "prohibited" Brandwatch "from … allowing any unauthorized parties to access that data." 1-ER-116. CCDH asserts that this allegation is "conclusory [and] speculative," CCDH Br. 50, but CCDH knows—anyone who has ever signed up for any online service knows—that this objection rings false. X obviously did not provide Brandwatch access to its data *gratis*, and if it received any sort of consideration in exchange, that bargain must be governed by a contract. And just as Netflix or Spotify does not give its customers access to their private content and then allow them to share that access with anyone in the world, the contract between X and Brandwatch necessarily included provisions barring Brandwatch from sharing X's data with unauthorized third parties. The inclusion of provisions in ECF's own contract with Brandwatch requiring it to keep X's data obtained through Brandwatch secure, CCDH-SER-113, clinches the point.

27

### V. ECF Is Subject to Personal Jurisdiction.

#### A. ECF Purposefully Directed Conduct at the United States.

1. As explained in our opening brief, ECF is subject to jurisdiction in the United States under Rule 4(k)(2), first, because X has alleged that the very tortious act that interfered with X's Brandwatch contract—ECF's transmission of its Brandwatch credentials to CCDH's U.S. subsidiary, 1-ER-98—took place *in the forum jurisdiction*. And this Court's "well-established rule" is that when "a defendant engages in tortious activity toward a plaintiff in the [jurisdiction] where that plaintiff resides" it "is subject to personal jurisdiction there." *Morrill*, 873 F.3d at 1148.

ECF resists that conclusion, but just like its evidence and statements before the district court, what it says in its response brief is all carefully phrased to *give the impression* that it disputes that it transmitted the credentials to a U.S. entity *without actually contradicting the fact*. ECF repeatedly states, for example, that it "*facilitated* CCDH's … access to Brandwatch" "not via CCDH US," "but via a *UK*-based employee of CCDH *UK*, Callum Hood." ECF Br. 22–23 (emphasis added); *see also id.* at 10, 15, 23. As explained in our opening brief, though, the emails show that Brandwatch contacted Callum Hood at CCDH's UK subsidiary to resolve a problem with the use of login credentials that ECF *had already provided* to CCDH US. 1-ER-87. That does not contradict—and in fact is fully consistent with—X's

28

allegation that ECF's actual transmission of the credentials themselves was to "CCDH US," "a US entity headquartered in Washington, D.C.," 1-ER-98. CCDH maligns that allegation as "speculative" (far from it) and contrary to the emails with Mr. Hood (not so), ECF Br. 22, 25, but it cannot honestly say that the allegation is actually false, or submit any evidence actually contrary to it. Given that X's opening brief made precisely this point, ECF's continued failure to squarely address it speaks volumes.

ECF attempts to distinguish *Morrill*'s principle that "when a defendant engages in tortious activity toward a plaintiff in the state where that plaintiff resides, the defendant is subject to personal jurisdiction there," 873 F.3d at 1148, by noting that it was never "physically present in the U.S. when facilitating [CCDH's] access," CCDH Br. 35. But *Brainerd v. Governors of the University of Alberta*, 873 F.2d 1257 (9th Cir 1989)—the very case *Morrill* cited for its "well-established rule," 837 F.3d at 1148—shows that actual physical presence is not dispositive. The defendant there "engage[d] in tortious activity toward [the] plaintiff in the state where that plaintiff resides," *Morrill,* 873 F.3d at 1148, not by physically entering the state but by directing "two telephone calls" and a letter into the forum, *Brainerd*, 873 F.2d at 1259.

*Brainerd* is also consistent with Supreme Court precedent equating the transmission of mail into a state with physical presence there for purposes of *in*

*personam* jurisdiction. *See Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("[P]hysical entry into the State—either by the defendant in person or through an agent, goods, *mail*, or some other means—is certainly a relevant contact." (emphasis added)). This does not "unconstitutionally extend personal jurisdiction to anyone physically located abroad who so much as communicates with an individual in the United States," ECF Br. 34, since jurisdiction only lies where those "communicat[ions] with an individual in the United States" constitute *the very tortious activity giving rise to the Plaintiff's claim*. *Id.*

2.    As its last gasp, ECF asks the Court not even to consider *Morrill*'s "well-established rule," 873 F.3d at 1148, because, it claims, X waived any reliance on *Morrill*, ECF Br. 32. But X adequately presented this argument below. It cited below many of the cases relied upon in the opening brief here, including *Morrill*, and it specifically explained that its jurisdictional theory was not based on "ECF's foreign conduct that merely targets X Corp," but rather that the "allegations in the Amended Complaint go well beyond ECF's targeting of X Corp., to establish that ECF reached into this forum by providing CCDH US with its login credentials." N.D. Cal. Doc. 61 at 9, 10. X's presentation of the argument may be more prominently articulated before this Court, in response to the district court's own flawed analysis, but that hardly means the argument is waived. After all, once a particular "claim is properly presented, a party can make any argument in support of

30

that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

3.    ECF's conduct was expressly aimed at the forum in other ways as well: by enabling CCDH to unlawfully access data on servers located in the United States, as part of a campaign to cause X millions of dollars of harm here. ECF disputes the relevance of the location of Brandwatch's servers, first highlighting that X's data was stored on U.S. servers "*among other places*." ECF Br. 30. But that gets ECF nowhere, since the important point is that *some* of the data targeted was stored here, not that *all* of it was.

ECF also highlights the same district-court cases that the court below relied upon for the proposition that the location of servers is not dispositive, *id.* at 30, but as explained in our opening brief, those cases all involved situations where the location of the server storing the data in question was irrelevant to the claim. *See, e.g.*, *Browne v. McCain*, 2021 WL 1947578, at *6 (N.D. Cal. May 14, 2021). By contrast, where the conduct at issue *centers on the server itself*, the courts have found jurisdiction. *See WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649 (N.D. Cal. 2020). ECF tries to distinguish *WhatsApp* on its facts, noting that there the unlawful conduct targeting the forum-based servers was done by "the defendant itself" rather than "another party," ECF Br. 30–31. But that merely shows that the *substantive claims* in *WhatsApp* were different—trespass and direct breach of

31

contract, for example, rather than tortious interference. 472 F. Supp. 3d at 659. Surely due process does not turn on whether ECF targeted the U.S. servers storing X's data by enabling CCDH's unlawful access rather than unlawfully accessing them itself.[5]

### B. X's Claims Arise out of and Relate to ECF's Conduct.

ECF argues that its forum contacts are not sufficiently related to X's claims to support specific jurisdiction, citing this Court's decision in *Yamashita v. LG Chem, Ltd.* for the proposition that "for an injury to arise out of a defendant's forum contacts" there must be "'but for' causation." 62 F.4th 496, 504 (9th Cir. 2023). But as *Yamashita* itself explains, the Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021), holds "that 'arise out of' and 'relate to' are alternatives," either of which suffices to support specific jurisdiction, and that while the "arise out of" alternative "requires causation, … a claim can relate to those contacts, even absent causation." 62 F.4th at 504–05. Accordingly, the "relate to" prong "contemplates that some relationships will support jurisdiction without a causal showing." *Ford Motor Co.*, 592 U.S. at 362. ECF's contacts with the U.S. clearly "relate to" X's claims against it, and that is enough to support jurisdiction.

---

[5] ECF's footnote argument that X has not "satisfied the foreseeable harm prong" of the jurisdictional analysis, ECF Br. 29 n.7, fails for reasons already explained. *See supra*, p. 27.

In any event, the relationship here satisfies even ECF's demand for a strict causal nexus: if ECF had not provided its Brandwatch credentials to CCDH's U.S. subsidiary, X's claims obviously would not exist. The fact that ECF can dream up hypothetical scenarios where it instead transmitted its credentials to CCDH *outside* of the United States does not matter, ECF Br. 27, since the but-for causation inquiry asks "whether, even if th[e] factor [in question] had been absent, the event nevertheless would have transpired in the same way," *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989)—not whether the result would have been the same if the factor was absent but a *different factor had existed in its place*.

## C. Jurisdiction Is Reasonable.

ECF also fails to show that the assertion of jurisdiction is unreasonable. X's opening brief explained why each of the seven factors bearing on this inquiry supports jurisdiction, Appellant's Br. 54–56, and nothing in ECF's brief justifies a contrary conclusion. ECF's claims that its contacts with the forum are nonexistent or "very limited," ECF Br. 40, fail for reasons already discussed. And its assertion that the burden it faces from litigating here is "unique" while litigating in Holland or England would be "efficient" is patently one-sided and ignores the fact that X's witnesses and evidence are principally located in the United States. ECF Br. 40–41.

## VI.    The District Court Erred in Denying Leave to Amend.

Finally, CCDH fails to justify the district court's denial of leave to amend. It again contests the reasonableness of X's investigation expenses, but as discussed above, that is a factual dispute appropriate for summary judgment or trial; it is certainly not a reason to deny leave to amend. CCDH also claims that X's proposed amendment was "dilatory," but like the district court, the reasons it offers have nothing to do with the timing of X's request. Instead, CCDH spins a Goliath-against-David narrative about X's "motive for bringing this suit" that is entirely baseless and certainly does not constitute a cognizable reason for denying X leave to amend.[6]

### CONCLUSION

The Court should reverse.

---

[6] Similarly, while ECF states that X "does not renew its request for jurisdictional discovery on appeal," ECF Br. 44, the opening brief specifically explained the abuse of discretion inherent in the district court's "catch-22 decision disregarding X's well-pleaded allegations by crediting its misreading of the Després declaration as uncontradicted, even as it refused to allow X to seek admissible evidence that would contradict it." Appellant's Br. 49. To the extent this Court harbors any doubts about whether ECF transmitted its Brandwatch credentials into the U.S., as the complaint alleges, or into the U.K., as ECF implies but never plainly states, the appropriate course would obviously be to remand for the jurisdictional discovery the district court denied.

34

November 12, 2024                    Respectfully submitted,


                                     /s/Charles J. Cooper

James Jonathan Hawk                  Charles J. Cooper
MCDERMOTT WILL & EMERY               David H. Thompson
2049 Century Park East               Peter A. Patterson
Suite 3200                           John D. Ohlendorf
Los Angeles, CA 90067                Samuel D. Adkisson
(310) 788-4181                       Athanasia O. Livas
jhawk@mwe.com                        COOPER & KIRK, PLLC
                                     1523 New Hampshire Avenue, N.W.
                                     Washington, DC 20036
                                     (202) 220-9600
                                     ccooper@cooperkirk.com

              *Attorneys for Plaintiff-Appellant X Corp.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-2643

I am the attorney or self-represented party.

**This brief contains** 8,355 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☑ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____ .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Charles J. Cooper **Date** November 12, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*