

Kaplan Martin LLP
1133 Avenue of the Americas, Suite 1500
New York, NY 10036

(212) 316-9500
rkaplan@kaplanmartin.com

January 2, 2026

**BY ACMS**
Molly C. Dwyer
United States Courts for the Ninth Circuit
The James R. Browning Courthouse
95 7th Street
San Francisco, California 94103

> *Re:*     *X Corp. v. Center for Countering Digital Hate, Inc., et al.,*
> 24-2643 (9th Cir.)

Dear Ms. Dwyer:

We write, pursuant to F.R.A.P. 28(j), about a new development in the dispute between our client, Defendant-Appellant Center for Countering Digital Hate, Inc. ("CCDH"), its CEO, Imran Ahmed, and Plaintiff-Appellant X Corp. ("X") and its CEO, Elon Musk.

More specifically, the State Department has acted to revoke the green card of Mr. Ahmed, apparently at the urging of Mr. Musk, because CCDH criticizes American tech companies for not doing more to deal with hate (including antisemitism), disinformation (treating COVID by inhaling bleach), and manipulation (AI models teaching children how to write suicide notes) on online

platforms.[1]  That is what motivated this lawsuit.  *See, e.g.*, ECF 30, CCDH Br. 3.

The district court agreed, explaining that this case is "about punishing Defendants

for their speech." ER-34.

On December 23, 2025, Secretary of State Rubio announced he was taking

"decisive action" against five persons, including Mr. Ahmed, based on the

determination that their "entry, presence, or activities" in the United States "have

potentially serious adverse foreign policy consequences," meaning that DHS can

"initiate removal proceedings."[2]  Under Secretary Rogers clarified that the action

was based on "extraterritorial censorship" by the so-called "censorship-NGO

ecosystem."[3]  Media outlets linked the State Department's action to a 120 million

Euro fine imposed on X for violations of the European Union's Digital Services Act

relating to transparency and deceptive practices.[4] Mr. Musk celebrated the State

---

[1] *See, e.g.*, https://counterhate.com/wp-content/uploads/2025/11/Hate-for-Sale-Final.pdf; https://counterhate.com/research/the-anti-vaxx-playbook/; https://counterhate.com/wp-content/uploads/2025/08/Fake-Friend_CCDH_FINAL-12Sep.pdf.

[2] *Announcement of Actions to Combat Global Censorship-Industrial Complex*, U.S. DEP'T OF STATE (Dec. 23, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/12/announcement-of-actions-to-combat-the-global-censorship-industrial-complex.

[3] X.com, @UnderSecPD (Dec. 23, 2025) https://x.com/UnderSecPD/status/2003567940462084439.

[4] *See, e.g.*, Adam Satariano, *They Seek to Curb Online Hate. The U.S. Accuses Them of Censorship.*, N.Y. TIMES (Dec. 24, 2025), https://www.nytimes.com/2025/12/24/business/europe-us-online-censorship-free-speech.html; Prem Thakker & Asawin Suebsaeng, *SCOOP: Trump Admin Is Preparing to Revoke Visas of Critics of Elon Musk's Twitter*, ZETEO (Dec. 11, 2025), https://zeteo.com/p/trumprevoke-visas-breton-ahmed-twitter-musk.

Department's action against Mr. Ahmed, framing it as a long-overdue response to CCDH's advocacy.[5]  A federal district court in New York granted Mr. Ahmed's request for a temporary restraining order preventing the government from detaining him for now.  *Ahmed v. Rubio, et al.*, 25 Civ. 10705 (S.D.N.Y. Dec. 24, 2025) (Preska, J.).  A copy of the relevant papers is attached.

If anyone is acting as a "censor" here, it is the federal government (and Mr. Musk), not Mr. Ahmed or CCDH, a small non-profit that issues research reports about the practices of tech companies, and doesn't have the power to censor anyone.

Respectfully submitted,

Roberta A. Kaplan

cc: Counsel of Record

---

[5]    X.com,    Elon    Musk,    @elonmusk    (Dec.    24,    2025) https://x.com/elonmusk/status/2003729167452635372?s=20; https://x.com/elonmusk/status/2003878242361790783.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                       :
IMRAN AHMED,                                           :
                                                       :
                                  Plaintiff,           :
                                                       :                    25-CV-10705
                        -against-                      :
                                                       :                       **ORDER**
MARCO RUBIO, in his official capacity as              :
Secretary of State, SARAH B. ROGERS, in               :
her official capacity as Under Secretary of           :
State for Public Diplomacy, PAMELA BONDI,:
in her official capacity as Attorney General,         :
KRISTI NOEM, in her official capacity as              :
Secretary of Homeland Security, TODD M.               :
LYONS, in his official capacity as Acting             :
Director of U.S. Immigration and Customs              :
Enforcement; JUDITH ALMODOVAR, in her :
official capacity as Acting Field Office              :
Director of the New York Immigration and              :
Customs Enforcement Office,                            :
                                  Defendants   :
                                                       :
-------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

I am in receipt of Plaintiff Imran Ahmed's Complaint, (Doc. 1), and Memorandum of

Law in Support of a Temporary Restraining Order and a Preliminary Injunction, (Doc. 10).

Upon review, it is hereby ORDERED:

1. Plaintiff's motion for a temporary restraining order is granted;

2. Defendants are enjoined from arresting or detaining the Plaintiff pending further order of the Court;

3. If Defendants have taken Plaintiff into custody they are enjoined from transferring the Plaintiff from the jurisdiction of this District pending further ruling of the Court;

4. Should Defendants seek to arrest, detain, or transfer Plaintiff on any asserted basis other than pursuing his removal under 8 U.S.C. § 1227(a)(4)(C) pending the Court's decision on a preliminary injunction, Defendants shall provide sufficient advance

notice to the Court and counsel to enable Plaintiff an opportunity to be heard regarding whether any such asserted basis for detention violates Plaintiff's rights under the First Amendment or the Fifth Amendment, or otherwise applicable law;

5. The parties shall attend an initial telephonic case conference on Monday, December 29, 2025 at 4:30 p.m.  The dial-in number is 1-855-244-8681 and the access code is 2309 3085 835.  There is no attendee ID.  The parties should be prepared to address venue, this Court's jurisdiction to hear this case, including how long Plaintiff intends to be in New York, and what steps Defendants have taken to impose visa restrictions and initiate removal proceedings against Plaintiff and others pursuant to the same or similar State Department sanction(s).  The parties should also be prepared to discuss the schedule for briefing during the telephonic conference;

6. The bond requirement of Federal Rule of Civil Procedure 65(c) is waived.

SO ORDERED.

Dated:    December 25, 2025
          New York, New York

Vernon S. Broderick
United States District Judge

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IMRAN AHMED, <br><br> *Plaintiff*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, SARAH B. ROGERS, in her official capacity as Under Secretary of State for Public Diplomacy, PAMELA BONDI, in her official capacity as Attorney General, KRISTI NOEM, in her official capacity as Secretary of Homeland Security, TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; JUDITH ALMODOVAR, in her official capacity as Acting Field Office Director of the New York Immigration and Customs Enforcement Office, <br><br> *Defendants*. | Case No. 25 Civ. _____ <br><br> **COMPLAINT** |

Plaintiff, Imran Ahmed, files this complaint against Defendants Marco Rubio, in his official capacity as Secretary of State, Sarah B. Rogers, in her official capacity as Under Secretary of State for Public Diplomacy, Pamela Bondi, in her official capacity as Attorney General, Kristi Noem, in her official capacity as Secretary of Homeland Security, Todd M. Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, and Judith Almodovar, in her official capacity as Acting Field Office Director of the New York Immigration and Customs Enforcement Office, and alleges as follows:

## INTRODUCTION

1. This case arises out of the federal government's latest attempt to abuse the immigration system to punish and punitively detain noncitizens for protected speech and silence viewpoints with which it disagrees. On December 23, 2025, on the day before Christmas Eve, just

aone hour before this Court closed for the holidays, the Trump Administration announced that it would move to deport Plaintiff Imran Ahmed, an advocate for human rights and civil liberties online, and a British legal permanent resident of the United States who has lived and worked here for five years with his American wife and American child. Rather than disguise its retaliatory motive, the federal government was clear that Mr. Ahmed is being "SANCTIONED" as punishment for the research and public reporting carried out by the nonprofit organization that Mr. Ahmed founded and runs, the Center for Countering Digital Hate ("CCDH"), which studies the content moderation policies of major social media companies, including Elon Musk's company, X Corp. In other words, Mr. Ahmed faces the imminent prospect of unconstitutional arrest, punitive detention, and expulsion for exercising his basic First Amendment rights. The government's actions are the latest in a string of escalating and unjustifiable assaults on the First Amendment and other rights, one that cannot stand basic legal scrutiny. Simply put, immigration enforcement—here, immigration detention and threatened deportation—may not be used as a tool to punish noncitizen speakers who express views disfavored by the current administration.

2. Mr. Ahmed is a lawful permanent resident and lives in the United States with his wife, who is a U.S. citizen, and their young child, who is also a U.S. citizen. He founded and runs CCDH, a nonprofit organization with the mission of protecting human rights and civil liberties online. CCDH conducts research and publishes publicly available reports about the content moderation policies and practices of major social media platforms, including with respect to topics of paramount importance, such as violence and suicide committed by minors, hate speech, vaccinations, mental health, violence against women and children, reproductive health care, and climate change.

3. On December 23, 2025, the federal government announced that it had taken steps

2

to impose visa restrictions and initiate removal proceedings against certain individuals pursuant to Immigration and Nationality Act ("INA") Section 273(a)(4)(C), 8 U.S.C. § 1227(a)(4)(C). That same day, Defendant Under Secretary of State Sarah B. Rogers posted on X that her agency had "SANCTIONED: Imran Ahmed," for his work with CCDH. Under Secretary Rogers tied these sanctions to the speech and advocacy of CCDH, citing the fact that CCDH has (1) publicly reported on the proliferation of anti-vaccine misinformation on social media, and (2) supported the United Kingdom's Online Safety Act and the European Union's Digital Services Act, which promote greater transparency and accountability for social media platforms in monitoring and removing illegal and harmful content. According to a separate press release by Defendant Secretary of State Marco Rubio issued that same day, as a result of these sanctions, Mr. Ahmed is now being subjected to "visa restrictions" and "removal proceedings" and will be "generally barred from entering the United States." In other words, on Christmas Eve, Mr. Ahmed, a lawful permanent resident, now faces the imminent prospect of unconstitutional arrest, punitive detention, and expulsion from his home country away from his wife and child for exercising his basic First Amendment rights.

4.      The government's shocking actions against Mr. Ahmed form part of a larger pattern of attempted repression of constitutionally protected speech. In case after case, the federal government has sought to use its immigration enforcement power as a bludgeon to silence voices and prevent disfavored speech. Rumeysa Ozturk, Mahmoud Khalil, and Badar Khan Suri, as just a few examples, all legally present noncitizens, were each arrested in retaliation for their protected speech and forced to endure unlawful detention, often thousands of miles away from their families.

5.      This contravenes the basic principles embodied in our Constitution. The government has no power to punish Mr. Ahmed for his research, protected speech, and advocacy,

3

and Defendants cannot evade those constitutional limitations by simply claiming that Mr. Ahmed's

presence or activities have "potentially serious adverse foreign policy consequences for the United

States."  Defendants' actions violate Mr. Ahmed's rights under the First Amendment and Fifth

Amendment of the U.S. Constitution, the Administrative Procedure Act ("APA"), the INA, and its

own policies.  This Court should vacate and set aside the Defendants' efforts to target Mr. Ahmed,

declare Defendants' actions to be illegal, enjoin Defendants from arresting, detaining, transferring,

or deporting Mr. Ahmed from this district unless Defendants establish that their actions are lawful

and do not violate the Constitution's protections against retaliation and discrimination.

**PARTIES**

6.      Plaintiff Imran Ahmed is a legal permanent resident of the United States. Mr.

Ahmed lives in Washington D.C. with his wife and child.  He is currently physically present in

New York City, where the New York ICE Field Office would detain him.

7.      Defendant Marco Rubio is named in his official capacity as the Secretary of State

of the United States.  His address is the United States Department of State, 2201 C Street, NW,

Washington D.C. 20520.

8.      Defendant Sarah B. Rogers, is named in her official capacity as Under Secretary of

State for Public Diplomacy.  Her address is the United States Department of State, 2201 C Street,

NW, Washington, D.C. 20520.

9.      Defendant Pamela Bondi is named in her official capacity as the Attorney General

of the United States.  Her address is the U.S. Department of Justice, 950 Pennsylvania Avenue,

NW, Washington D.C. 20530.

10.     Defendant Kristi Noem is named in her official capacity as the Secretary of

Homeland Security.  Her address is the U.S. Department of Homeland Security ("DHS"), Office

4

of the General Counsel, 2707 Martin Luther King Jr. Ave, SE, Washington D.C. 20528.

11. Defendant Todd M. Lyons is named in his official capacity as the Acting Director of Immigration and Customs Enforcement. His address is Office of the Principal Legal Advisor, 500 12th St. NW, Mail Stop 5900, Washington D.C. 20536.

12. Defendant Judith Almodovar is named in her official capacity as the Acting Filed Office Direct of the New York Field Office for ICE within the United States Department of Homeland Security. Her address is the New York ICE filed Office Director, 26 Federal Plaza, New York, New York 10278.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Constitution of the United States because this case presents a federal question under the laws of the United States, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. This Court has remedial authority including pursuant to the APA, 5 U.S.C. §§ 705, 706; the All Writs Act, 28 U.S.C. § 1651; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; and Rules 57 and 65 of the Federal Rules of Civil Procedure.

14. Venue is proper in this Court under 28 U.S.C §§ 2241(a), 1391(b)(2), and 1391(e)(1) because a substantial part of the events giving rise to Mr. Ahmed's claims occurred in this district; Mr. Ahmed is currently in New York City; Defendant Almodovar resides in this District; and the New York ICE Field Office, located in this District, is seeking Mr. Ahmed's detention.

## BACKGROUND

**A. Mr. Ahmed's Decision to Found CCDH to Prevent Online Discrimination and Hate**

15. Mr. Ahmed is a citizen of the United Kingdom and lawful permanent resident of

5

the United States. He moved to the United States from the United Kingdom in 2021 with an O-1 Visa, a visa for immigrants who possess "extraordinary ability in the sciences, arts, education, business, or athletics." 8 U.S.C. § 1101(a)(15)(O). Mr. Ahmed received the O-1 visa on January 8, 2021. Mr. Ahmed applied for an adjustment of status, submitting an application for legal permanent resident status. His application was granted (i.e., he received a "green card") on March 29, 2024, and he is now a legal permanent resident of the United States. Mr. Ahmed is married to a U.S. citizen and his child is a U.S. citizen.

16. Mr. Ahmed was born in Manchester, England, in 1978, and attended Manchester Grammar School. His family is Pashtun, one of the largest ethnic groups in Afghanistan.

17. Mr. Ahmed turned twenty-three on September 12, 2001. The Taliban were Pashtun, and Mr. Ahmed felt a strong sense of purpose to devote his life to addressing evil in the world. He returned to formal study and earned a degree in politics from the University of Cambridge before embarking on a long career in public service and political strategy within the United Kingdom's Labour Party.

18. In 2016, while working in British politics, Mr. Ahmed grew concerned by the rise in antisemitism and racism across the United Kingdom, where he was living at the time. He observed a sharp rise in antisemitism, xenophobia, and far-right organizing in the United Kingdon, particularly during the campaign surrounding the Brexit referendum and when the far-right party, Britain First, launched the dangerous conspiracy theory that the EU was attempting to import Muslims and Black people to "destroy" white citizens.

19. In November 2016, Jo Cox, a Member of Parliament and Mr. Ahmed's colleague, was shot and stabbed in a brutal politically motivated murder, by a man who screamed "Britain first" and "keep Britain independent" during the attack. Ms. Cox's killer was alleged to have

accessed several websites about the Nazis, the Ku Klux Klan, the Waffen-SS, and Israel on the days before killing Cox.

20. Inspired and devastated by this tragedy, Mr. Ahmed formed the CCDH in 2019 to call attention to the enormous problem of digitally driven disinformation and hate online,

**B.    CCDH's Work to Prevent the Spread of Online Hate and Disinformation**

21. CCDH is a nonprofit organization that works to stop the spread of online hate and disinformation through innovative research, public campaigns, and policy advocacy.  Its mission is to protect human rights and civil liberties online.

22. By developing an understanding of the online harm landscape that exists on social media platforms, CCDH has demonstrated how social media algorithms can pose real life harms to marginalized communities, minors, and democracy more broadly.

23. CCDH works towards better online spaces that promote truth, democracy, and are safe for all with the goal of increasing economic and reputational costs for the platforms that facilitate the spread of hate and disinformation. It has published reports on a variety of topics to further their ultimate mission of reducing hate online and its real-world impacts. For example:

   a. CCDH publishes a free Parents Guide, a downloadable document to help parents understand what kids are exposed to online, how to set boundaries, how to have conversations about what they see online, and where to find additional resources.[1]

   b. CCDH has conducted wide ranging investigations into Meta, TikTok, YouTube, and AI tools to document children users' exposure to abuse, self-

---

[1] Center for Countering Digital Hate, *Parents Guide: How to Navigate Social Media Safely with Your Kids*, (2025), https://counterhate.com/parents-guide-how-to-navigate-social-media-safely-with-your-kids/.

7

harm, eating disorders, drugs, and extremist content. CCDH's polling further links social media use to increased susceptibility to extremist and antisemitic beliefs and conspiracy theories, directly linking online child safety to broader concerns about democratic resilience and civic health. Its findings have been widely cited in court proceedings and complaints brought against Meta. Its research has also prompted the platforms themselves to modify or remove features.

c. CCDH also offers Digital & Information Resilience Training for individuals and organizations to better navigate social media and build resilience against online hate.

d. In March 2021, CCDH published a report entitled the "Disinformation Dozen," which reveled that just twelve individuals were responsible for almost two-thirds of anti-vaccine content circulating on social media platforms.[2] CCDH found that despite the fact that these twelve individuals repeatedly violated Facebook, Instagram, and Twitter's terms of service agreements, nine remained on all three platforms. The report also published CCDH's research that social media platforms in the analyzed time period in 2021 failed to act on 95 percent of the Covid and vaccine misinformation reported to them and in fact there was some evidence that the algorithms actively recommended similar misinformation.

e. CCDH has also worked to draw attention to harmful content that social media

---

[2] Center for Countering Digital Hate, *The Disinformation Dozen*, (2021), https://counterhate.com/research/the-disinformation-dozen/.

and online search companies often end up pushing to children.  For example, a December 2022 report examined how TikTok's algorithm recommends suicide, self-harm, and eating disorder content to teen users within minutes of their signing up for an account.[3]

f.  In April 2023, CCDH published a report co-authored with the Anti-Defamation League entitled "How Iran's Press TV Uses Social Media to Promote Anti-Jewish Hatred."[4] The report exposed how a foreign state was using state-controlled media to promote dangerous antisemitism, Holocaust denial, and hateful views about LGBTQ+ and women's rights through social media platforms to millions across the world.

g.  In 2025, CCDH published a 55-page report containing the results from a large-scale safety test it conducted by setting up teen accounts on ChatGPT.[5]  The results were highly alarming.[6]  Within two minutes of interacting with ChatGPT, the program gave clear instructions to a 13-year old teen on how she should cut herself, and within 12 minutes it advised another teen on the exact quantities of MDMA and alcohol to mix for a "crossfading" effect.  Within 40 minutes, ChatGPT gave a teen specific doses of multiple medications that a 13-

---

[3] Center for Countering Digital Hate, *Deadly by Design* (2022), https://counterhate.com/research/deadly-by-design/.

[4] Center for Countering Digital Hate, *Iranian state TV using social media to evade broadcast bans and spread antisemitic hate campaigns, new report finds*, (2023) https://counterhate.com/blog/new-report-state-hate/.

[5] Center for Countering Digital Hate, *Fake Friend, How ChatGPT Betrays Vulnerable Teens by Encouraging Dangerous Behavior* (2025), https://counterhate.com/wp-content/uploads/2025/08/Fake-Friend_CCDH_FINAL-12Sep.pdf.

[6] Researchers at CCDH developed three 13-year-old personalities and registered free ChatGPT accounts in their names, ages, and locations within the United States.

9

year-old girl weighing 110 pounds would need to ingest to overdose.  In an hour, it wrote a complete suicide plan for a teen including the suicide note he should leave and the step-by-step plan he should use to prepare his bedroom and computer to be discovered by his parents after his death.

h.   Another 2025 report published by CCDH in partnership with The Jewish Federations of North America focused on the proliferation of antisemitism and hate speech on social media and 11 Instagram accounts that were openly selling "hate merchandise" on e-commerce systems.[7]  Over six months, the number of views the accounts received jumped from 220 million views to 826 million views.  CCDH's research showed that the spike in views – and in sales of the "hate merch" – directly corresponded with sweeping policy reforms that Meta implemented, which rolled back earlier safeguards that detected and stopped the spread of hate speech and hate accounts.[8]

24.   CCDH was one of the original supporters of the United Kingdom's Online Safety Act, which became law in October 2023.  The groundbreaking legislation set the rules for social media and search engine platforms operating in the United Kingdon, requiring them to identify and remove illegal content, conduct risk assessments, and provide a higher level of online protection for children. Mr. Ahmed provided evidence and testimony in support of the bill before Parliament and now regularly advises, Ofcom, the United Kingdom's online safety regulator, on

---

[7] Center for Countering Digital Hate, *Hate for Sale: How Instagram Enables Sellers of Hateful Merchandise to Reach a Billion Views* (2025), https://counterhate.com/wp-content/uploads/2025/11/Hate-for-Sale-Final.pdf.

[8] Examples of merchandise include two t-shirts: one stamped with a reimagined Adidas logo made of three nazi salutes and the "brand" "adidolf," and the other replaced the well-known Nike swoosh with one made of cotton balls above the phrase "Just Pick It." *Hate for Sale* at 14.

how to ensure safety is at the forefront of the government's policies.

25.     CCDH is a proud supporter of the Digital Services Act (the "DSA"), the 2024 "rulebook" that regulates digital service in the European Union that requires social media and search engine platforms to comply with risk assessment and mitigation efforts.

26.     The DSA addresses the CCDH's STAR Framework, it's blueprint for social media platforms' regulation:  Safety by Design, Transparency, Accountability, and Responsibility.  The DSA requires companies to investigate whether platforms are failing to tackle online harms, hate, and misinformation so that they can help mitigate the problems where it exists. The DSA also requires greater transparency of algorithms and advertising across the platforms.  In order to operate in Europe, where there are over 45 million active users, Meta's Facebook and Instagram, X, TikTok, LinkedIn, and YouTube must comply with the DSA's additional requirements.

27.     CCDH has also advocated for reforms to Section 230 of the Communications Decency Act.  Section 230 shields "interactive computer services" from liability for content created and added to websites by another party.[9]  CCDH has discussed how Section 230 was passed when online interactions looked very different from how they do today, and it has advocated for taking a more nuanced approach to liability protections for social media companies to hold them accountable for the content that appears on their platforms.

**C.     CCDH Is Sued by X Corp. for Its Work Exposing the Spread of Disinformation and Hate on Social Media**

28.     Unsurprisingly, CCDH's work has drawn retaliation from powerful social media companies.  On July 20, 2023, X Corp. ("X"), the social media company owned by billionaire Elon

---

[9] Center for Countering Digital Hate, *Understanding Section 230 – Social Media Companies' Get Out of Jail Free Card*, (2024), https://counterhate.com/blog/understanding-section-230-social-media-companies-get-out-of-jail-free-card/.

Musk, sent a letter to Mr. Ahmed and the CCDH criticizing their reports and threatening litigation under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125.

29. On July 31, 2023, X Corp. filed a lawsuit in the Northern District of California against the CCDH, presenting two categories of allegations about three specific reports by the CCDH Defendants.

30. CCDH had done research that was published on the front page of The New York Times that showed an increase in hate speech on X since Elon Musk had taken over the social media company.[10] For example, there was a tripling in the use of the N-word after the change in ownership with people using the word with three times as much frequency the week he took over compared to the daily average the year before.

31. X complained that this research had been gathered in alleged violation of various contractual provisions and published without authority.

32. On March 25, 2024, the Honorable Charles R. Breyer of the United States District Court for the Northern District of California granted CCDH's motion to dismiss finding that the lawsuit was "unabashedly and vociferously" about "punishing the Defendants for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948 (N.D. Cal. 2024). X has appealed that decision, and that appeal is currently pending before the United States Court of Appeals for the Ninth Circuit.

**D.      The Government's Adverse Actions Against Mr. Ahmed**

33. On December 4, 2025, the European Commission issued a fine of 120 million euros against X for violations of the DSA's provisions governing transparency, accessibility, and

---

[10] Center for Countering Digital Hate, *The Musk Bump: Quantifying the Rise in Hate Speech Under Elon Musk*, (2022), *https://counterhate.com/blog/the-musk-bump-quantifying-the-rise-in-hate-speech-under-elon-musk/*.

deceptive practices.

34.    The ruling drew a strong reaction from the Trump Administration, with President Trump describing it as "nasty" and criticizing the European Union for going in "bad directions."[11]

35.    Secretary of State Marco Rubio posted to social media that the ruling was "an attack on all American tech platforms and the American people by foreign governments" and declared that "[t]he days of censoring Americans online are over."



*Figure 1 – December 5, 2025 Social Media Post by Secretary of State Marco Rubio*

36.    On December 23, 2025, Secretary of State Marco Rubio issued a press release announcing that the State Department "is taking decisive action against five individuals" for their protected speech activities.  The press release further announced that Secretary Rubio had made a determination that the individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States" (the "Rubio Declaration") and noted that, under the Rubio Declaration, the Department of Homeland Security "can initiate removal proceedings against certain individuals  pursuant  to  INA  section

---

[11] Reuters, *Trump Calls EU fine on X 'Nasty One,' says Europe Going in 'Bad Directions,'* (Dec. 8, 2025), https://www.reuters.com/business/trump-calls-eu-fine-x-nasty-one-says-europe-going-bad-directions-2025-12-08/.

237(a)(4)(C), which renders such individuals deportable." The press release explained that "[t]hose actions are pursuant to Section 212(a)(3)(C) of the Immigration and Nationality Act" (the "Foreign Policy Ground").

*Figure 2 - December 23, 2025 Press Statement of Secretary of State Marco Rubio*

37. That same day, Under Secretary of State Sarah B. Rogers posted on social media: "Today, the United States issued SANCTIONS reinforcing the 'red line' I invoked on @GBNEWS. Namely: extraterritorial censorship of Americans. Today's sanctions target the

14

censorship-NGO ecosystem." In a separate post, Under Secretary Rogers continued: WE'VE SANCTIONED: Imran Ahmed, key collaborator with the Biden Administration's effort to weaponize the government against U.S. citizens. Ahmed's group, Center for Countering Digital Hate (CCDH), created the infamous 'disinformation dozen' report, which called for platforms to deplatform twelve American 'anti-vaxxers', including now-HHS Secretary @SecKennedy" ("Rogers' Post").



*Figure 3 – December 23, 2025 Social Media Post by Under Secretary of State Sarah B. Rogers*

38. Defendant Rogers also referenced "leaked documents" from CCDH that show that the organization wants to "kill Musk's Twitter" and "trigger EU and UK regulatory action" as supporters of the UK's "Online Safety Act and EU's Digital Services Act."

39. Also on December 23, 2025, an article was published by Elizabeth Troutman Mitchell at *The Daily Signal*. The article, which describes a State Department document obtained by *The Daily Signal*, notes that Mr. Ahmed is "subject to deportation."[12] The article further

---

[12] Elizabeth Troutman Mitchell, *Exclusive: Trump Bars Global Censorship Agents From Entering US*, Daily Signal (Dec. 23, 2025), https://www.dailysignal.com/2025/12/23/exclusive-trump-bars-five-europeans-accused-on-censoring-american-speech-from-entering-us/.

explains: "Due to Secretary of State Marco Rubio's foreign policy determination, the Department of Homeland Security can now initiate removal proceedings." *Id.*

40.    The following day, Under Secretary Rogers made light of the federal government's devastating actions against Mr. Ahmed in a public jibe directed at Morgan McSweeney, Chief of Staff to British Prime Minister Keir Starmer and a former director of CCDH.  Referencing the government's efforts to deport Mr. Ahmed and separate him from his family on Christmas Eve, Under Secretary Rogers posted on X: "Hey McSweeney. Merry Christmas."



*Figure 4 – December 24, 2025 Social Media Post by Under Secretary of State Sarah B. Rogers*

41.    Elon Musk also posted online to celebrate the administration's actions, reposting an individual's reaction to Under Secretary of State Rogers' post with the comment "This is so

great."



*Figure 5 – December 24, 2025 Social Media Post by Elon Musk*

## E.   History of the Foreign Policy Ground

42.   The government's retaliation against Mr. Ahmed comes in a broader context of retaliation against other noncitizens who have exercised their First Amendment rights.  Officials at the highest levels of the federal government have made clear that they intend to use immigration to punish noncitizens who speak out in support of causes the government does not agree with or who are perceived to have engaged in such speech.

43.   8 U.S.C. § 1227 provides the Secretary of State with the authority to refuse entry to noncitizens if he has "reasonable grounds to believe" that their presence or activities "would have potentially serious adverse foreign policy consequences for the United States." *See* U.S.C. § 1227(a)(4)(C)(i) (referencing 8 U.S.C. § 1182(a)(4)(C)(i).

44.   However, the Secretary of State is expressly forbidden by statute from issuing a policy or decision to deny entry or initiate deportation proceedings based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations

would be lawful within the United States." In such circumstances, the Secretary must "personally determine[]" that admitting the individual or allowing them to remain in the United States would "compromise a compelling U.S. foreign policy interest," 8 U.S.C. § 1182(a)(3)(C)(iii), and then notify certain leaders in Congress of the person's identity and the reasons for the determination, 8 U.S.C. § 1128(a)(3)(C)(iv).

45.     Legislative history confirms that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. A Senate Committee report provides that for years "the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendments which resulted in the current version of the law were intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States."[13]

46.     In a separate House Conference report, Congress made clear that the authority to use this provision should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that "the 'compelling foreign policy interest' standard [should] be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'"[14]

47.     As an example, the same House report on the amendment shared the case of the Shah of Iran as an example where his "mere entry into the United States could [have resulted] in imminent harm to the lives or property of United States persons abroad or to property of the United

---

[13] S. Rep. No. 100-75 at 11, 100th Cong., 1st Sess. (1987) (reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

[14] H.R. Conf. Rep. 101-955, at 6793-94, 101st Cong., 2nd Sess. (1990) (reprinted in 1990 U.S.C.C.A.N. 6784).

States government abroad.'"[15]

## F.    DHS Guidance Concerning First Amendment Activity

48.    In 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees specifically concerning First Amendment protected activities.[16]  Per that memorandum, the prior Trump Administration directed that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."[17]

49.    In 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."[18]  As of the date of filing, the Mayorkas 2021 Guidance remains publicly available on ICE's website.

## G.    Pattern of Government Retaliation Against Other Noncitizens

50.    Over the past year, the Trump Administration has repeatedly employed the same retaliatory playbook against noncitizens whose speech it disfavors.  The playbook is the same every time:  first, the administration identifies an individual based on protected advocacy of certain views it dislikes, then ICE arrests the individual suddenly in a public or domestic setting.  The individual is denied any meaningful process and often transferred hundreds or thousands of miles

---

[15] *Id.* at 6793.

[16] See Memorandum from Kevin McAleenan, Sec'y, U.S. Dep't of Homeland Sec., to all DHS Employees (May 17, 2019), https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_ activities_as1_sign ed_05.17.2019.pdf.

[17] *Id.*

[18] See Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021), https://www.ice.gov/doclib/news/guidelinescivilimmigrationlaw.pdf.

away—often overnight—to remote detention facilities far from their families, communities, and counsel. Mr. Ahmed has seen this playbook in action.

51. Rumeysa Ozturk is a Turkish national and a Ph.D. student at Tufts University. Her alleged "offense" consisted of co-authoring a student newspaper op-ed criticizing Tufts' response to student calls for divestment from companies connected to Israel's military operations in Gaza. Federal agents arrested Ms. Ozturk near her home in Massachusetts. Within hours, they transferred her out of the Northeast entirely and placed her in an immigration detention facility in Louisiana— more than 1,400 miles away—severing her from her academic community, local counsel, and support network. Government officials publicly characterized her protected speech as "support for Hamas," despite identifying no unlawful conduct.

52. Mahmoud Khalil, a lawful permanent resident and graduate student at Columbia University, experienced the same treatment. Mr. Khalil served as a mediator between student protesters and university administrators and spoke publicly about Palestinian human rights and international law. Agents arrested him at his university housing in Manhattan. Even after his counsel filed an emergency habeas petition in New York, the government transferred Mr. Khalil and sent him to a detention facility in Louisiana—approximately 1,300 miles away—without notice to counsel and while his wife, who was pregnant at the time, remained in New York. Senior administration officials then openly admitted that his arrest was based on his campus activism and vowed that additional arrests would follow.

53. Badar Khan Suri, an Indian national and postdoctoral fellow at Georgetown University, was arrested outside his home in Rosslyn, Virginia, after teaching and attending iftar during Ramadan. Dr. Suri had made only limited social-media posts expressing concern about civilian deaths in Gaza and affirming principles of international law. Officers told him directly

that "someone very high up" did not want him in the United States and cited his social-media activity as the basis for his arrest. After briefly holding him in Virginia, the government transported him first to Louisiana and then to Texas—more than 1,200 miles from his wife, three young children, and legal counsel—classifying him as high-security despite acknowledging that he had committed no crime.

54. These arrests do not follow criminal investigations or adjudicated violations of law. They follow speech. And the transfers are not incidental; they are central to the strategy. Separating detainees from their counsel, even after counsel has appeared or litigation has begun, is how the government attempts to isolate these individuals, disrupt judicial review, and amplify the punitive effect of detention.

55. Mr. Ahmed now faces that same threat, except this time the threatened actions were announced publicly. The government's actions in the Rubio Declaration and Rogers' Post fit squarely within this established pattern of retaliatory enforcement—one that uses immigration power not to advance legitimate regulatory goals, but to punish dissent and deter protected speech that the administration or its supports disagree with.

**H. Unlawful Use of the Foreign Policy Ground Against Mr. Ahmed**

56. DHS and Defendant Rubio have invoked the Foreign Policy Ground against Mr. Ahmed. As set forth above, the federal government has made clear that it intends to seek the deportation of Mr. Ahmed.

57. On December 23, 2025, Defendant Rubio issued the Rubio Declaration announcing that the State Department had made a determination that five individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States, and noted that the Department of Homeland "can initiate removal proceedings" against these individuals "pursuant to INA § 237(a)(4)(C), which renders such individuals

deportable."

58.     That same day, Defendant Rogers identified Mr. Ahmed as one of those five individuals.

59.     The federal government has taken the position in other litigation that a noncitizen is not permitted to seek review of his custody determination before an immigration judge where the government invokes the Foreign Policy Provision.  See Opp'n to Mot. for Release under *Lucas v. Haaden* and *Mapp v. Reno, Khalil v. Trump*, No. 25 Civ. 1963 (D.N.J. Mar. 23, 2025), ECF 99, n.5.  It stands to reason that the government will adopt the same position in Mr. Ahmed's case once he is in physical detention, all but barring him from any meaningful ability to remain at liberty for months or seek release through administrative avenues, and thereby making the relief sought herein all the more critical to protect against irreparable harm.

60.     Other reporting indicates that the government intends to deport Mr. Ahmed because of his constitutionally protected, past, current, or expected beliefs, statements, or associations.

61.     The applicable statutes expressly prohibit removal based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary "personally determines" that not removing the noncitizen would compromise a compelling U.S. foreign policy interest and provides notice of the same to the individuals identified by statute. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (incorporating 8 U.S.C. § 1182(a)(3)(C)(iii)). Plaintiff is not aware of any evidence to indicate that Defendant Rubio has provided the required notification to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).  Invocation of any ground of deportability for one's protected speech is unconstitutional.

22

**I.** **Mr. Ahmed Faces Irreparable Harm Without Injunctive Relief From this Court**

62. Defendants' actions have inflicted irreparable harm on Mr. Ahmed. The prospect of imminent detention, and the commencement of deportation proceedings, has chilled his liberty, free speech, and continued advocacy with CCDH.

63. If Mr. Ahmed is taken into physical custody, he will be further prevented from expressing the disfavored viewpoints that form the basis of the government's unlawful retaliatory conduct. And if he is deported without due process, he will be indefinitely separated from his family and community. Mr. Ahmed's wife and child are citizens of this country and reside in the United States.

64. Mr. Ahmed also faces a separate and distinct and irreparable reputational harm. His work depends on credibility, public trust, and the confidence of institutional partners, journalists, and civil-society organizations. Government action that targets him for protected speech—or associates him with threats to public safety or national security—inflicts a stigma that undermines his professional standing and institutional relationships.

## CAUSES OF ACTION

### COUNT I
### Retaliation, Discrimination, Viewpoint, and Prior Restraint
### (U.S. Constitution, First Amendment)

65. Plaintiff realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

66. The Foreign Policy Ground laid out in 8 U.S.C. §§ 1227 (a)(4)(C) and 1182(a)(3)(C)(iii) is unconstitutional as a facial matter, and also unconstitutional as applied to Imran Ahmed under the First Amendment.

23

67. The First Amendment to the U.S. Constitution provides in part that "Congress shall make no law… abridging the freedom of speech… or the right of the people… to petition the Government for a redress of grievances." U.S. Const. Amend. I.

68. The First Amendment protects past and future speech. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("The first amendment protects speakers from threats of punishment that are designed to discourage future speech."); *Saleh v. City of New York*, 2007 WL 4437167, at *3 (S.D.N.Y Dec. 17, 2007) (noting that First Amendment retaliation claims can be brought "alleging punishment for past speech and those complaining of suppression of future speech"). The First Amendment protects "[t]he rights to complain to public officials and to seek administrative and judicial relief." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994). The First Amendment applies to actions taken against people in custody, *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), and those threatened with deportation, *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019) (internal citations omitted), cert. granted, remanded, and vacated sub nom. on other grounds, *Pham v. Ragbir*, 141 S. Ct. 227 (2020).

69. Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218, 234 (2017).

70. Mr. Ahmed's speech is protected by the First Amendment. Mr. Ahmed's past speech pertains to matters of prominent public concern, including the ongoing violent hate speech

24

occurring on all social media platforms, criticism of certain legal protections for social media companies, and advocacy for accountability and transparency online.

71.     Defendants are aware of Mr. Ahmed's speech and viewpoint and specifically reference it in the Rubio Declaration and the Rogers' Post.

72.     There is a substantial causal connection between Mr. Ahmed's protected speech and Defendants' adverse actions and threats.  Defendants have taken adverse actions against Mr. Ahmed that are motivated by his past and future exercise, and perceived exercise, of First Amendment-protected speech, and have taken action to silence and discourage Mr. Ahmed from speaking out in the future.

73.     The Rubio Declaration, the Rogers' Post, and the targeting of Mr. Ahmed violate the First Amendment because they:

   a.  Retaliate against and punish Mr. Ahmed for his past protected actual and perceived speech;

   b.  Prevent him from speaking now (through threat of detention and deportation);

   c.  Attempt to chill (through ongoing threat) or prevent (through eventual removal) his future speech in the United States;

   d.  Chill others from expressing views critical of online hate speech or of the legal protections enjoyed by social media companies.

74.     These speech-related consequences are the point of Rubio Declaration, the Rogers' Post, and the government's threatened actions against Mr. Ahmed, and are, in their own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

75.     Defendants' actions against Mr. Ahmed on the basis of Mr. Ahmed's protected speech do not serve a compelling state interest and are not narrowly tailored to any legitimate

government interest.  Defendants' actions operate as a prior restraint on his liberty that will prevent Mr. Ahmed from engaging in protected speech.

**COUNT II**
**Violation of the Due Process Clause**
**(U.S. Constitution, Fifth Amendment)**

76.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

77.     The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (*quoting Zadvydas*, 533 U.S. at 693).

78.     The Foreign Policy Ground and its implementation through the administration's past practices, Rubio Declaration, the Rogers' Post, and Defendants' threat to deport Mr. Ahmed violate his due process rights under the Fifth Amendment as unconstitutionally vague and violative of Mr. Ahmed's substantive and procedural due process rights.

79.     The Fifth Amendment to the U.S. Constitution requires the government to provide individuals with fair notice of conduct that is prohibited to prevent arbitrary or discriminatory enforcement by government officials.

80.     "Freedom from imprisonment— from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

81.     The Foreign Policy Ground in the INA is unconstitutionally vague, both as a facial matter and as applied specifically to Mr. Ahmed — a lawful permanent resident, living peacefully in the country, who has engaged and may engage in speech to shed light on the problems of racism,

antisemitism, and other hate speech going under or unaddressed on the largest social media platforms in the world.

82.     The Fifth Amendment to the U.S. Constitution requires the government to provide individuals with fair notice of conduct that is prohibited to prevent arbitrary or discriminatory enforcement by government officials.

83.     The arbitrary and wrongful nature of the administration's past practices, Rubio Declaration, and the Rogers' Post also violate Mr. Ahmed's substantive due process rights because they are so egregious and outrageous that they may be fairly said to shock the contemporary conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998).  Mr. Ahmed studies and engages in civic discourse about the content moderation policies of major social media companies in the United States, the United Kingdom, and the European Union.  There is no conceivable foreign policy impact from his speech acts whatsoever.

84.     The Fifth Amendment also requires fair, pre-deprivation process when a person's liberty hangs in the balance, another right Defendants have so far denied Mr. Ahmed by threatening to detain him unlawfully.

85.     The government's threat to detain and deport Mr. Ahmed are wholly unjustified. The government has not demonstrated that Mr. Ahmed—a long-term permanent resident of the United States, with no criminal convictions, and with a wife and young child who are American citizens—needs to be detained.  *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring noncitizen's appearance during removal proceeding and (2) preventing danger to the community).  There is no credible argument for Mr. Ahmed's immigration detention, away from his wife and young child.

27

## COUNT III
## Violation of the Immigration and Nationality Act, Administrative Procedure Act, and the
### *Accardi* Doctrine
### (5 U.S.C. § 706; 8 U.S.C. §§ 1227, 1182)

86.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

87.     The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech of criticizing online hate.   This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction, 5 U.S.C. § 706(2)(A)-(B), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaugnessy*, 347 U.S. 260 (1954).

88.     In addition, the Secretary of State's determination that Mr. Ahmed's "presence or activities" would carry "potential serious adverse foreign policy consequences for the United States" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).   The Secretary of State's personal determination that Mr. Ahmed's protected past, current, or expected speech, beliefs, statements, or associations may form a basis to deport him because his presence "would have potentially serious adverse foreign policy consequences for the United States" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction.  5 U.S.C. § 706(2)(A), (B), (C).

## COUNT IV
### Violation of the Non-Delegation Doctrine

89.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

90.     Congress has not provided the Executive Branch with intelligible principles from

which the Executive can implement 8 U.S.C. § 1227(a)(4)(C)(i)-(ii) or § 1182(a)(3)(C)(iii).

91.    Congress has delegated discretionary authority that is standardless and unreviewable. Congress has failed to provide standards or procedures to allow for judicial review of an agency's discretionary deprivation of a noncitizen's liberty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

i.    Take jurisdiction over this case;

ii.    Vacate and set aside the Announcement of Actions to Combat the Global Censorship-Industrial Complex;

iii.    Vacate and set aside Defendants' unlawful policy of targeting noncitizens for removal based on First Amendment protected speech;

iv.    Enjoin Defendants from taking any enforcement action against Mr. Ahmed arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

v.    Enjoin Defendants from arresting or detaining Mr. Ahmed pending these proceedings;

vi.    Enjoin Defendants from transferring Mr. Ahmed away from the jurisdiction of this District pending these proceedings;

vii.    Enjoin Defendants from removing Mr. Ahmed from the United States pending these proceedings;

viii.    Order Defendants to provide Mr. Ahmed with notice and a meaningful opportunity to challenge any attempt to restrict his movement or otherwise impose conditions that change his rights as a lawful permanent resident of the United States.

ix.    Declare that Defendants' actions to arrest, detain, or transfer Mr. Ahmed violate the First Amendment, the Due Process Clause of the Fifth Amendment, the INA, the APA, the *Accardi* doctrine, and the non-delegation doctrine.

x.    Award Plaintiff his costs for the action, including reasonable attorneys' fees; and

xi.    Grant all such other and further relief as it deems just and proper.

29

Dated: December 24, 2025
       New York, New York

Respectfully submitted,


/s/ Roberta A. Kaplan
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
Michael P. Quinn
Avita Anand
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com
mquinn@kaplanmartin.com
aanand@kaplanmartin.com


/s/ Christopher J. Clark
Christopher J. Clark
Andrew J. Rodgers
CLARK SMITH VILLAZOR LLP
666 Third Avenue, 21st Floor
New York, NY 10019
Tel: (212) 377-0850
clark@csvllp.com
andrew.rodgers@csvllp.com



/s/ Norman Eisen
NORMAN EISEN**
STEPHEN JONAS**
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

** *pro hac vice* pending


/s/ Jesse M. Bless
JESSE M. BLESS*
MA Bar # 660713
Bless Litigation LLC

30

6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

*Motion to appear Pro Hac Vice forthcoming*


*Attorneys for Plaintiff Imran Ahmed*

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IMRAN AHMED,<br><br>        *Plaintiff*,<br><br>        v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State; SARAH B. ROGERS, in her official capacity as Under Secretary of State for Public Diplomacy; PAMELA BONDI, in her official capacity as Attorney General; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; JUDITH ALMODOVAR, in her official capacity as Acting Field Office Director of the New York Immigration and Customs Enforcement Office,<br><br>        *Defendants*. | Case No. 25 Civ. 10705 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**IMRAN AHMED'S PROPOSED ORDER TO SHOW CAUSE FOR A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND .................................................................................................. 3

      A.      Mr. Ahmed and His Commitment to Preventing Hate and Discrimination............ 3

      B.      Mr. Ahmed's and CCDH's Reporting on Social Media Platforms ........................ 4

      C.      Defendants Target Mr. Ahmed for Removal Based on His Protected Speech ....... 6

      D.      The Current Administration's Practice of Using the Foreign Policy Ground to Suppress Disfavored Speech.................................................................................. 8

LEGAL STANDARD............................................................................................. 9

ARGUMENT ....................................................................................................... 9

    I.   MR. AHMED IS LIKELY TO SUCCEED ON THE MERITS ..................................... 10

      A.      Defendants' Actions Violate the First Amendment............................................... 10

           1.      Defendants' Actions Constitute Unlawful First Amendment Retaliation ............................................................................................... 10

           2.      Defendants' Actions Constitute Unlawful Viewpoint Discrimination ..... 13

      B.      Mr. Ahmed's Detention Would Violate Due Process........................................... 15

      C.      Defendants' Actions Are Arbitrary and Capricious in Violation of the APA ...... 15

    II.  MR. AHMED WOULD SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF ............................................................................................................ 17

   III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF ......................................................................................... 20

CONCLUSION................................................................................................... 22

## TABLE OF AUTHORITIES

**CASES**                                                                                      ***Page(s)***

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986) ................................................................................ 14

*Aditya W.H. v. Trump*,
    2025 WL 1420131 (D. Minn. May 14, 2025)........................................................... 15

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)................................................................................................. 13

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
    651 F.3d 218 (2d Cir. 2011)..................................................................................... 13

*Am. Ass'n of Univ. Professors v. Rubio*,
    2025 WL 2777659 (D. Mass. Sept. 30, 2025) ....................................... 12, 14, 16, 17

*American Association of University Professors v. Rubio*,
    780 F. Supp. 3d 350 (D. Mass. 2025) ..................................................................... 18

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963).................................................................................................. 10

*Black v. Decker*,
    103 F.4th 133 (2d Cir. 2024) ................................................................................... 15

*Bridges v. California*,
    314 U.S. 252 (1941)................................................................................................. 10

*Bridges v. Wixon*,
    326 U.S. 135 (1945).................................................................................. 10, 11, 14

*Connick v. Myers*,
    461 U.S. 138 (1983)................................................................................................. 11

*Coronel v. Decker*,
    449 F. Supp. 3d 274 (S.D.N.Y. 2020)..................................................................... 20

*Coscarelli v. ESquared Hosp. LLC,*
    364 F. Supp. 3d 207 (S.D.N.Y. 2019)..................................................................... 17

*Dorsett v. County of Nassau*,
    732 F.3d 157 (2d Cir. 2013)..................................................................................... 11

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
     472 U.S. 749 (1985)......................................................................................... 11

*Elrod v. Burns*,
     427 U.S. 347 (1976)......................................................................................... 18

*Ercelik v. Hyde*,
     2025 WL 1361543 (D. Mass. May 8, 2025) ...................................................... 15

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
     559 F.3d 110 (2d Cir. 2009).............................................................................. 17

*Hardy v. Fischer*,
     701 F. Supp. 2d 614 (S.D.N.Y. 2010)................................................................ 18

*Holder v. Humanitarian L. Project*,
     561 U.S. 1 (2010)............................................................................................. 14

*Jayaraj v. Scappini*,
     66 F.3d 36 (2d Cir. 1995)................................................................................. 19

*Joint Anti-Fascist Comm. v. McGrath*,
     341 U.S. 123 (1951).......................................................................................... 15

*Jolly v. Coughlin*,
     76 F.3d 468 (2d Cir. 1996)................................................................................ 18

*Jones v. United States*,
     463 U.S. 354 (1983)......................................................................................... 18

*Khalil v. Trump*,
     786 F. Supp. 3d 871 (D.N.J. 2025) .................................................................... 19

*Kleindienst v. Mandel*,
     408 U.S. 753 (1972).......................................................................................... 14

*League of Women Voters v. Newby*,
     838 F.3d 1 (D.C. Cir. 2016)............................................................................... 20

*Lerman v. Bd. of Elections in City of New York*,
     232 F.3d 135 (2d Cir. 2000).............................................................................. 11

*Mahdawi v. Trump*,
     2025 WL 1243135 (D. Vt. Apr. 30, 2025).......................................................... 10

*Mahdawi v. Trump*,
136 F.4th 443 (2d Cir. 2025) ...................................................................... 10, 15

*Make the Rd. N.Y. v. Pompeo*,
475 F. Supp. 3d 232 (S.D.N.Y. 2020) ............................................................ 20

*Martin v. City of Struthers*,
319 U.S. 141 (1943) ......................................................................................... 14

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ......................................................................................... 15

*Meyer v. Grant*,
486 U.S. 414 (1988) .................................................................................. 11, 13

*Mohammed H. v. Trump*,
2025 WL 1692739 (D. Minn. June 17, 2025) ................................................. 15

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ......................................................................................... 12

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ......................................................................................... 10

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ......................................................................................... 14

*New York Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) ...................................................................... 18, 21

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ......................................................................................... 13

*New York v. D.H.S.*,
408 F. Supp. 3d 334 (S.D.N.Y. 2019) ............................................................ 20

*New York v. D.H.S.*,
969 F.3d 42 (2d Cir. 2020) .............................................................................. 20

*New York v. U.S. Dep't of Educ.*,
477 F. Supp. 3d 279 (S.D.N.Y. 2020) .............................................................. 9

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) .............................................................................. 20

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ................................................................................................ 11

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................................... 9, 20

*Ozturk v. Hyde*,
    136 F.4th 382 (2d Cir. 2025) .......................................................................... 10, 12

*Öztürk v. Trump*,
    2025 WL 1145250 (D. Vt. Apr. 18, 2025) .............................................................. 15

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ................................................................................................ 14

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ................................................................................................ 10

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) ................................................................................................ 13

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ..................................................................... 20

*Sajous v. Decker*,
    2018 WL 2357266 (S.D.N.Y. May 23, 2013) .......................................................... 20

*Smith v. Campbell*,
    782 F.3d 93 (2d Cir. 2015) ...................................................................................... 11

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................................................ 11

*Taal v. Trump*,
    2025 WL 926207 (N.D.N.Y. Mar. 27, 2025) .......................................................... 19

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) ................................................................................................ 13

*Velasco Lopez v. Decker*,
    978 F.3d 842 (2d Cir. 2020) .................................................................................... 18

*Velesaca Lopez v. Decker*,
    458 F. Supp. 3d 224 (S.D.N.Y. 2020) ..................................................................... 18

*Yang v. Kosinski*,
 960 F.3d 119 (2d Cir. 2020).................................................................... 19

*Zadvydas v. Davis*,
 533 U.S. 678 (2001)................................................................................ 15

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. I ..................................................................................... 21

**STATUTES**

5 U.S.C. § 706(2)(A)-(D)............................................................................... 16

8 U.S.C. § 1227(a)(4)(C) ............................................................................... 16

European Union's Digital Services Act .................................................. *passim*

Immigration and Nationality Act 212(a)(3)(C)............................................... 7

Immigration and Nationality Act 237(a)(4)(C)............................................... 7

Lanham Act...................................................................................................... 6

United Kingdom's Online Safety Act................................................. 1, 5, 8, 11

**OTHER AUTHORITIES**

CCDH, *State Hate: How Iran's Press TV Uses Social Media to Promote Anti-Jewish Hatred,*
 April 27, 2023, https://counterhate.com/blog/new-report-state-hate/ ......................................... 5

CCDH, *The Disinformation Dozen: Why Platforms Must Act on Twelve Leading Online Anti-Vaxxers,* March 24, 2021, https://counterhate.com/research/the-disinformation-dozen/ ....... 4, 6

Elizabeth Troutman Mitchell, *Exclusive: Trump Bars Global Censorship Agents From Entering US*, Daily Signal (Dec. 23, 2025), https://www.dailysignal.com/2025/12/23/exclusive-trump-bars-five-europeans-accused-on-censoring-american-speech-from-entering-us/ ...................... 7

## PRELIMINARY STATEMENT

Yesterday afternoon—about an hour before the Court closed for the holidays—Under Secretary of State Sarah B. Rogers posted on X that the Department of State had "SANCTIONED" Plaintiff Imran Ahmed, an advocate for human rights and civil liberties online, and a British citizen and legal permanent resident of the United States who has lived and worked here with his American wife and American daughter for five years.[1]  Under Secretary Rogers explicitly tied these sanctions to the speech and advocacy of Mr. Ahmed's non-profit organization, the Center for Countering Digital Hate ("CCDH"), which identifies social media dangers such as instructions from AI chatbots on the best ways for children to commit suicide and carry out acts of violence in their schools.

CCDH's research is likely unpopular among large tech companies, but its purpose is to raise awareness among the public and protect American children and internet users.  Under Secretary Rogers suggests, however, that Mr. Ahmed and CCDH's research could somehow have "potentially serious adverse foreign policy consequences for the United States" and announced a shocking plan to deport Mr. Ahmed from this country because of his speech.  To support this outrageous decision she cited the fact that CCDH has: (1) filed publicly available reports on the proliferation of anti-vaccine misinformation on social media; and (2) conducted and published research supporting the United Kingdom's Online Safety Act and the European Union's Digital Services Act, which promote greater transparency and accountability for social media platforms, two actions that are explicitly protected by the First Amendment.  According to a separate press release issued by Defendant Secretary of State Marco Rubio the same day, as a result of these

---

[1] Declaration of D. Brandon Trice ("Trice Decl."), Ex. A, X.com, Under Secretary of State Sarah B. Rogers, @UnderSecPD (Dec. 23, 2025) (3:46 p.m.), https://x.com/UnderSecPD/status/2003567950541058394.

1

sanctions, Mr. Ahmed is now being subjected to "visa restrictions" and "removal proceedings" and he will be "generally barred from entering the United States."[2]  In other words, on Christmas Eve, Mr. Ahmed has now abruptly had his legal permanent resident status thrown into question and faces the imminent prospect of unconstitutional arrest, detention, expulsion from his home country, and separation from his American wife and young daughter, for exercising his basic First Amendment rights.

This is not the way our system of laws works.  The Constitution prevents the government from punishing Mr. Ahmed for his speech and advocacy.  Mr. Ahmed's effort to protect children from social media dangers and harmful hate speech does not present "serious foreign policy consequences"—any more than do the actions of the United Kingdom and European Union legislators who voted to pass the laws that Secretary Rubio apparently does not like.  Indeed, the real motivator for Defendants' actions against Mr. Ahmed appears to be that he has criticized X, and Elon Musk in particular, for failing to properly monitor and regulate hate speech and dangerous, violent content on that platform—including not only misinformation by anti-vaxxers, but the growing scourge of antisemitic content.  That too is obviously not a basis for the United States government to "pick sides" in a public debate and to try to remove Mr. Ahmed from the country.

The government also cannot evade judicial review by sanctioning Mr. Ahmed in the midst of the holiday season, and then spiriting him away from New York (where he is currently present) to whatever detention center it wants before this Court can review its actions in the first instance.

_____

[2] Trice Decl., Ex. B ("Rubio Declaration"), U.S. Dep't of State, "Announcement of Actions to Combat the Global Censorship-Industrial Complex" (Dec. 23, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/12/announcement-of-actions-to-combat-the-global-censorship-industrial-complex/.

Mr. Ahmed is entitled to due process, and that includes an orderly determination by this Court as to whether Defendants can, consistent with the Constitution, the Immigration and Nationality Act ("INA"), and their own regulations, summarily arrest and detain him.  A temporary restraining order to enjoin Defendants from unlawfully detaining Mr. Ahmed and transferring him is urgently necessary because the Department of Homeland Security ("DHS") has unlawfully detained and transferred other individuals on the basis of the same provisions of the INA, which the State Department has now cited to seek to detain and deport Mr. Ahmed.

## BACKGROUND

### A.    Mr. Ahmed and His Commitment to Preventing Hate and Discrimination

Mr. Ahmed is a forty-seven-year-old citizen of the United Kingdom and a lawful permanent resident of the United States.  Compl. ¶ 15-16.  He was born in Manchester, England, in 1978, and attended Manchester Grammar School.  *Id.* ¶ 16.  His family is Pashtun, one of the largest ethnic groups in Afghanistan.  *Id.*

Mr. Ahmed turned twenty-three on September 12, 2001, a day after the Taliban took down the World Trade Center towers in New York City.  *Id.* ¶ 17.  The Taliban were Pashtun, and Mr. Ahmed felt a strong sense of purpose to devote his life to addressing evil in the world.  *Id.*  He returned to formal study and earned a degree in politics from the University of Cambridge before embarking on a long career in public service and political strategy within the United Kingdom's Labour Party.  *Id*.

By 2016, while working in British politics, Mr. Ahmed observed a sharp rise in antisemitism, xenophobia, and extremist organizing in the United Kingdom, particularly during the campaign surrounding the Brexit referendum.  *Id.* ¶ 18.  He witnessed Britain First, a political party in the United Kingdom, promote conspiracy theories falsely claiming that the European Union sought to "destroy" white British citizens through immigration.  *Id.*  Things came to a head

3

in November 2016, when Mr. Ahmed's Labour Party colleague, Member of Parliament Jo Cox, was murdered in a politically motivated attack. *Id.* ¶ 19. The assailant shouted "Britain First" and "keep Britain independent" during the killing and had reportedly accessed extremist and white-supremacist materials on the days leading up to the attack. *Id.* The murder profoundly affected Mr. Ahmed and reinforced his resolve to confront the role of digital platforms in amplifying extremist ideology and violence. *Id.* ¶ 20.

On January 8, 2021, Mr. Ahmed received permission to move to the United States on an O-1 visa, a nonimmigrant classification reserved for individuals who possess extraordinary ability in their field. *Id.* ¶ 15. He later married his wife, an American citizen, and in 2024 he obtained lawful permanent resident status. *Id.* Mr. Ahmed now lives with his wife and his daughter in Washington, D.C., *id.*, though he is currently in New York City, *id.* ¶ 6.

### B.    Mr. Ahmed's and CCDH's Reporting on Social Media Platforms

Mr. Ahmed formed CCDH in 2019 to call attention to the enormous problem of digitally driven disinformation and hate online. *Id.* ¶ 20. CCDH's mission is to protect human rights and civil liberties online by identifying systemic failures in platform governance and the role of algorithms in amplifying harmful content. *Id.* ¶ 21-23.

CCDH first gained widespread attention for its research in 2021, when it published *The Disinformation Dozen*. *Id.* ¶ 23(d). That report found that just twelve individuals were responsible for nearly two-thirds of anti-vaccine content circulating on major social media platforms. *Id.* The research further showed that, despite repeated violations of the platforms' terms of service, most of those individuals remained active on Facebook, Instagram, and Twitter. *Id.* During the same period, CCDH documented that the platforms failed to act on the overwhelming majority of reported COVID-19 and vaccine misinformation and, in some cases, actively recommended similar content through their algorithms. *Id.*

4

In subsequent years, CCDH expanded its reporting to examine the use of social media by state and non-state actors to promote hate. In April 2023, CCDH co-authored a report with the Anti-Defamation League entitled *How Iran's Press TV Uses Social Media to Promote Anti-Jewish Hatred*, which detailed how a foreign state actor used state-controlled media accounts to disseminate antisemitism, Holocaust denial, and hateful views about LGBTQ+ people and women's rights to millions of users worldwide. *Id.* ¶ 32(d). CCDH has also worked to draw attention to harmful content that social media and online search companies often end up pushing to children. For example, a December 2022 report examined how TikTok's algorithm recommends suicide, self-harm, and eating disorder content to teen users within minutes of their signing up for an account. *Id.* ¶ 23(e). And a recent report from CCDH discusses how ChatGPT responds to teen users by providing dangerous advice about self-harm, suicide, eating disorders, and drugs. *Id.* ¶ 23(g).

CCDH also examined how changes in platform ownership and governance affected the prevalence of hate speech. Research conducted by CCDH and reported on the front page of *The New York Times* showed a marked increase in hate speech on X following Elon Musk's acquisition of the platform, including a tripling in the use of the N-word during the week after the change in ownership compared to the prior year's daily average. *Id.* ¶ 30.

In recent years, CCDH has supported the enactment of online-safety and digital-services legislation in response to concerns about the role of social media platforms in amplifying hate, disinformation, and extremist content. *Id.* ¶ 24-27. CCDH has commented on the enactment of the United Kingdom's Online Safety Act and the European Union's Digital Services Act, which require large technology platforms to assess and mitigate systemic risks, and reduce the spread of unlawful and harmful material online. *Id.* ¶ 24-25. And it has advocated for reforming Section

5

230 of the Communications Decency Act in the United States, calling for a more nuanced approach to liability protections for social media companies for the content that appears on their platforms. *Id.* ¶ 27.

As CCDH's reporting gained visibility, it drew criticism from the platforms it criticized. In July 2023, X Corp. ("X") sent a letter to Mr. Ahmed and CCDH criticizing their work and threatening litigation under the Lanham Act. *Id.* ¶ 28. Days later, X filed suit in the Northern District of California, asserting claims based on three CCDH reports, including *The Disinformation Dozen*, and alleging that CCDH had gathered and published its research without authorization. *Id.* ¶¶ 29-31. On March 25, 2024, the district court dismissed the action in its entirety, finding that California's anti-SLAPP law (which is meant to protect free speech rights) applied to X's claims and concluding that the lawsuit was "unabashedly and vociferously" about "punishing the Defendants for their speech." *Id.* ¶ 32. X has appealed that decision, and that appeal is currently pending before the United States Court of Appeals for the Ninth Circuit. *Id.*

**C.    Defendants Target Mr. Ahmed for Removal Based on His Protected Speech**

Earlier this month, on December 4, 2025, the European Commission issued a fine of 120 million euros against X for violations of the Digital Services Act's provisions governing transparency, accessibility, and deceptive practices. *Id.* ¶ 33. The ruling drew a strong reaction from the Trump Administration, with the President describing it as "nasty" and criticizing the European Union for going in "bad directions." *Id.* ¶ 34. Secretary Rubio posted to social media that the ruling was "an attack on all American tech platforms and the American people by foreign governments" and declared that "[t]he days of censoring Americans online are over." *Id.* ¶ 35.

On December 23, Secretary Rubio issued a press release announcing that the State Department "is taking decisive action against five individuals" for their protected speech activities. *Id.* ¶ 36. The press release further announced that Secretary Rubio had made a determination that

6

the individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States" and noted that the Department of Homeland Security "can initiate removal proceedings against certain individuals pursuant to INA section 237(a)(4)(C), which renders such individuals deportable." *Id.* The press release explained that "[t]hese actions are pursuant to Section 212(a)(3)(C) of the Immigration and Nationality Act" (the "Foreign Policy Ground"). *Id.* The announcement by Secretary Rubio was widely perceived as being linked to the European Commission's fine against X earlier this month.[3]

That same day, December 23, Under Secretary of State Sarah B. Rogers posted (ironically, on X): "Today, the United States issued SANCTIONS reinforcing the 'red line' I invoked on @GBNEWS. Namely: extraterritorial censorship of Americans. Today's sanctions target the censorship-NGO ecosystem." *Id.* ¶ 37.[4] She continued: "WE'VE SANCTIONED: Imran Ahmed, key collaborator with the Biden Administration's effort to weaponize the government against U.S. citizens. Ahmed's group, Center for Countering Digital Hate (CCDH), created the infamous 'disinformation dozen' report, which called for platforms to deplatform twelve American 'anti-vaxxers', including now-HHS Secretary @SecKennedy." *Id.* Under Secretary Rogers also

---

[3] *See, e.g.*, Adam Satariano, *They Seek to Curb Online Hate. The U.S. Accuses Them of Censorship.*, N.Y. Times (Dec. 24, 2025), https://www.nytimes.com/2025/12/24/business/europe-us-online-censorship-free-speech.html.

[4] Also on December 23, 2025, an article was published by Elizabeth Troutman Mitchell at *The Daily Signal*. The article, which describes a State Department document obtained by *The Daily Signal*, notes that Mr. Ahmed is "subject to deportation." Elizabeth Troutman Mitchell, *Exclusive: Trump Bars Global Censorship Agents From Entering US*, Daily Signal (Dec. 23, 2025), https://www.dailysignal.com/2025/12/23/exclusive-trump-bars-five-europeans-accused-on-censoring-american-speech-from-entering-us/. The article further explains: "Due to Secretary of State Marco Rubio's foreign policy determination, the Department of Homeland Security can now initiate removal proceedings." *Id.*

pointed to CCDH's support for the Online Safety Act and the Digital Services Act. *Id.*[5]

*Figure 1 – December 23, 2025 Social Media Post by Under Secretary of State Sarah B. Rogers*

**D.    The Current Administration's Practice of Using the Foreign Policy Ground to Suppress Disfavored Speech**

The Administration's targeting of Mr. Ahmed did not occur in isolation.  Over the past year, the Administration has repeatedly employed the same retaliatory playbook against noncitizens whose speech it disfavors.  *Id.* ¶ 42, 50-53 (collecting examples).  First, the Administration identifies an individual based on protected advocacy of certain views it dislikes. *Id.* ¶ 50.  Then, ICE arrests the individual suddenly in a public or domestic setting.  *Id.*  The individual is denied any meaningful process.  *Id.*  They are then transferred hundreds or thousands of miles away—often overnight—to remote detention facilities far from their families, communities, and counsel.  *Id.*

Across these cases, the government's objective is both clear and distinctive.  The arrests do not follow criminal investigations or adjudicated violations of law.  They follow speech.  And

---

[5] Earlier today, Elon Musk posted on X, "This is so great," with an emoji of a smiling face with star eyes, in response to another user commenting on the Administration's action to impose immigration sanctions on Mr. Ahmed and others.  *Id.* ¶ 41.

8

the transfers are not incidental; they are central to the strategy. *Id.* ¶ 54. By moving detainees across vast distances immediately after arrest—often after counsel has appeared or litigation has begun—the government isolates its targets, disrupts judicial review, and amplifies the punitive effect of detention. *Id.* In other words, the distance itself becomes the punishment.[6]

Mr. Ahmed now faces that same threat. Although Mr. Ahmed has yet not received a Notice to Appear or been detained, the government's actions fit squarely within this established pattern of retaliatory enforcement—one that uses immigration power not to advance legitimate regulatory goals, but to punish dissent and deter protected speech. *Id.* ¶ 55.

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order must show, as Plaintiff has shown here, that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020). If the federal government is the opposing party, then the last two factors merge. *Id.* at 294 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

Mr. Ahmed is a father to one young child who is a U.S. citizen, husband to a wife who is a U.S. citizen, and a legal permanent resident of the United States who has lived and worked here since arriving on an O-1 visa granted by the first Trump Administration in 2021. But because of Defendants' arbitrary decision, taken two days before Christmas, to punish individuals who identify and speak out against the growing threat of antisemitism and hate in online platforms, he

---

[6] We also note that the undersigned counsel from Kaplan Martin LLP have represented Mr. Ahmed and CCDH for years and are based in New York City.

9

now faces the imminent prospect of unconstitutional detention for exercising his First Amendment rights. A temporary restraining order preventing such unlawful detention is warranted in light of Mr. Ahmed's likelihood of success on the merits of showing that Defendants' actions are unconstitutional and arbitrary and capricious, the irreparable harm that Mr. Ahmed will experience absent injunctive relief, and the balance of hardships, which overwhelmingly favor Mr. Ahmed.[7]

## I.      MR. AHMED IS LIKELY TO SUCCEED ON THE MERITS

As set forth below, Mr. Ahmed is likely to succeed on the merits of his claims that Defendants' purported actions to "sanction" him violate his First Amendment and Due Process rights and violate the Administrative Procedure Act. The fact that this case arises in the context of government action purportedly taken pursuant to the INA does not undermine Mr. Ahmed's claims or deprive this Court of jurisdiction. *See Mahdawi v. Trump*, 136 F.4th 443, 449-52 (2d Cir. 2025); *Ozturk v. Hyde*, 136 F.4th 382, 394-99 (2d Cir. 2025).

### A.      Defendants' Actions Violate the First Amendment

#### 1.      *Defendants' Actions Constitute Unlawful First Amendment Retaliation*

As the Supreme Court unanimously reiterated just last year, "the First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion ... to achieve the suppression' of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). This applies equally to non-citizens; the First Amendment has long protected the rights of non-citizens to publish reports criticizing institutions and to support particular political causes. *See Bridges v. California*, 314 U.S. 252 (1941) ("*Bridges I*"); *Bridges v. Wixon*, 326 U.S. 135

---

[7] In the event that Defendants detain Mr. Ahmed before this Court has an opportunity to rule on this motion for a temporary restraining order, Mr. Ahmed reserves his right to seek habeas relief and plans to do so.

10

(1945) ("*Bridges II*"). Indeed, it "is well settled that '[f]reedom of speech and of press is accorded aliens residing in this country.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring) (quoting *Bridges II*, 326 U.S. at 148).

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). To succeed on a First Amendment retaliation claim, a plaintiff must show that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) the defendant's actions caused him some injury." *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (quoting *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)). Mr. Ahmed is likely to succeed in establishing each of these elements here.

First, Mr. Ahmed's expressive activity in reporting on and discussing the prevalence of antisemitic and other hate speech on social media platforms is speech on matters of "public concern" which are "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-759 (1985)). In fact, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Moreover, Under Secretary Rogers has specifically pointed to CCDH's support for the Online Safety Act and Digital Services Act as one of the reasons for sanctioning him. Ex. A. But expressing support for or opposition to particular laws or political outcomes is "core political speech," *Meyer v. Grant*, 486 U.S. 414, 422 (1988), for which "the importance of First Amendment protections is 'at its zenith.'" *Id.* at 425. Government consequences based on Mr. Ahmed's core political speech are subject to "exacting scrutiny," *Lerman v. Bd. of Elections*

11

*in City of New York*, 232 F.3d 135, 146 (2d Cir. 2000), which Defendants cannot possibly meet here.

Second, Mr. Ahmed need only prove that his expressive activity was a "motivating factor" in Defendants' decision to sanction him, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), and Defendants have openly admitted that their actions were motivated by Mr. Ahmed's exercise of his First Amendment rights. For example, as mentioned above, Defendant Rogers explicitly called out CCDH's support for UK and EU laws designed to protect consumers as part of the justification for Defendants' sanctions against him. Ex. A. This implicates Mr. Ahmed's core political speech. Under Secretary Rogers also pointed to CCDH's publication of a report on anti-vaccine influencers, which also implicates Mr. Ahmed's speech rights (and has no obvious connection to the supposed "foreign policy consequences" mentioned in the Rubio Declaration). *Id.* And sadly this comes as no surprise given that federal officials in recent months have repeatedly expressed or acted on the desire to revoke the legal status of and/or remove individuals with whose speech they disagree. *See, e.g.*, *Am. Ass'n of Univ. Professors v. Rubio*, --- F. Supp. 3d ----, 2025 WL 2777659, at *10-11 (D. Mass. Sept. 30, 2025) ("*AAUP*").

Third, Defendants' actions to purportedly revoke Mr. Ahmed's status as a legal permanent resident and to potentially remove him would cause him serious injury. Perhaps most seriously, Defendants' actions, if given effect, would jeopardize Mr. Ahmed's status as a legal permanent resident and potentially tear him apart from his wife and child, who are U.S. citizens. Moreover, Mr. Ahmed faces the possibility of being transferred out of this district, as Defendants have done to a number of other individuals who have been targeted for their speech in the last year. *See id.* at *35 (describing ICE attempt to fly an individual "out of the district" of Vermont to Louisiana); *Ozturk v. Hyde*, 136 F.4th 382, 389 (2d Cir. 2025) (describing federal officials' efforts to transport

12

individual from Massachusetts to New Hampshire, then to Vermont, and then to Louisiana).

2.  *Defendants' Actions Constitute Unlawful Viewpoint Discrimination*

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641-643 (1994)).  Defendants' actions here constitute textbook viewpoint discrimination since they "require[] recipients to take the government's side on a particular issue."  *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 235 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013).  Specifically, Defendants are punishing Mr. Ahmed for his work reporting on antisemitism, hate speech, and disinformation on social media platforms and for CCDH's support of UK and EU digital transparency and consumer protection laws.  While claiming that their actions will combat supposed "censorship," Defendants flip the First Amendment on its head, achieving their goals by trying to silence individuals like Mr. Ahmed who express or uncover speech that may be inconvenient for Defendants or their allies.  Indeed, Defendants' actions run exactly counter to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," and that it may sometimes involve "unpleasantly sharp attacks on government and public officials"—or their corporate allies. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Defendants' purported sanctions against Mr. Ahmed cannot withstand the strict scrutiny applied to viewpoint discrimination.  As discussed above, Defendants' actions are based on Mr. Ahmed's "core political speech," so the importance of the First Amendment's protections "is at its zenith." *Meyer*, 486 U.S. at 422, 425.  Although Defendants have pointed to vague "foreign policy consequences" as a justification for their actions, "concerns of national security and foreign relations do not warrant abdication of the judicial role" in applying the First Amendment's

13

protections. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010); *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring) ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment."); *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) ("The Executive has broad discretion over the admission and exclusion of aliens, but that discretion is not boundless. … It is the duty of the courts, in cases properly before them, to say where [the] statutory and constitutional boundaries lie."). And even if such unspecified concerns could amount to a compelling state interest, Defendants' actions—essentially banning people whose views on the importance of combating antisemitism online and supporting transparency and consumer protection laws differ from those in the White House and their allies—are not even close to being sufficiently narrowly tailored to address supposed concerns about censorship or foreign policy consequences. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 395-96 (1992) (municipal ordinance that discriminated based on viewpoint was not "narrowly tailored to serve compelling state interests" when the ordinance was meant to "display[] the [government's] special hostility" toward that viewpoint). Moreover, Defendants' actions also deprive listeners, including U.S. citizens, of their right to hear Mr. Ahmed's speech. *See Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) ("It is … well established that the Constitution protects the right to receive information and ideas.") (citing *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)).

As noted above, these principles apply with full force to citizens and non-citizens alike. *AAUP*, 2025 WL 2777659, at *46; *Bridges II*, 326 U.S. at 162 (Murphy, J., concurring) ("[T]he First Amendment and other portions of the Bill of Rights make no exception in favor of deportation laws or laws enacted pursuant to a 'plenary' power of the Government."). In fact, when confronted with the Trump Administration's recent policy to strip individuals of immigration protections and

14

remove them from the country based on their speech, courts across the country have consistently held that the First Amendment protects non-citizen residents from viewpoint discrimination. *See, e.g.*, *Mohammed H. v. Trump*, 2025 WL 1692739, at *3 (D. Minn. June 17, 2025); *Aditya W.H. v. Trump*, 2025 WL 1420131, at *10 (D. Minn. May 14, 2025); *Ercelik v. Hyde*, 2025 WL 1361543, at *10 (D. Mass. May 8, 2025); *Mahdawi v. Trump*, 2025 WL 1243135, at *9 (D. Vt. Apr. 30, 2025); *Öztürk v. Trump*, 2025 WL 1145250, at *18 (D. Vt. Apr. 18, 2025).

### B.    Mr. Ahmed's Detention Would Violate Due Process

"The Constitution establishes due process rights for 'all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.'" *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-172 (1951) (Frankfurter, J., concurring)). Defendants have already purported to impose restrictions on Mr. Ahmed's ability to enter and remain in the country without any notice. And given the Defendants' efforts over the last year to detain and transfer individuals without warning based on their speech, it appears likely that Defendants will attempt to do the same to Mr. Ahmed. Entering a temporary restraining order would ensure that Mr. Ahmed is not deprived of his constitutional rights to notice and an opportunity to be heard before Defendants seek to detain and remove him.

### C.    Defendants' Actions Are Arbitrary and Capricious in Violation of the APA

A court shall "hold unlawful and set aside" a final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."

5 U.S.C. § 706(2)(A)-(D).  As stated above, Defendants' actions against Mr. Ahmed violate his constitutional rights under the First and Fifth Amendments, *see supra* at 10-15, thus they should be set aside as contrary to constitutional right, power, privilege, or immunity.  *Cf. AAUP*, 2025 WL 2777659, at *52 ("nothing in the text, history, or tradition of the First Amendment suggests that persons lawfully present here may be subject to adverse action based on their political speech ….").

Defendants' actions to purportedly revoke Mr. Ahmed's green card are also arbitrary and capricious.  As reports from multiple news outlets in the previous weeks make clear, Defendants' invocation of supposed foreign policy concerns are nothing more than a pretext for a decision that was taken to retaliate against the EU for its regulatory actions against X and as punishment for Mr. Ahmed's protected speech.[8]  In fact, those reports not only noted that the federal government would take immigration actions against certain non-citizens as a retaliatory measure against the EU; they specifically identify Mr. Ahmed as one of the proposed targets.  Though the State Department's press release points to "foreign policy consequences" to justify their actions if the targeted individuals remain in the United States, they do not explain what kinds of "foreign policy consequences" might possibly arise, nor how any such consequences are connected to the targeted individuals' presence in the United States.  In other words, Defendants entirely fail to show that they have any "reasonable ground to believe" that there could be any "potentially serious adverse foreign policy consequences" to Mr. Ahmed's continued presence in the United States, as the statute requires.  *See* 8 U.S.C. § 1227(a)(4)(C)(i).  And Defendants' public statements after the

---

[8] Trice Decl., Ex. D, Prem Thakker & Asawin Suebsaeng, *SCOOP: Trump Admin Is Preparing to Revoke Visas of Critics of Elon Musk's Twitter*, Zeteo (Dec. 11, 2025), https://zeteo.com/p/trump-revoke-visas-breton-ahmed-twitter-musk; Trice Decl., Ex. E, Connor Stringer, *Trump to deport boss of Starmer-linked charity*, The Telegraph (Nov. 9, 2025), https://www.telegraph.co.uk/us/news/2025/11/09/trump-to-expel-boss-of-labour-linked-ngo/.

announcement of their actions only reinforce that supposed "foreign policy consequences" are not the real reason for their actions. For example, Defendant Rogers posted on X that Mr. Ahmed was being targeted because of CCDH's reporting on anti-vaccine disinformation, and supposed internal organizational priorities focused on X. Ex. A. And Musk, who owns X, expressed his glee at the Defendants' action earlier today, posting "This is so great," in response to another user discussing the news.[9]

Defendants' efforts to change Mr. Ahmed's immigration status and remove him from the country are particularly ironic given Mr. Ahmed's history of countering antisemitism online and the federal government's focus on combating antisemitism as a justification to detain and attempt to expel other non-citizens based on their speech in the last year. *AAUP*, 2025 WL 2777659, at *6-35 (detailing government statements and executive orders seeking to combat antisemitism, as well as arrests, detention, and removal efforts against non-citizens for their alleged speech relating to Israel, Palestine, and/or Hamas). For years, Mr. Ahmed and CCDH have been at the forefront of reporting on and calling out antisemitism on social media platforms, even working with the first Trump Administration to do so.[10] But while the Defendants used antisemitism to justify crackdowns on students' speech earlier this year, they have used Mr. Ahmed's criticism of the antisemitism that runs rampant on X to target him based on nebulous "foreign policy consequences." Defendants' rank hypocrisy makes clear that their actions are arbitrary and capricious.

## II. MR. AHMED WOULD SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

---

[9] Trice Decl., Ex. I, X.com, Elon Musk, @elonmusk (Dec. 24, 2025) (2:27 a.m.), https://x.com/elonmusk/status/2003729167452635372?s=20.

[10] Trice Decl., Ex. F, *Ancient Hatred, Modern Medium: Conference on Internet Anti-Semitism*, U.S. Dep't of State, https://2017-2021.state.gov/anti-semitism-conference/.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Coscarelli v. ESquared Hosp. LLC,* 364 F. Supp. 3d 207, 221-22 (S.D.N.Y. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  Absent injunctive relief, Mr. Ahmed faces irreparable harm in the form of ongoing and imminent violations of his constitutional rights.  The Supreme Court and the Second Circuit have long held that the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury" as a matter of law. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Once a plaintiff shows a likely First Amendment violation, the court presumes irreparable harm and requires no further showing. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm"); *see also Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) (same).

That principle does not turn on citizenship status.  Courts in this circuit have repeatedly held that the deprivation of a non-citizen's constitutional liberties constitutes irreparable harm in its own right. *See Velesaca v. Decker*, 458 F. Supp. 3d 224, 240-41 (S.D.N.Y. 2020) (collecting cases).  Courts confronting immigration enforcement used to suppress protected speech have likewise recognized the irreparable nature of the resulting injuries.  In *American Association of University Professors v. Rubio*, the court emphasized that chilled academic and political expression, combined with the threat of detention and removal, inflicts ongoing constitutional and liberty harms that cannot be undone after the fact and therefore require prospective injunctive relief.  780 F. Supp. 3d 350, 385-86 (D. Mass. 2025).  That conclusion accords with decisions in this circuit holding that the deprivation of liberty inherent in civil immigration detention constitutes irreparable harm. *Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020) (describing civil

18

immigration detention as a "significant deprivation of liberty that requires due process protection" (quoting *Jones v. United States*, 463 U.S. 354, 361 (1983))).

Mr. Ahmed also faces distinct and irreparable reputational harm.  His work depends on credibility, public trust, and the confidence of institutional partners, journalists, and civil-society organizations.  Government action that targets him for protected speech—or associates him with threats to public safety or national security—inflicts a stigma that undermines his professional standing and institutional relationships.  Courts have recognized that such government-imposed reputational injury, particularly where it affects career prospects and chills speech, constitutes irreparable harm not compensable by damages.  *See Khalil v. Trump*, 786 F. Supp. 3d 871, 876 (D.N.J. 2025); *see also Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) ("Irreparable harm means injury for which a monetary award cannot be adequate compensation" (internal quotation marks omitted)).  The government's actions permanently damage Mr. Ahmed's credibility, and no later relief can repair that harm.

Moreover, the federal government has taken the position in other litigation that where it invokes the Foreign Policy Ground as a basis for deportation, a noncitizen is not permitted to seek review of his custody determination before an immigration judge.  *See* O*pp'n to Mot. for Release under* Lucas v. Haaden *and* Mapp v. Reno, *Khalil v. Trump*, No. 25 Civ. 1963 (D.N.J. Mar. 23, 2025), ECF 99, n.5. It stands to reason that the government would adopt the same position in Mr. Ahmed's case if he were detained, all but barring him from a meaningful ability to administratively seek release, and making the relief sought herein all the more critical.

Where, as here, detention and removal threaten to chill protected speech and cannot be undone after the fact, irreparable harm is not merely speculative—it is inevitable absent immediate injunctive relief.

19

## III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

"Under the last injunction factor, [courts] must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Yang v. Kosinski*, 960 F.3d 119, 135-36 (2d Cir. 2020). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009). These two factors weigh overwhelmingly in favor of enjoining Defendants from unlawfully detaining Mr. Ahmed or transferring him outside of this District before he can be heard on his constitutional and APA claims.

First and foremost, there is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. (internal quotation marks omitted); *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020) ("[T]here is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority."); *New York v. D.H.S.*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020). Defendants acted unlawfully in purporting to unilaterally alter Mr. Ahmed's immigration status, bar him from entry to the United States, and subject him to removal proceedings. *See supra* at 10-17. Mr. Ahmed's likelihood of success "is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12; *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019).

20

Moreover, the public interest is "best served by ensuring the constitutional rights of persons within the United States are upheld." *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) (quoting *Sajous v. Decker*, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2013)).  In fact, the Second Circuit has explicitly stated that "securing First Amendment rights is in the public interest," where a plaintiff sought a preliminary injunction to halt enforcement of a law that the plaintiff argued infringed on its speech rights.  *N.Y. Progress*, 733 F.3d at 488.

The only "public" interest Defendants can cite to support the purported revocation of Mr. Ahmed's green card is to stop supposed "censorship crackdowns by foreign states … targeting American speakers and American companies."  Ex. B.  Defendants' action here is the height of hypocrisy, claiming to take on supposed "censorship" by barring and/or removing individuals because of their speech.  Mr. Ahmed has spent his time in the United States shining a light on the growing antisemitism and hate speech permeating social media platforms.  To the extent there could be a public interest in the government removing individuals over their speech, *but see* U.S. CONST. amend. I, that interest cannot extend to defending antisemitic speech in the face of speech calling out antisemitism.

The equities also clearly favor Mr. Ahmed and warrant a temporary restraining order. Whereas public reporting reflects that Defendants have been considering taking this action against Mr. Ahmed for no fewer than *six weeks*, *see* Exs. D & E, they did not announce their decision until December 23rd, just hours before Christmas Eve and two days before the Christmas holiday, which Mr. Ahmed had hoped to spend with his wife and child.  In contrast, Mr. Ahmed is diligently submitting this request to the Court on Christmas Eve, the day after Defendants announced their action against him, to defend his rights and ensure he can receive an opportunity to be heard.

21

## CONCLUSION

For the reasons provided herein, the Court should grant Plaintiff's motion for a temporary restraining order.[11]

Dated: December 24, 2025  
       New York, New York

Respectfully submitted,

*/s/ Roberta A. Kaplan*  
Roberta A. Kaplan  
D. Brandon Trice  
Maximilian T. Crema  
Michael P. Quinn  
Avita Anand  
KAPLAN MARTIN LLP  
1133 Avenue of the Americas | Suite 1500  
New York, NY 10036  
Tel.: (212) 316-9500  
rkaplan@kaplanmartin.com  
btrice@kaplanmartin.com  
mcrema@kaplanmartin.com  
mquinn@kaplanmartin.com  
aanand@kaplanmartin.com

*/s/ Christopher J. Clark*  
Christopher J. Clark  
Andrew J. Rodgers  
CLARK SMITH VILLAZOR LLP  
666 Third Avenue, 21st Floor  
New York, NY 10019  
Tel: (212) 377-0850  
clark@csvllp.com  
andrew.rodgers@csvllp.com

---

[11] As reflected in the Proposed Order filed herewith, Mr. Ahmed also requests that the Court require Defendants to provide sufficient advance notice to the Court and counsel, should they seek to detain Mr. Ahmed on any other asserted basis pending the Court's decision on a preliminary injunction, to enable Mr. Ahmed an opportunity to be heard regarding whether any such asserted basis for detention constitutes a pretext for First Amendment retaliation or raises other, related constitutional problems.

/s/ Norman Eisen
Norman Eisen**
Stephen Jonas**
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

** *pro hac vice* pending


/s/ Jesse M. Bless
Jesse M. Bless*
MA Bar # 660713
Bless Litigation LLC
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

*Motion to appear Pro Hac Vice forthcoming*


*Attorneys for Plaintiff Imran Ahmed*

24

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1, I hereby certify that, according to the word count provided by Microsoft Word, the total number of words in this brief is 7,128, which complies with the word count limit of 8,750 words permitted by Local Civil Rule 7.1(c).

Dated:  December 24, 2025

/s/ Roberta A. Kaplan
Roberta A. Kaplan